1  Christopher S. Morris, Esq., SBN 163188
   cmorris@morrislawfirmapc.com
2  Danielle R. Pena, Esq., SBN 286002
   dpena@morrislawfirmapc.com
3  MORRIS LAW FIRM, APC
   501 West Broadway, Suite 1480
4  San Diego, CA 92101
   Telephone: (619) 826-8060
5  Facsimile: (619) 826-8065

6  Attorneys for Tanya Suarez

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| TANYA SUAREZ, Individually, <br><br> Plaintiff, <br><br> v. <br><br> COUNTY OF SAN DIEGO, REGISTERED NURSE SHANNON KEENE, Individually, AND DOES 1-10, inclusive, <br><br> Defendants. | Case No. **'20CV0456 BEN BGS** <br><br> **COMPLAINT FOR:** <br><br> **1. 14th AMENDMENT – OBJECTIVE INDIFFERENCE** <br><br> **2. 14th AMENDMENT – INADEQUATE SUICIDE PREVENTION / SELF-HARM POLICY AND TRAINING** <br><br> **3. NEGLIGENCE** <br><br> **4. INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS** |

COMPLAINT           CASE NO.

## I.

## STATEMENT OF FACTS

1. Plaintiff, Tanya Suarez (herein "Tanya"), is an inspiring young woman. She genuinely cares about other people. She cares about the environment. So much so that she planned to dedicate her entire life to helping both.



2. Tanya was born and raised in San Diego. She lived with her parents, twin sister, and younger siblings in National City.

3. In early 2019, Tanya studied at San Diego State University. She was seven credits shy of graduating with a bachelor's degree in psychology. Tanya had no criminal record to speak of.

4. Just before the chain of events at issue, Tanya started associating with a new group of people. Shortly thereafter, she began lightly experimenting with methamphetamines. That experiment went terribly wrong.

5. On May 6, 2019, Tanya used methamphetamines with her new group of friends. Not being an experienced methamphetamine user, Tanya began experiencing psychotic delusions. Tanya was acting bizarrely in the parking lot of a gas station and caught the attention of San Diego Police Officers. Tanya was arrested for being under the influence of a controlled substance. Upon her arrest, Tanya was screaming and wailing on the floor. During the struggle, Tanya asked the officers to shoot her. It was evident to the arresting officers that Tanya was experiencing delusions. Ultimately, Tanya was transported to Las Colinas Jail.

///
///
///
///

6. Upon intake, Tanya was honest and informed the intake nurse that she had used meth that night and that she had a 5150 hospitalization the year prior. Tanya also admitted to the nurse that at the same time of her 5150 hospitalization she had thoughts of committing suicide. During her intake interview, Tanya was acting bizarrely and responding to internal stimuli.

7. While being fingerprinted, Tanya again experienced psychotic delusions. She believed she was going to be tortured by the correctional deputies. At the same time, Tanya overheard another woman screaming about her eyes.

8. In a deranged effort to prevent the deputies from torturing her, Tanya began to claw out her right eye.

9. Defendant DOE deputies immediately intervened and tackled Tanya to the ground. Defendant DOE deputies secured Tanya to a gurney face down. Defendant DOE deputies handcuffed Tanya with her hands behind her back.

10. While lying face-down on the gurney, Defendant DOE deputies cut Tanya's acrylic nails. Because Tanya had on acrylic nails, the nails shattered in some places and became jagged on the edges. Defendant DOE deputies left Tanya's fingernails worse off than before.



11. Per jail medical records, Tanya suffered from a hematoma on her right pupil. She denied visual impairment and was able to track visually. During a moment of lucidity, Tanya told Defendant Registered Nurse Shannon Keene that she was bipolar and not currently on medication. Most importantly, Tanya informed Defendant Registered Nurse Shannon Keene that she had been using meth and was experiencing paranoid delusions.

///
///

COMPLAINT                                           CASE NO.

12. After cutting her nails, Defendant DOE deputies removed Tanya from the gurney and placed her in a safety chair. They restrained Tanya to the chair and escorted her to a safety cell. *Defendant DOE deputies removed Tanya from the safety chair – <u>removed the handcuffs</u> – and left Tanya in the cell alone and unrestrained.*

13. Predictably, seconds after being placed in the cell, using her nails – that were now jagged and sharp – Tanya, still obviously suffering from psychosis, began clawing out her right eye again.

14. The complete extraction of the right eye took approximately thirty seconds. Tanya was screaming as she removed her right eyeball. As Tanya was gouging out her right eyeball, she noticed a female guard was <u>standing outside the cell door filming Tanya with her iPhone</u>.

15. Tanya then moved on to the left eyeball.

16. It took Tanya approximately four minutes to remove her left eye. The female guard stood by and filmed the enucleation of both eyes, during which Tanya was **<u>SCREAMING</u>** and flailing around the cell.

17. It took another five to ten minutes for deputies to enter the cell. Jail staff contacted 911. Tanya was rushed to the hospital.

18. Tanya is now permanently blind and has two prosthetic eyes.

19. As a result of Defendants' callous and indifferent behavior, Tanya is now permanently blind. Before her arrest, even as a 23-year-old, Tanya was known to sleep with the lights on because she was afraid of the dark. Now, she lives in complete darkness. She can no longer do simple day-to-day tasks. She cannot drive. She cannot put on makeup. She cannot make a cup of coffee. She cannot cook. She cannot go shopping. She cannot walk around outside, at least not yet. Tanya constantly walks into things as she roams around her *own* house. She trips every time she needs to walk up or down the stairs. She spills food every time she tries to eat. She fights off the feeling of depression every week. She feels anxious

about the burden she has created for her family, who must do nearly everything for her. Most of all, she is fearful of being alone and incapable of living without support.

20. The list goes on. But, so does Tanya. Despite this horrific incident, Tanya is optimistic that her life will not end in tragedy. Tanya wants to use this experience – and her psychology degree – to help others who suffer from mental illness and drug abuse.

21. Incredibly, while this incident has changed her life forever, Tanya maintains her sense of optimism and drive. She fights off her physical limitations and depression by trying to maintain her previous goals. Tanya is currently taking classes at San Diego Center for the Blind and Blind Community Center. She intends to enroll in the Braille Institute within the year. Once she obtains the necessary skill level, Tanya will complete the seven remaining credits needed to graduate with a degree in psychology.

  

II.

**JURISDICTION AND VENUE**

22. This action arises under the Constitution and laws, including Article III, Section 1 of the United States Constitution and is brought pursuant to 42 U.S.C. section 1983. The Jurisdiction of this court is invoked pursuant to 28 U.S.C. section 1331. State law claims are alleged as well, over which Plaintiff invokes the Court's supplemental jurisdiction.

///

COMPLAINT                                              CASE NO.

23. This case is instituted in the United States District Court for the Southern District of California pursuant to 28 U.S.C. section 1391, as the judicial district in which all relevant events and omissions occurred and in which Defendants maintain offices, work, and/or reside.

24. Pursuant to the California Government Code, Plaintiff filed her claim with the County of San Diego based on the foregoing incident on July 23, 2019. The claim was rejected on September 10, 2019. Thus, the present complaint is timely, pursuant to California Government Code section 945.6.

## III.
## THE PARTIES

25. Plaintiff Tanya Suarez was a resident of San Diego County in the State of California and a citizen of the United States at all times relevant to this complaint. She was injured at Las Colinas Jail which is in the County of San Diego.

26. Defendant Registered Nurse Shannon Keene was working at Las Colinas Jail on the morning of May 6, 2019. Based on information and belief, Registered Nurse Shannon Keene lives in the County of San Diego at all times mentioned herein, and committed the culpable acts against Plaintiff in the same county.

27. Defendant County of San Diego ("county") is, and at all times mentioned herein was, a public entity authorized by law to establish certain departments responsible for enforcing the laws and protecting the welfare of San Diego County citizens. At all times mentioned herein, Defendant county was responsible for overseeing the operation, management, and supervision of the San Diego County jails such as Las Colinas, as well as its Corrections Deputies, Medical Staff, and inmates. The county is also responsible for developing, implementing, and amending jail policies, procedures, and training.

///

| | |
|---|---|
| 1 | 28. The names of the other individual Sheriff's Deputies who are |
| 2 | responsible for Plaintiffs' injuries are currently unknown to Plaintiff. As such, |
| 3 | these individuals are sued herein as DOES 1-10. |
| 4 | 29. The true names and capacities whether individual, corporate, associate |
| 5 | or otherwise, of defendants named herein as DOES 1-10 are unknown to Plaintiff, |
| 6 | who therefore sue said defendants by said fictitious names. Plaintiff will amend |
| 7 | this complaint to show said defendants true names and capacities when the same |
| 8 | have been ascertained. Plaintiff is informed and believes and thereon alleges that |
| 9 | all defendants sued herein as DOES are in some manner responsible for the acts and |
| 10 | injuries alleged herein. |
| 11 | 30. At all times mentioned herein Defendants named herein as DOES 1-10 |
| 12 | were employees and/or independent contractors of Defendant San Diego County |
| 13 | and in doing the acts hereinafter described acted within the course and scope of |
| 14 | their employment. The acts of all defendants and each of them were also done |
| 15 | under the color and pretense of the statutes, ordinances, and regulations of the |
| 16 | County of San Diego and the State of California. In committing the acts and/or |
| 17 | omissions alleged herein, all defendants acted under color of authority and/or under |
| 18 | color of law. Plaintiff sues all public employees named as Defendants in their |
| 19 | individual capacities. |

## IV.

## FIRST CAUSE OF ACTION

**42 U.S.C. Section 1983 – 14th Amendment – Objective Indifference**

**[By Tanya Suarez Against Defendant RN Keene and DOES 1-10]**

31. Plaintiff realleges and incorporates by reference all paragraphs stated above, as though fully set forth herein.

32. When Tanya initially tried to remove the right eyeball while being fingerprinted, deputies intervened by jumping on top of her and restraining her hands. (Plaintiff does not take issue with this use of force.) As this happened,

7

COMPLAINT                                             CASE NO.

Tanya was screaming and making delusional statements. She even bit a deputy that was trying to restrain her. Defendant DOE deputies put Tanya on a gurney in order to cut her nails. They then placed her in a restraint chair and took her to get medically evaluated. Tanya continued to act delusional as she was being medically evaluated.

33. However, because this incident occurred at 3:45 a.m., a psych provider was not present at the jail. Defendant Shannon Keene is a Registered Nurse and is not trained to perform psychiatric assessments. Defendant Registered Nurse Shannon Keene is (or should be) trained to initiate certain psychiatric-related protocols in the context of self-harming incidents. But, Defendant Registered Nurse Shannon Keene did not initiate the psych protocol, nor did she initiate the 5150 protocol. Defendant Registered Nurse Shannon Keene also failed to notify the PSU, which the jail's psychiatric unit. Defendant Registered Nurse Shannon Keene should have ordered that a medical provider monitor Tanya until she was able to be evaluated by a psychiatrist. Defendant Registered Nurse Shannon Keene simply set up a "medical sick call" for the next day because of the "use of force." Defendant Registered Nurse Shannon Keene did not take the necessary and obvious steps of addressing Tanya's psychiatric needs. Nor did she take any steps to address the obvious and on-going psychosis.

34. As Tanya was being medically evaluated by Defendant Registered Nurse Shannon Keene, Defendant DOE deputies made the decision to house Tanya in a safety cell. Defendant DOE deputies escorted Tanya to the safety cell. They removed her from the restraint chair, <u>removed the handcuffs</u>, and left her alone in the cell.

35. Defendants were objectively indifferent to think Tanya was not going to inflict more damage to herself once they left her in the cell <u>unrestrained</u>.

36. A reasonable deputy in their position would have appreciated the risk of harm that Tanya was presenting. At a minimum, a reasonable deputy or nurse

8

COMPLAINT                                             CASE NO.

would have kept Tanya restrained until she was evaluated by a psychiatrist. A reasonable deputy or nurse would not have left Tanya in a cell <u>unrestrained</u> without constant monitoring.

37. Notably, the county has a policy that requires each safety cell to have a video surveillance system. A deputy is tasked with observing the surveillance of inmates housed in the safety cells in order to prevent inmates from injuring themselves. Knowing that Tanya had just attempted to remove her right eye, a reasonable deputy working in the surveillance bubble would not have ignored Tanya's self-harming behavior for over five minutes.

38. Most egregiously, a reasonable deputy would not have stood by the safety cell for over five minutes – <u>recording Tanya remove her eyeballs</u> – without intervening to prevent Tanya from permanently blinding herself. This behavior was sadistic and malicious.

39. In sum, Defendants were on direct notice that Tanya was under the influence of methamphetamines and was actively experiencing paranoid-meth-induced-delusions. Defendants were also on direct notice that those delusions caused Tanya to gruesomely attempt to remove her right eyeball. Despite this notice, Defendants left Tanya in a cell <u>unrestrained</u>, with sharp and <u>jagged</u> nails, and then <u>watched (and recorded) her remove both eyeballs.</u>

40. As a result of Defendants' callous and indifferent behavior, Tanya is now permanently blind. But <u>the very last vision</u> she constantly relives in her mind is of the female guard recording this horrific scene. A guard who took joy in recording the worst moment of Tanya's life.

41. Before her arrest, even as a 23-year-old, Tanya was known to sleep with the lights on because she was afraid of the dark. Now, she lives in complete darkness. She can no longer do simple day-to-day tasks. She cannot drive. She cannot put on makeup. She cannot make a cup of coffee. She cannot cook. She cannot go shopping. She cannot walk around outside, at least not yet. Tanya

constantly walks into things as she roams around her *own* house. She trips every time she needs to walk up or down the stairs. She spills food every time she tries to eat. She fights off the feeling of depression every week. She feels anxious about the burden she has created for her family, who must do nearly everything for her. Most of all, she is fearful of being alone and incapable of living without support.

42. The list goes on. But, so does Tanya. Despite this horrific incident, Tanya is optimistic that her life will not end in tragedy. Tanya wants to use this experience – and her psychology degree – to help others who suffer from mental illness and drug abuse.

43. Due to her permanent blindness and emotional trauma, Tanya is entitled to money damages pursuant to 42 U.S.C. section 1983 to compensate her for her injuries and for the violation of her constitutional and civil rights.

44. In addition to compensatory, economic, consequential, and special damages, Plaintiff is entitled to punitive damages against each Defendant under 42 U.S.C. section 1983, in that the actions of each were done intentionally and with the intent to violate Plaintiff's right, or was done with a reckless disregard or wanton disregard for Tanya's constitutional rights.



///

///

COMPLAINT                                                             CASE NO.

## V.

## SECOND CAUSE OF ACTION

## 42 U.S.C. Section 1983 – 14th Amendment

## Inadequate Suicide Prevention / Self-Harm Policy and Training Program

## [By Tanya Suarez Against the County of San Diego]

45. Plaintiff realleges and incorporates by reference all paragraphs stated above, as though fully set forth herein.

46. Tanya's preventable blindness is one of many tragic stories. In fact, the county's suicide and self-harming rates are the highest in the state of California. According to the UT Tribune, "San Diego County's overall mortality rate over the past decade is the highest among California's six largest jail systems, according to data those departments are required to report to the state Department of Justice." The county's suicide and self-harming rate has been a hot topic recently. In 2017, the Grand Jury found the county's prevention and training program was inadequate.[1] In 2019, the Disability Rights Center published a report that found the county was failing to provide constitutionally adequate programs and training as it pertains to mental illness and preventable injuries/deaths.[2]

47. Within the last ten years the county has been hit with nearly 20 million dollars in verdicts and settlements for cases alleging preventable deaths and injuries. As of date, San Diego County is defending itself in at least a dozen other state and federal lawsuits brought by inmates and family members of those who suffered from obvious and preventable injuries or death.

48. The inadequate provisions identified by the Grand Jury include shortcomings pertaining to the intake screening, the interplay of self-harming

---

[1] Attached hereto as Exhibit 1 is a true and correct copy of the Grand Jury's findings as it pertains to suicide and self-harming injuries. Plaintiff incorporates this report by reference.

[2] Attached hereto as Exhibit 2 is a true and correct copy of the Disability Rights California report as it pertains to mental illness and suicide and self-harming injuries. Plaintiff incorporates this report by reference.

11

COMPLAINT                                              CASE NO.

conduct with mental health issues, and overall training in regards to deputies preventing known inmates from inflicting self-harm in the future. These are the same contentions Tanya alleges were the moving force in her sustaining her resulting injuries.

49. According to the UT Tribune, in a publication entitled *Rate of jail inmate deaths in San Diego County far exceeds other large California counties*,[3] dated September 20, 2019, "Despite years of controversy over departmental lapses and repeated promises of reform, deaths this year include: a young man who repeatedly threatened to commit suicide and had access to a plastic bag to suffocate himself after being found earlier in the day with a noose in his cell; a 34-year-old with a serious heart condition who was given cough syrup instead of his prescription medication when he told staff he was having trouble breathing; a young veteran who struggled with opiate and methamphetamine addiction after his hand was blown off in Afghanistan. He died with withdrawal symptoms less than an hour after being returned to his cell from the infirmary."

50. There is more.

51. The UT reported, "Ivan Ortiz managed to suffocate himself on March 18 while housed in the jail's psychiatric observation unit, its highest level of care for mentally ill inmates." … "According to his autopsy report, Ortiz tried unsuccessfully to hang himself that morning and told jail staff he 'felt like ending his life.'" That afternoon, according to surveillance video, he climbed under a sheet and put a plastic bag over his head and died. Nearly an hour passed before deputies checked on him."

52. In July 2018, Manuel Gomez Cruz, 36, choked himself to death in the jail's enhanced observation housing unit, which was created in 2015 to protect suicidal inmates.

---

[3] Attached hereto as Exhibit 3 is a true and correct copy of the publication entitled "Rate of jail inmate deaths in San Diego County far exceeds other large California counties." Plaintiff incorporates this article by reference.

COMPLAINT                                         CASE NO.

53. Though the county was on notice that it needed to address its suicide / self-harm program and training, according to the UT Tribune, "To date the Sheriff's Department has not remedied the problems," the Grand Jury's report notes. "The explanation provided to this Grand Jury was that [recommendations were] placed on hold due to the cost and a delay in renovation of Rock Mountain, which is expected to replace (South Bay Detention Facility)."

54. The injuries and deaths that predated Tanya's and led to the findings by the Grand Jury and the DRC were just as preventable and egregious as Tanya's preventable blindness.

55. One of those instances involved 27 year-old, Jose Sierra. Mr. Sierra was a mentally ill Mexican citizen who had been arrested for being under the influence of a controlled substance. According to *CityBeat*, a summary of the incident in the CLERB's June agenda stated, during a security check Deputies 1 and 2 discovered Sierra hanging from a bed-sheet in his single occupancy locked cell ... During the previous security check, Deputies 1 and 2 observed and unauthorized laundry line affixed to the top bunk in Sierra's cell, and failed to take corrective action per Sheriff's Polices & Procedures. Deputies 1 and 2 failed to remove the unauthorized laundry line or confront Sierra to direct its removal, actions which may have prevented Sierra from carrying out the suicide at that time. (Attached hereto as Exhibit 4.)

56. Another instance involved a mentally ill inmate, Anna Wade. In this particular case, the CLERB found that the deputy violated policy and procedure by logging a security check that did not actually happen. According to *CityBeat*, a summary of the incident in the CLERB's October agenda stated, "Checks are supposed to happen hourly, but two hours passed between when Wade was last seen alive and when she was found hanging in her cell on April 28, 2013."[4]

---

[4] Attached hereto as Exhibit 5 is a true and correct copy of the publication entitled "10 More Dead Inmates." Plaintiff incorporates this article by reference.

13

COMPLAINT                                                CASE NO.

57. According to an October 2013 publication, "*10 More Dead Inmates,*" in *CityBeat*, another inmate, Robert Lubsen, displayed suicidal ideations – known and ignored by county staff – prior to committing suicide on February 7, 2013. In that case, Mr. Lubsen was arrested by San Marcos campus police for a drug related crime. While he was being detained in the campus holding cell, Mr. Lubsen attempted to commit suicide by trying to hang himself with his shoelaces. The attempt was witnessed and stopped by campus police. Mr. Lubsen was transferred the next day to VDF. During intake it was noted that Mr. Lubsen had ligature marks around his neck. In addition to the ligature mark, VDF "received a tip that Robert Lubsen was a risk to himself. Despite the prior attempted suicide and Robert Lubsen's history with substance abuse. The San Diego County Sheriffs determined the tip was not credible." (Attached hereto as Exhibit 5.)

58. Further, according to a December 2014 publication, *"San Diego County Sets a Dubious Record for Jail Deaths,"* in CityBeat, "Hector Lleras, 36, the fifth suicide of the year, twice told jail staff – first a nurse, then a deputy – that he was going to kill himself. On July 1, he was put in a safety cell and then released 24 hours later. Almost exactly 24 hours after that, he was found hanging in his Central Jail cell."[5]

59. According to that same article, in 2014, another inmate, Christopher Carroll, was a mentally ill homeless man who was placed in administrative segregation because he was unable to get along with other inmates. Mr. Carroll had scrawled a suicide note on his cell walls using his blood. Prior to hanging himself he had urinated on the floor and stuck food and feces to the ceiling of his cell. Carroll was never transferred out of his Ad-seg call.

60. Jonathan Thomas was a paranoid schizophrenic whom was transferred from Atascadero State Hospital to Central Jail. Central Jail had knowledge that Mr.

---

[5] Attached hereto as Exhibit 6 is a true and correct copy of the publication entitled "San Diego Sets a Dubious Record for Jail Deaths." Plaintiff incorporates this article by reference.

14

COMPLAINT CASE NO.

Thomas had attempted suicide multiple times at Atascadero. Central also knew Mr. Thomas had previously jumped twice from the second tier while in custody in County Jail. In 2014, upon a routine commitment hearing, despite knowing about Mr. Thomas' previous suicide attempts, mental conditions, and transfer status, Central housed Mr. Thomas on a second tier cell. Days later Mr. Thomas jumped from the second tier sustaining severe injuries.

61. In February 2014, Kristopher NeSmith hung himself in his general population cell. NeSmith displayed classic triggers of active suicidal ideations; such as, previous suicide attempts while in custody, severe mental and personality disorders, repeated family warnings of suicidal ideations, recorded admissions of a desire to kill himself, and a change in his medication prescriptions. Hours before he hung himself, a deputy saw a noose hanging from NeSmith's light fixture. Instead of taking any proactive measures, the deputy said, "NeSmith, what are you trying to do? Kill yourself? Take that thing down!" Nesmith was found dead hours later.

62. Jason Nishimoto had never had a run-in with the law. However, Jason was a known paranoid schizophrenic. Jason attempted to overdose on prescription pain pills but his brother intervened. As he had done in the past, his brother called the authorities to have them take Jason in for evaluation. Jason, and his family, informed the sheriffs Jason was trying to kill him. Instead, Jason was arrested and taken to VDF. Jason's mother spoke to a psychiatric nurse the following day and informed her Jason was schizophrenic and suicidal. The nurse said, "don't worry mom, we'll take care of him." Jason was then housed in ad-seg. After three days of seclusion, being un-medicated, and having gone unevaluated by a psychiatrist, Jason hung himself.

63. In May of 2016, Heron Moriarty admitted to Central jail staff that he was feeling suicidal. Central rejected Moriarty because it did not have an available safety cell. Moriarty was transferred to VDF for the specifically to be housed in a

15

COMPLAINT                                                    CASE NO.

safety cell. However, when Moriarty arrived he was treated and processed like a typical inmate. Over the days, Moriarty was acting manic and psychotic. A psychiatric provider recommended Moriarty be placed in a safety cell. The sergeant on duty rejected the recommendation and said, "No, it's my Friday."

64. Lastly, Pursuant to Federal Rule of Evidence 201 *Judicial Notice of Adjudicative Facts* and Rule 32.1 *Citing Judicial Dispositions*, Plaintiff requests this Court take judicial notice of a recent September 12, 2016, Order written by Judge Sammartino in *NeSmith v. County of San Diego,* in which the court found ample evidence to establish a pre-existing pattern of similar violations. In pertinent part, the Order states, Plaintiffs' Second Amended Complaint describes a number of previous suicides and events leading up to them in San Diego County jails so as to establish a pre-existing pattern that put the county on notice it's policies and training were inadequate and in need of modification.[6]

65. As detailed in the above paragraphs, the county is liable for Tanya's blindness and trauma because it was on notice via a pre-existing – and highly publicized – pattern of similar constitutional violations due to the county's inadequate suicide and self-harm prevention policies and training programs. Notwithstanding the litany of media publications, the millions paid in litigation, the Grand Jury's findings and the report from Disability Rights California, the <u>sheer number of obvious and preventable</u> injuries occurring in county jails across San Diego, alone, imputes knowledge on the county that its inadequate policies and training were the moving force behind these preventable deaths and injuries; and, therefore required modification.

///

///

///

---

[6] Attached hereto as Exhibit 7 is a true and correct copy the Court's Order. Plaintiff incorporates this article by reference.

16

COMPLAINT             CASE NO.

1    66.  As a result of the county's objective indifference, Tanya had to endure the pain and suffering of removing both of her eyeballs, she continues to endure living a life in total blindness, as well as the emotional and psychological trauma of this horrific incident and the consequences it had medically and psychologically.

67.  Because the county was on notice that its self-harming policies and training were constitutionally inadequate, yet failed to improve it, Plaintiff is entitled to money damages pursuant to 42 U.S.C. section 1983 to compensate her for her injuries and for the violation of her constitutional and civil rights.

68.  In addition to compensatory, economic, consequential, and special damages, Plaintiff is entitled to punitive damages against each Defendant under 42 U.S.C. section 1983, in that the actions of each were done intentionally and with the intent to violate Plaintiff's right, or was done with a reckless disregard or wanton disregard for Tanya's constitutional rights.

## VI.
## THIRD CAUSE OF ACTION
### Negligence
### [By Tanya Suarez Against All Defendants and DOES 1-10]

69.  Plaintiff realleges and incorporates by reference all paragraphs stated above, as though fully set forth herein.

70.  Defendants were charged with the duty to act in accordance with the laws of state and the Constitution.  Each have a particularized duty to summon adequate medical care when they are on notice that an inmate is in need of such care.  They are charged to as a reasonable deputy or nurse in the same or similar circumstances.

71.  Defendants were negligent because they were directly on notice that Tanya was under the influence and experiencing paranoid-meth-induced-psychosis. They also knew those delusions were influencing her to gouge her eyes out. Deputies jaggedly cut Tanya's nails and then left her in a cell, alone, unmonitored,

COMPLAINT                                                    CASE NO.

and <u>unrestrained.</u> They then <u>watched and recorded</u> Tanya as she continued to remove her right eyeball, then her left. No one intervened. In fact, after she fell to the floor, with blood surrounding her, it took DOES another five-ten minutes to open the cell door.

72. Defendants' conduct was done for the sole purpose of causing severe harm, distress, injury, fear, and pain, or at the very least, was done in reckless disregard of that probability.

73. As a result of these acts, Plaintiff suffered the injuries and damages described above, entitling her to damages in an amount to be proven at trial.

74. Pursuant to California Government Code Section 845.6, public employees, and the public entity itself, are liable for Tanya's injuries because Defendants knew Tanya was in need of immediate medical care yet not only denied Tanya that care, but stood by and recorded Tanya's erratic and life-altering behavior.

75. In committing the acts alleged above, the individual Defendants acted maliciously and/or were guilty of a wanton and reckless disregard for Tanya's rights and feelings and by reason thereof she is entitled to exemplary and punitive damages in an amount to be proven at trial.

VII.

FOURTH CAUSE OF ACTION

**Intentional Infliction of Emotional Distress**

**[By Tanya Suarez Against All Defendants and DOES 1-10]**

76. Plaintiff realleges and incorporates by reference all paragraphs stated above, as though fully set forth herein.

/ / /

/ / /

/ / /

/ / /

COMPLAINT                                                                 CASE NO.

77. Defendants were charged with the duty to act in accordance with the laws of state and the Constitution. Each have a particularized duty to summon adequate medical care when they are on notice that an inmate is in need of such care. They are charged to as a reasonable deputy or nurse in the same or similar circumstances.

78. Defendants were negligent because they were directly on notice that Tanya was under the influence and experiencing paranoid-meth-induced-psychosis. They also knew those delusions were influencing her to gouge her eyes out. Deputies jaggedly cut Tanya's nails and then left her in a cell, alone, unmonitored, and <u>unrestrained.</u> They then sadistically <u>watched and recorded</u> Tanya as she continued to remove her right eyeball, then her left. No one intervened. In fact, after she fell to the floor, with blood surrounding her, it took DOES another five-ten minutes to open the cell door.

79. Watching and recording Tanya remove both eyeballs – instead of intervening – is outrageous, and done with the certain purpose of causing permanent blindness and trauma; or at the very least, was done in reckless disregard of that probability.

80. As a result of these acts, Plaintiff suffered the injuries and damages described above, entitling her to damages in an amount to be proven at trial.

81. Pursuant to California Government Code Section 845.6, public employees, and the public entity itself, are liable for Tanya's injuries because Defendants knew Tanya was in need of immediate medical care yet not only denied Tanya that care, but <u>sadistically stood by and recorded Tanya's erratic and life-altering behavior</u>.

82. In committing the acts alleged above, the individual Defendants acted maliciously and/or were guilty of a wanton and reckless disregard for Tanya's rights and feelings and by reason thereof she is entitled to exemplary and punitive damages in an amount to be proven at trial.

COMPLAINT                                             CASE NO.

# VIII.
# PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for judgement against Defendants, for each and every cause of action, as follows:

1. For compensatory, general, and special damages against each defendant, jointly and severally, in an amount according to proof;

2. For punitive and exemplary damages against each individually named defendant in their individual capacity in an amount appropriate to punish defendants and deter others from engaging in similar misconduct;

3. For costs and reasonable attorney's fees pursuant to 42 U.S.C. section 1988 and as otherwise authorized by statute or law;

4. For any further relief that the Court may deem appropriate.

# IX.
# DEMAND FOR JURY TRIAL

Demand is hereby made by for a jury trial.

Respectfully submitted,

**MORRIS LAW FIRM, APC**

Dated: March 10, 2020   by:   *s/ Danielle R. Pena*
Danielle R. Pena, Esq.
dpena@morrislawfirmapc.com
Christopher S. Morris
cmorris@morrislawfirmapc.com
Attorneys for Plaintiff

COMPLAINT                                          CASE NO.