1  Danielle R. Pena, Esq., SBN 286002
   dpena@PHGLawGroup.com
2  PHG Law Group
   501 West Broadway, Suite 1480
3  San Diego, CA 92101
   Telephone:  (619) 826-8060
4  Facsimile:   (619) 826-8065

5  Attorneys for Tanya Suarez

6

7

8                 UNITED STATES DISTRICT COURT

9              SOUTHERN DISTRICT OF CALIFORNIA

10

11  TANYA SUAREZ, Individually,          | Case No. 20-cv-00456-WQH-DEB
12                        Plaintiff,     | **REVISED MOTION FOR LEAVE**
13         v.                            | **TO FILE THIRD AMENDED**
                                         | **COMPLAINT**
14  COUNTY OF SAN DIEGO,
    REGISTERED NURSE SHANNON            | Date:        August 15, 2022
15  KEENE, Individually, AND DOES 1-    | Judge:       Hon. William Q. Hayes
    10, inclusive,
16                        Defendants.    | **NO ORAL ARGUMENT**
17                                       | **UNLESS REQUESTED BY THE**
                                         | **COURT**
18

19

20

21

22

23

24

25

26

27

28

                                  1

# TABLE OF CONTENTS

I. INTRODUCTION ................................................................... 5

II. TIMELINE RELATING TO PRODUCTION OF THE IA REPORT ................. 6

III. FACTS REVEALED BY THE IA REPORT ...................................... 7

IV. STANDARD OF LAW ......................................................... 11

V. GOOD CAUSE EXISTS TO MODIFY THE SCHEDULING ORDER FOR THE PURPOSE OF AMENDING THE COMPLAINT ......................................... 11

   A.   Plaintiff was Diligent in Discovery and Diligent in Filing the Instant Motion 12

   i.   The "Good Cause" Three-Part Test Weighs in Plaintiff's   Favor ............ 14

VI. JUSTICE REQUIRES LEAVE BE GRANTED BECAUSE ALL *FOMAN* FACTORS WEIGH IN PLAINTIFF'S FAVOR ...................................... 14

   A.   Prior Amendments ...................................................... 15

   B.   Undue Delay .............................................................. 15

   C.   Bad Faith .................................................................. 15

   D.   Futility of the Amendment ............................................. 15

VII. THERE IS NO PREJUDICE TO THE OPPOSING PARTY ..................... 16

VII. CONCLUSION ................................................................. 17

MOTION FOR LEAVE TO AMEND          CASE NO. 20-CV-00456-WQH-DEB

1

<b>TABLE OF AUTHORITIES</b>

2

**CASES**

3  Amcast Indus. Corp. v. Detrex Corp.

4    132 F.R.D. 213 (N.D. Ind. 1990) ...................................................... 12

5  *Beeck v. Aquaslide 'N' Dive Corp*.

6    562 F.2d 537 (9th Cir. 1977) ........................................................... 16

7  *Bonin v. Calderon*

8    59 F.3d 815 (1995) ......................................................................... 15

9  Forstmann v. Culp

10    114 F.R.D. 83 (M.D.N.C. 1987) ..................................................... 12

11  *Fru-Con Constr. Corp. v. Sacramento Mun. Util. Dist*.

12    2006 U.S. Dist. LEXIS 94421 (E.D. Cal. Dec. 15, 2006) ................ 11

13  *Harrison Beverage Co. v. Dribeck Importers, Inc*.

14    133 F.R.D. 463 (D.N.J. 1990) ........................................................ 12

15  *Hood v. Hartford Life and Acc. In*s. Co.

16    567 F. Supp. 2d 1221 (E.D. Cal. 2008) ........................................... 11

17  *Jackson v. Laureate, Inc*.

18    186 F.R.D. 605 (E.D. Cal. 1999) .................................................... 13

19  *Johnson v. Mammoth Recreations, Inc*.

20    975 F.2d 604 (9th Cir. 1992) ........................................................... 11

21  *Macias v. City of Clovis*

22    2016 U.S. Dist. LEXIS 38964, *7 ................................................... 11

23  *Morongo Band of Mission Indians v. Rose*

24    893 F.2d 1074 (9th Cir. 1990) ........................................................ 16

25  *Townsend v. University of Alaska*

26    543 F.3d 478 (9th Cir. 2008) ......................................................... 15

27  **RULES**

28  Federal Rule of Civil Procedure 16 ......................................2, 10, 11, 12

3

Federal Rule of Civil Procedure, Rule 12(b)(6) ..................................................... 15

Federal Rule of Civil Procedure, Rule 15 ............................................................. 10

Federal Rule of Civil Procedure, Rule 16 ...................................................... 10, 13

Federal Rules of Civil Procedure, Rule 15(a) ..................................... 10, 11, 16, 17

MOTION FOR LEAVE TO AMEND          CASE NO. 20-CV-00456-WQH-DEB

# I.

## __INTRODUCTION__

Plaintiff Tanya Suarez (herein "Ms. Suarez" or "Plaintiff"), requests leave from this Court to add a Section 1983 claim and update various state law claims against existing defendant Watch Commander Charlise Wilson based on new evidence produced by Defendants.  The new evidence is an IA report that was recently produced on May 23, 2022.  During meet and confer efforts regarding the instant motion to amend, Defendants stipulated to adding Sergeant Terry Jackson as an individual defendant.  (Exhibit 1.)

However, County Counsel refused to stipulate to adding a Section 1983 claim, and updating existing state law claims, against Watch Commander Wilson. Defendants contend Plaintiff was on notice—prior to production of the IA report— that Watch Commander Wilson was the supervisor in charge.  Plaintiff agrees, which is why Watch Commander Wilson was named in the Second Amended Complaint ("SAC") as a supervisory defendant.  (SAC [Dkt. 37], ¶ 68.)  However, Plaintiff contends the IA report revealed new facts that support additional allegations against Watch Commander Wilson.

Accordingly, the question before this Court is whether Plaintiff can show good cause to add a Section 1983 claim against existing Defendant Watch Commander Wilson.  (See, Exhibits 2 and 3, Proposed Amendment, Fifth Cause of Action, ¶¶ 151-165.)  As detailed below, good cause exists to permit Plaintiff's proposed amendment because Plaintiff was ignorant of facts supporting the proposed amendment until the County produced the IA report on May 23, 2022. Following production of the IA report, Plaintiff immediately reached out to County Counsel for a stipulation to amend the complaint.  Once a partial stipulation was obtained from Defendants, Plaintiff timely filed the instant motion.  As such, Plaintiff has been diligent and therefore respectfully requests this Court grant Plaintiff's instant motion.

5

## II.

## <u>TIMELINE RELATING TO PRODUCTION OF THE IA REPORT</u>

The facts relevant to the proposed amendment concerning Watch Commander Wilson were not exposed until the deposition of Defendant Deputy Castner, which occurred on March 7, 2022.  During the deposition, Deputy Castner testified that an IA investigation occurred relating to dishonesty of a deputy.  When pressed further, Deputy Castner did not know any details other than an IA investigation occurred because someone removed content from the incident report relating to Deputy Crist's suggestion that Ms. Suarez be retrained in the prostraint chair prior to her safety cell placement.  Notably, had that occurred, Ms. Suarez would not have had any means to gouge out her eyes while being detained in the safety cell.

Two weeks after Deputy Castner's deposition, on March 22, 2022, Plaintiff served discovery on the county relating to the IA investigation referenced by Deputy Castner.  Documents relating to the IA investigation were produced on May 23, 2022.  Included in the production was over a dozen witness interviews regarding Ms. Suarez's incident which provided more detail than the incident reports that were produced early on in litigation. [1]  *The IA investigation revealed for the first time what supervisors __rejected__ Deputy Crist's suggestion to use prostraint chair: Watch Commander Wilson and Sergeant Jackson.*  Furthermore, the IA investigation sustained charges against Sergeant Jackson for dishonest conduct because he admitted to removing content from Deputy Crist's reporting which detailed her suggestion to use the prostraint chair and the supervisors' rejection. *Sergeant Jackson stated he removed the content at the direct order of <u>Watch Commander Wilson</u>.*

/ / /

---

[1] It is the deputies' incident reports that document the details regarding a particular incident that occurred in jail.  In this matter, the facts supporting the SAC were completely derived from the deputies' incident reports and the surveillance footage.

6

Two days after receiving and reviewing the IA investigation, Plaintiff's counsel conferred with County Counsel regarding a stipulation to add Sergeant Jackson as an individual defendant based on the newly discovered IA report.  On June 2, 2022, County Counsel advised that it may be agreeable to a stipulation; however, County Counsel wanted to see the proposed amended complaint.  On June 14, 2022, Plaintiff's counsel provided the proposed amended complaint to County Counsel.  Two weeks later, on June 23, 2022, County Counsel agreed to a stipulation as to Sergeant Jackson, but could not stipulate to adding a claim against Watch Commander Wilson.  The instant motion followed within 10 business days.[2]

### III.

### FACTS REVEALED BY THE IA REPORT

The IA report revealed that immediately following Ms. Suarez's transport to the hospital, involved deputies were required to write incident reports prior to ending their shift.  Deputy Crist was tasked with drafting the incident report relating to Ms. Suarez's first attempt to gouge out her eyes and the follow-on safety cell placement. In drafting the incident report, Deputy Crist wrote:

> As I was standing by the medical evaluation, I briefed *the supervisors* on scene of the incident. I explained Suarez had just finished her fingerprints when she attempted to gouge her eyes out using her fingernails. I explained Suarez bit Deputy Chavez while we were trying to restrain her. I suggested *to supervisors on scene* the option of utilizing the Prostraint chair to prevent Suarez from further harming herself or possibly having to use force to stop her in the future. It was explained to me that due to Suarez being calm and not actively trying to harm herself that the Prostraint chair would not be utilized at that time.

As is customary, Deputy Crist submitted her report to Sergeant Jackson. Sergeant Jackson reviewed the report for grammatical errors and approved the report.  Sergeant Jackson then uploaded the report to NetRMS, the report database.

---

[2] Plaintiff contends the efforts described above establish Plaintiff's diligence in discovery as well as diligence in filing the instant motion.  However, ideally this motion would have been filed soon after June 23, 2022, but Plaintiff's counsel was ill the last week of June 2022.

MOTION FOR LEAVE TO AMEND          CASE NO. 20-CV-00456-WQH-DEB

Sometime later that night, Defendant Watch Commander Wilson held a meeting with Sergeant Jackson wherein Defendant Watch Commander Wilson directly ordered Sergeant Jackson to remove the ==highlighted== content from Deputy Crist's incident report.  During the IA investigation, Sergeant Jackson stated Watch Commander Wilson gave him a "direct order" to remove the prostraint comment from Deputy Crist's report.

Two days after the incident, the involved deputies and supervisors gathered for a debriefing by Captain Marsden relating to Ms. Suarez.  During the Captain's debriefing, Deputy Crist stood up and told the group that she had just reviewed her incident report and noticed the report had been substantively altered.  An internal investigation followed—actually, two investigations occurred.  A CRIB investigation regarding Ms. Suarez's foreseeable self-harm and the failure to prevent it.  And, an IA investigation ensued regarding the misconduct by Sergeant Jackson and Watch Commander Wilson.

The CRIB investigation into the incident itself happened first.  Detective Blanco was the investigator assigned to the matter.  On the night of the incident, Detective Blanco responded to the hospital for a full debriefing.  She then spent the next two days reviewing every related incident report and all related surveillance footage.  On May 9, 2019, Detective Blanco interviewed Defendant Watch Commander Wilson and asked her why she directed Sergeant Jackson to remove the content.  Defendant Watch Commander Wilson admitted that she directed Sergeant Jackson to remove reference to the prostraint chair because she was **"fearful of getting into trouble because she was on probation and her entire team was talking poorly about her decision [not to place Ms. Suarez in the prostraint chair."**

However, when Defendant Watch Commander Wilson, who was the most senior official involved in the incident, was tasked with giving a presentation to the CRIB board members, Defendant Watch Commander Wilson changed her story

MOTION FOR LEAVE TO AMEND          CASE NO. 20-CV-00456-WQH-DEB

1    entirely.  Shockingly, Defendant Watch Commander Wilson said she directed

2    Sergeant Jackson to remove the content because it was not relevant to the incident.

3    Even more shockingly, Defendant Watch Commander Wilson boldly claimed that

4    she had no idea Ms. Suarez tried to gouge out her eyes and thought she responded

5    to a use of force incident regarding the bite to Deputy Chavez.  Accordingly,

6    Defendant Watch Commander Wilson stated because the incident report was

7    "assumed" to be about the bite to Deputy Chavez, she had Sergeant Jackson remove

8    reference to the prostraint chair because it was not relevant to the bite.[3]

9         This is a boldface lie.  As Detective Blanco pointed out to the IA

10   investigator, Defendant Watch Commander Wilson knew Ms. Suarez tried to gouge

11   out her eyes when she rejected use of the prostraint chair because surveillance

12   footage shows that Wilson responded to the original scene seconds after Ms. Suarez

13   tried to remove her eyes.  Defendant Watch Commander Wilson can be seen in the

14   surveillance footage standing by for approximately ten minutes while Ms. Suarez

15   was restrained to the gurney, evaluated by the suicide gatekeeper, and by the

16   medical nurse for potential damage done to Ms. Suarez's eyeball.  Moreover,

17   according to Deputy Crist's report, and the surveillance footage, Deputy Crist

18   advised "the supervisors on scene"—aka Watch Commander Wilson—that Ms.

19   Suarez tried to "remove her eyes," hence why she then suggested use of the

20   prostraint chair.

21   / / /

22   / / /

23   / / /

24   / / /

25   _____

26   [3] In this version of events, Watch Commander Wilson is still deliberately indifferent
     because she claims she learned Ms. Suarez tried to gouge out her eyes when the
     deputies were in the process of removing Ms. Suarez from the gurney, prior to

27   being placed in the safety cell.  Even under these facts, Watch Commander Wilson
     knew, prior to placing Ms. Suarez unrestrained in the safety cell, Ms. Suarez posed

28   a specific risk of gouging out her eyes in the safety cell if not restrained.

9

1    Ultimately, charges were sustained against Sergeant Jackson but **not** against

2    Watch Commander Wilson due to her inconsistent statements and change in story.

3    Unfortunately, there was no additional investigation into Watch Commander

4    Wilson's lies and inconsistencies.  To state it bluntly, Watch Commander Wilson

5    got away with it and threw Sergeant Jackson under the bus.

6    Based on the facts revealed by the IA report, it is clear for the first time in

7    this case, that the "supervisors on scene" Deputy Crist referenced in her incident

8    report as the ones she advised about Ms. Suarez's self-harming behavior and the

9    suggestion to restrain her in the prostraint chair **was Sergeant Jackson and Watch**

10   **Commander Wilson.**  Prior to the IA report, Plaintiff was unaware of what

11   "supervisors" rejected use of the prostraint chair.  See Exhibit 4, Crist's Incident

12   Report, which does not identify by name the supervisor(s) that rejected use of the

13   Prostraint chair.

14   Accordingly, Plaintiff moves this Court to add claims against Sergeant

15   Jackson (stipulated to by Defendants) and Watch Commander Wilson for being the

16   supervisors directly involved in the incident who were notified of the specific

17   danger Ms. Suarez posed to herself and failed to take reasonable measures to

18   prevent it, despite Deputy's Crist's suggestion to use the prostraint chair.

19   Furthermore, due to their direct involvement and knowledge of Defendant

20   Deputies' misconduct in cutting Ms. Suarez's acrylic nails, removing the handcuffs,

21   failing to elevate the matter with a psychiatrist/hospital, failing to restrain Ms.

22   Suarez while in the safety cell, and failing to intervene when Deputy Castner saw

23   the first eyeball fall to the floor, Watch Commander Wilson ratified her

24   subordinates' misconduct, and/or failed to direct her subordinates to act reasonably.

25   (See Exhibits 2 and 3, proposed TAC, ¶¶ 152-160.)

26   / / /

27   / / /

28   / / /

MOTION FOR LEAVE TO AMEND          CASE NO. 20-CV-00456-WQH-DEB

# IV.

## <u>STANDARD OF LAW</u>

When a party seeks to amend a pleading after the deadline in the applicable case management order has passed, the request implicates both Federal Rule of Civil Procedure 15 and 16.  Rule 16(b) governs the issuance and modification of pretrial scheduling orders while Rule 15(a) governs amendment of pleadings.  Fed. R. Civ. P. 16(b) and 15(a).  The Federal Rules of Civil Procedure, Rule 16(b)'s good-cause standard should be applied first, to modify the scheduling order, then the "when justice so requires" standard of Rule 15(a) is applied.  *Johnson v. Mammoth Recreations, Inc*., 975 F.2d 604, 608-09 (9th Cir. 1992).  Good cause may be demonstrated by a change in circumstance or newly discovered facts.  See *Fru-Con Constr. Corp. v. Sacramento Mun. Util. Dist*., 2006 U.S. Dist. LEXIS 94421 (E.D. Cal. Dec. 15, 2006) (allowing amendment under Rule 16(b) when the amendment was prompted by new evidence obtained through discovery); *Macias v. City of Clovis*, 2016 U.S. Dist. LEXIS 38964, *7.

# V.

## <u>GOOD CAUSE EXISTS TO MODIFY THE SCHEDULING ORDER FOR THE PURPOSE OF AMENDING THE COMPLAINT</u>

Under Rule 16(b), "a finding of diligence is proper when the moving party obtains new evidence through the discovery process and promptly moves to amend the pleading."  See, e.g., *Fru-Con Const. Corp. v. Sacramento Mun. Util. Dist*., 2006 U.S. Dist. LEXIS 94421, at *4 (E.D. Cal. 2006) ("Allowing parties to amend [under Rule 16] based on information obtained through discovery is common and well established.")  Also See *Hood v. Hartford Life and Acc. In*s. Co., 567 F. Supp. 2d 1221, 1225-26 (E.D. Cal. 2008)(granting a motion to modify the scheduling order after a deposition revealed new information.) But "carelessness is not compatible with a finding of diligence and offers no reason for a grant of relief."  See *Johnson v. Mammoth Recreations,* 975 F.2d at 609 (9th Cir. 1992) (holding that

11

plaintiff's failure timely to review evidence produced earlier in discovery did not establish good cause.)

    A.    **Plaintiff was Diligent in Discovery and Diligent in Filing the Instant Motion**

    When a party requests changes to the scheduling order, the Court's inquiry focuses on that party's diligence.  See, *Johnson v. Mammoth Recreations, Inc.*, 975 F.2d at 609.  The district court may modify the pretrial schedule "if it cannot reasonably be met despite the diligence of the party seeking the extension."  Fed. R. Civ. P. 16 advisory committee's notes (1983 amendment); *Harrison Beverage Co. v. Dribeck Importers, Inc.*, 133 F.R.D. 463, 469 (D.N.J. 1990); *Amcast Indus. Corp. v. Detrex Corp.*, 132 F.R.D. 213, 217 (N.D. Ind. 1990); Forstmann v. Culp, 114 F.R.D. 83, 85 (M.D.N.C. 1987); 6A Wright, Miller & Kane, Federal Practice and Procedure § 1522.1 at 231 (2d ed. 1990) ("good cause" means scheduling deadlines cannot be met despite party's diligence). The Ninth Circuit precedent states that, "[i]f that party was not diligent, the inquiry should end."  *Id.*  Prejudice to another party may reinforce the court's decision to deny leave to amend.  *Id*.

    Here, there can be no dispute that Plaintiff was diligent in serving discovery following the ENE and in setting the Deposition of Deputy Castner.  Notably, Deputy Castner was the first Defendant/percipient witness deposed in this matter. It was during her deposition that Plaintiff first learned there was an IA investigation related to Ms. Suarez's incident.  Plaintiff drafted follow-on discovery and served Defendants with a Request for Production on March 22, 2022.  Documents relating to the IA investigation were produced on May 23, 2022.  Two days after receipt of the IA investigation, Plaintiff's counsel conferred with County Counsel regarding a stipulation to amend the complaint based on the newly discovered IA report.

    On June 2, 2022, County Counsel advised that it may be agreeable to a stipulation; however, County Counsel wanted to see the proposed amended complaint.  On June 14, 2022, Plaintiff's counsel provided the proposed amended

complaint to County Counsel.  Two weeks later, on June 23, 2022, County Counsel agreed to a stipulation as to Jackson, but could not stipulate to adding Watch Commander Wilson to the supervisory claim.  The parties met and conferred further but were unable to come to a resolution. The instant motion followed within 10 business days.[4]

Furthermore, based on Defendants' stipulation regarding the addition of Sergeant Jackson, Plaintiff should be afforded the inference that she was diligent in discovery and in filing the instant motion.  Similarly, Defendants' stipulation as to Sergeant Jackson speaks to the lack of prejudice Defendants will face by the proposed amendment relating to Watch Commander Wilson.

Importantly, Plaintiff contends she has previously alleged a general supervisory claim against Watch Commander Wilson, via paragraph 68 in the SAC. At the time of the SAC, discovery revealed that Wilson was the supervisor in charge and was aware of, and ratified, the conduct of Defendant deputies.  (SAC, ¶ 68.)

However, at that time of filing the SAC, Plaintiff was ignorant that Wilson was the actual supervisor that **rejected** Deputy Crist's suggestion to use the prostraint chair.  The fact that Wilson was the supervisor that rejected use of the prostraint chair was not discoverable until production of the IA report.  As detailed above, within two days of production of the IA report, Plaintiff reviewed the documents and meet and conferred with County Counsel regarding a stipulation. The instant motion was filed within 10 business days after coming to a partial stipulation with Defendants.

/ / /

/ / /

---

[4] Plaintiff contends the efforts described above establish Plaintiff's diligence in discovery as well as diligence in filing the instant motion.  However, ideally this motion would have been filed soon after June 23, 2022, but Plaintiff's counsel was ill the last week of June 2022.

13

i.     **The "Good Cause" Three-Part Test Weighs in Plaintiff's Favor**

On occasion, "courts have applied a more detailed three-part test: a movant may establish good cause by showing (1) it diligently assisted with creation of the Rule 16 order, (2) circumstances beyond its control and anticipation prevented compliance with the order, and (3) after it became apparent a new schedule was needed, the party promptly sought relief." *Jackson v. Laureate, Inc.*, 186 F.R.D. 605, 608 (E.D. Cal. 1999).

In this matter, Plaintiff and Defendants worked together to diligently create the Joint Discovery Plan.  (See Dkt. 23.)  As detailed above, Plaintiff could not comply with the Court imposed deadline to amend—July 28, 2021—because the IA report was not produced until May 23, 2022.  Plaintiff timely reviewed the documents and conferred with Defendants regarding a stipulation within two days of receiving the IA report.  The instant motion was filed 10 business days after the parties came to a partial stipulation.  Accordingly, Plaintiff has established good cause to add the proposed factual allegations against Watch Commander Wilson based on new evidence.

**VI.**

**JUSTICE REQUIRES LEAVE BE GRANTED BECAUSE ALL *FOMAN* FACTORS WEIGH IN PLAINTIFF'S FAVOR**

Under the federal scheme of Rule 15, there are several factors a court may consider in deciding whether to grant leave to amend a complaint: (1) whether the plaintiff has previously amended the compliant, (2) undue delay, (3) bad faith, (4) futility of amendment, and (5) prejudice to the opposing party.  *Foman v. Davis*, 371 U.S. 178, 182, 83 S. Ct. 227, 9 L. Ed. 2d 222 (1962); *Loehr v. Ventura County Cmty. Coll. Dist.*, 743 F.2d 1310, 1319 (9th Cir. 1984).

/ / /

/ / /

14

### A.    Prior Amendments

Plaintiff has amended the complaint twice: once prior to discovery and again after receiving the incident reports and surveillance footage.  However, the information that is the basis of this motion was not available to Ms. Suarez until May 23, 2022.  As such, this factor weighs in favor of granting Plaintiff's amendment.

### B.    Undue Delay

As detailed above, Plaintiff was diligent in pursuing discovery and deposing Deputy Castner.  Plaintiff was also diligent in requesting IA related discovery and reviewing the discovery when produced on May 23, 2022.  Within two days of production, the parties began to meet and confer.  Ultimately the parties agreed to a partial stipulation on June 23, 2022.  The instant motion was filed within 10 business days.  As such, this factor too weighs in favor of granting Plaintiff's amendment.

### C.    Bad Faith

There is no evidence that Plaintiff is acting in bad faith by seeking to add factual allegations that were discovered in a recently produced IA report.  Notably, Plaintiff is not acting in bad faith.  As such, this factor weighs in favor of granting Plaintiff's amendment.

### D.    Futility of the Amendment

"Futility of amendment can, by itself, justify the denial of a motion for leave to amend." *Bonin v. Calderon,* 59 F.3d 815, 845 (1995).  To determine whether the proposed amendment is futile, the Court should evaluate whether the facts alleged would be sufficient to withstand a motion to dismiss pursuant to Rule 12(b)(6).  See *Townsend v. University of Alaska,* 543 F.3d 478, 486 n.6 (9th Cir. 2008) (noting that the "basis for futility is more accurately characterized as a failure to state a claim for relief").

/ / /

15

1    Here, the proposed amendment against Watch Commander Wilson (and

2  Sergeant Jackson) is not futile because it answers the fundamental question: Who

3  refused to place Ms. Suarez in the prostraint chair? Watch Commander Wilson's

4  refusal to restrain Ms. Suarez inside the safety cell, while knowing she had just

5  attempted to gouge out her eyes and was screaming while restrained on the gurney,

6  was unreasonable and deliberately indifferent to Ms. Suarez's medical needs.  The

7  supervisory portion of the claim, aka knowing Ms. Suarez was intent on removing

8  her eyes but failing to direct her subordinates to intervene, is also meritorious

9  because the IA investigation revealed Watch Commander Wilson was on scene

10  during the entire encounter and was witnessing her subordinates ignore Ms.

11  Suarez's obvious need to be restrained in a way that would prevent her from doing

12  more harm to her eyes.  These allegations could reasonably amount to deliberate

13  indifference.

## VII.

## <u>THERE IS NO PREJUDICE TO THE OPPOSING PARTY</u>

16    Generally, the most critical factor in determining whether to grant leave to

17  amend is prejudice to the opposing party.  *Eminence Capital, LLC v. Aspeon,* 316

18  F.3d at 1052 (2003) ("Prejudice is the touchstone of the inquiry under rule 15 (a)")

19  The burden of showing prejudice is on the party opposing an amendment to the

20  complaint.  *Beeck v. Aquaslide 'N' Dive Corp.*, 562 F.2d 537, 540 (9th Cir. 1977).

21  Prejudice must be substantial to justify denial of leave to amend.  *Morongo Band of*

22  *Mission Indians v. Rose*, 893 F.2d 1074, 1079 (9th Cir. 1990).  Under Rule 15(a),

23  there is a presumption in favor of granting leave to amend where prejudice is not

24  shown.  *Eminence Capital, LLC v. Aspeon,* 316 F.3d at 1052 (2003).

25    First and foremost, the County will not be prejudiced by Plaintiff's proposed

26  amendment because Watch Commander Wilson is an existing Defendant and

27  because the County knew that an IA investigation revealed new facts relating to

28  Wilson's conduct.  As such the County is not caught off guard by the proposed

MOTION FOR LEAVE TO AMEND     CASE NO. 20-CV-00456-WQH-DEB

amendment.  Furthermore, because this Court recently granted the parties request to continue discovery-related deadlines, Defendants will not suffer any undue hardship.  Furthermore, discovery is ongoing, and experts have yet to be named. Watch Commander Wilson has not yet been deposed, so inclusion of additional allegations will not prejudice any party.

**VII.**

**<u>CONCLUSION</u>**

For the reasons detailed above, Plaintiff was diligent in their discovery of the IA report and in filing the instant motion.  The county will not be prejudiced by granting the proposed amendment because experts have not been designated and because the deposition of Watch Commander Wilson has yet to occur.  Given the liberal standard set forth in Rule 15 (a), coupled with Plaintiff's diligence in seeking discovery and timely filing this motion, Plaintiff's motion should be granted.

Respectfully submitted,

**PHG Law Group**

Dated:  August 4, 2022                by: ___*s/ Danielle R. Pena*___
                                                                Danielle R. Pena, Esq.
                                                                dpena@phglawgroup.com
                                                                Attorneys for Plaintiff Tanya Suarez

17

# EXHIBIT 1

**Leanna Pierce**

**Subject:**            FW: Suarez

**From:** Ortiz, Robert <Robert.Ortiz@sdcounty.ca.gov>
**Sent:** Saturday, July 2, 2022 2:33 PM
**To:** Danielle Pena <dpena@morrislawfirmapc.com>
**Subject:** RE: Suarez

Hi Danielle,

I was out of town yesterday.  We will not object to the supervisory claim against Jackson.

**From:** Danielle Pena <dpena@morrislawfirmapc.com>
**Sent:** Friday, July 01, 2022 11:38 AM
**To:** Ortiz, Robert <Robert.Ortiz@sdcounty.ca.gov>
**Cc:** Guerra, Nora H <Nora.Guerra@sdcounty.ca.gov>; Leanna Pierce <lpierce@morrislawfirmapc.com>
**Subject:** [External] Suarez

Hi Robert,

I'm working on the motion to amend in Suarez. I know you can't agree to the supervisory claim against Wilson, but will you still stipulate as to Jackson? I need clarify the county's position in the motion. Let me know. Thanks.

Danielle R. Pena, Esq.
**MORRIS LAW FIRM, APC**
501 West Broadway, Suite 1480
San Diego, CA 92101
Tel. (619) 826-8060
Fax. (619) 826-8065
dpena@morrislawfirmapc.com
https://www.morrislawfirmapc.com

CONFIDENTIAL NOTICE: This email message, including any attachments, is for the sole use of the intended recipient(s) and may contain information protected by the attorney-client privilege, the attorney work product doctrine or other applicable privileges or confidentiality laws or regulations. If you are not an intended recipient, you may not review, use, copy, disclose or distribute this message or any of the information contained in this message to anyone. If you are not the intended recipient, please contact the sender by reply email and destroy all copies of this message and any attachments.  Unintended transmission shall not constitute waiver of the attorney-client or any other privilege.

**Leanna Pierce**

**Subject:**                      FW: Suarez - Stipulation re TAC

**From:** Ortiz, Robert <Robert.Ortiz@sdcounty.ca.gov>
**Sent:** Thursday, June 23, 2022 7:27 AM
**To:** Danielle Pena <dpena@morrislawfirmapc.com>
**Subject:** Re: Suarez - Stipulation re TAC

Danielle, I'm not going to be able to get the greenlight on Wilson. So we wont reach an agreement on that claim. I'm working on a joint motion to extend now.

**From:** Danielle Pena <dpena@morrislawfirmapc.com>
**Sent:** Wednesday, June 22, 2022 10:40 AM
**To:** Ortiz, Robert <Robert.Ortiz@sdcounty.ca.gov>
**Subject:** [External] RE: Suarez - Stipulation re TAC

Jackson is pointing the finger at Wilson in the IA report saying it was her that directly ordered removal of the prostraint reference. That is a huge deal. If you're telling me I can't add Wilson to the supervisory claim, then I will file a motion to amend and un-sanitize the allegations revealed by the IA investigation. Prior to the production of the IA report, it was not clear who Crist told about the 1st attempt and who she asked for permission to utilize to prostraint chair. The IA investigation flushed that out. I appreciate you trying to be reasonable but given the new allegations regarding Wilson and Jackson set forth in the IA report, I have to add her to the supervisory claim.

If we can't agree on the above, can we file a joint motion to continue discovery? I recall you were going to take the lead on that, right? Talk soon.

Danielle R. Pena, Esq.
**MORRIS LAW FIRM, APC**
501 West Broadway, Suite 1480
San Diego, CA 92101
Tel. (619) 826-8060
Fax. (619) 826-8065
dpena@morrislawfirmapc.com
https://www.morrislawfirmapc.com

CONFIDENTIAL NOTICE: This email message, including any attachments, is for the sole use of the intended recipient(s) and may contain information protected by the attorney-client privilege, the attorney work product doctrine or other applicable privileges or confidentiality laws or regulations. If you are not an intended recipient, you may not review, use, copy, disclose or distribute this message or any of the information contained in this message to anyone. If you are not the intended recipient, please contact the sender by reply email and destroy all copies of this message and any attachments.  Unintended transmission shall not constitute waiver of the attorney-client or any other privilege.

**From:** Ortiz, Robert [mailto:Robert.Ortiz@sdcounty.ca.gov]
**Sent:** Tuesday, June 21, 2022 3:44 PM

**To:** Danielle Pena <dpena@morrislawfirmapc.com>
**Subject:** RE: Suarez - Stipulation re TAC

Dani,

Lt. Wilson was the Watch Commander and highest ranking official involved in the decision to place Plaintiff in a safety cell. That was info we disclosed in response to interrogatories last year (SROG 1 & 14). And we only discussed adding Sgt. Jackson to the amended complaint. That would be a deal breaker on our end to add additional individuals/claims other than Sgt. Jackson.

**From:** Danielle Pena <dpena@morrislawfirmapc.com>
**Sent:** Tuesday, June 21, 2022 1:54 PM
**To:** Ortiz, Robert <Robert.Ortiz@sdcounty.ca.gov>
**Subject:** [External] RE: Suarez - Stipulation re TAC

Hey Robert,

I didn't know what I now know about Wilson when I amended the complaint last time. I need to add her to the supervisory claim given Jackson's statement that she ordered him to remove content that implicates liability against both supervisors. Also, she was the highest ranked on scene, right?

Is this a deal breaker?

Danielle R. Pena, Esq.
**MORRIS LAW FIRM, APC**
501 West Broadway, Suite 1480
San Diego, CA 92101
Tel. (619) 826-8060
Fax. (619) 826-8065
dpena@morrislawfirmapc.com
https://www.morrislawfirmapc.com
CONFIDENTIAL NOTICE: This email message, including any attachments, is for the sole use of the intended recipient(s) and may contain information protected by the attorney-client privilege, the attorney work product doctrine or other applicable privileges or confidentiality laws or regulations. If you are not an intended recipient, you may not review, use, copy, disclose or distribute this message or any of the information contained in this message to anyone. If you are not the intended recipient, please contact the sender by reply email and destroy all copies of this message and any attachments. Unintended transmission shall not constitute waiver of the attorney-client or any other privilege.

**From:** Ortiz, Robert [mailto:Robert.Ortiz@sdcounty.ca.gov]
**Sent:** Tuesday, June 21, 2022 1:49 PM
**To:** Danielle Pena <dpena@morrislawfirmapc.com>
**Cc:** Leanna Pierce <lpierce@morrislawfirmapc.com>; O'Sullivan, Matthew <Matthew.O'Sullivan@sdcounty.ca.gov>; Guerra, Nora H <Nora.Guerra@sdcounty.ca.gov>; Aceves, Sylvia <Sylvia.Aceves@sdcounty.ca.gov>
**Subject:** RE: Suarez - Stipulation re TAC

Hi Danielle,

My primary concern is the inclusion of a new claim against Lt. Wilson. We only discussed adding Sgt. Jackson and claims against the sergeant. Are you amenable to deleting the supervisory claim against Lt. Wilson?

I'm in a depo but should be out by 3:30 to discuss.

Robert

**From:** Danielle Pena <dpena@morrislawfirmapc.com>
**Sent:** Tuesday, June 21, 2022 12:21 PM
**To:** Ortiz, Robert <Robert.Ortiz@sdcounty.ca.gov>
**Cc:** Leanna Pierce <lpierce@morrislawfirmapc.com>; O'Sullivan, Matthew <Matthew.O'Sullivan@sdcounty.ca.gov>; Guerra, Nora H <Nora.Guerra@sdcounty.ca.gov>; Aceves, Sylvia <Sylvia.Aceves@sdcounty.ca.gov>
**Subject:** [External] RE: Suarez - Stipulation re TAC

Hey, I really want to file a motion to continue the discovery deadlines asap. What's your status on below?

Danielle R. Pena, Esq.
**MORRIS LAW FIRM, APC**
501 West Broadway, Suite 1480
San Diego, CA 92101
Tel. (619) 826-8060
Fax. (619) 826-8065
dpena@morrislawfirmapc.com
https://www.morrislawfirmapc.com
CONFIDENTIAL NOTICE: This email message, including any attachments, is for the sole use of the intended recipient(s) and may contain information protected by the attorney-client privilege, the attorney work product doctrine or other applicable privileges or confidentiality laws or regulations. If you are not an intended recipient, you may not review, use, copy, disclose or distribute this message or any of the information contained in this message to anyone. If you are not the intended recipient, please contact the sender by reply email and destroy all copies of this message and any attachments. Unintended transmission shall not constitute waiver of the attorney-client or any other privilege.

**From:** Ortiz, Robert [mailto:Robert.Ortiz@sdcounty.ca.gov]
**Sent:** Wednesday, June 15, 2022 4:43 PM
**To:** Danielle Pena <dpena@morrislawfirmapc.com>
**Cc:** Leanna Pierce <lpierce@morrislawfirmapc.com>; O'Sullivan, Matthew <Matthew.O'Sullivan@sdcounty.ca.gov>; Guerra, Nora H <Nora.Guerra@sdcounty.ca.gov>; Aceves, Sylvia <Sylvia.Aceves@sdcounty.ca.gov>
**Subject:** RE: Suarez - Stipulation re TAC

Dani,

I'm meeting with the team to go through the amended complaint.  We'll have a response by Monday morning.

**From:** Danielle Pena <dpena@morrislawfirmapc.com>
**Sent:** Tuesday, June 14, 2022 10:25 AM
**To:** Ortiz, Robert <Robert.Ortiz@sdcounty.ca.gov>
**Cc:** Leanna Pierce <lpierce@morrislawfirmapc.com>; O'Sullivan, Matthew <Matthew.O'Sullivan@sdcounty.ca.gov>; Guerra, Nora H <Nora.Guerra@sdcounty.ca.gov>
**Subject:** [External] Suarez - Stipulation re TAC

Robert,

Thank you for considering stipulation to the attached Third Amended Complaint. As we discussed, I only added factual allegations and a supervisory claim regarding the facts uncovered by the IA investigation with regard to Commander Wilson and Sergeant Jackson.

Let me know your thoughts. I want to get a joint motion for a continuance filed asap. Thanks.

Danielle R. Pena, Esq.
**MORRIS LAW FIRM, APC**
501 West Broadway, Suite 1480
San Diego, CA 92101
Tel. (619) 826-8060
Fax. (619) 826-8065
dpena@morrislawfirmapc.com
https://www.morrislawfirmapc.com

CONFIDENTIAL NOTICE: This email message, including any attachments, is for the sole use of the intended recipient(s) and may contain information protected by the attorney-client privilege, the attorney work product doctrine or other applicable privileges or confidentiality laws or regulations. If you are not an intended recipient, you may not review, use, copy, disclose or distribute this message or any of the information contained in this message to anyone. If you are not the intended recipient, please contact the sender by reply email and destroy all copies of this message and any attachments. Unintended transmission shall not constitute waiver of the attorney-client or any other privilege.

# EXHIBIT 2

Danielle R. Pena, Esq., SBN 286002
dpena@PHGLawGroup.com
PHG Law Group
501 West Broadway, Suite 1480
San Diego, CA 92101
Telephone:  (619) 826-8060
Facsimile:  (619) 826-8065

Attorneys for Tanya Suarez

# UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| TANYA SUAREZ, Individually,<br><br>                              Plaintiff,<br><br>      v.<br><br>COUNTY OF SAN DIEGO, REGISTERED NURSE SHANNON KEENE, Individually, AND DOES 1-10, inclusive,<br><br>                              Defendants. | Case No. 20-cv-00456-WQH-DEB<br><br>**THIRD AMENDED COMPLAINT FOR:**<br><br>**1. 14th AMENDMENT – OBJECTIVE INDIFFERENCE**<br><br>**2. 14th AMENDMENT – INADEQUATE SUICIDE PREVENTION / SELF-HARM POLICY AND TRAINING**<br><br>**3. NEGLIGENCE**<br><br>**4. INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS**<br><br>**5. 14th AMENDMENT – SUPERVISORY LIABILITY** |

THIRD AMENDED COMPLAINT                    20-CV-00456-WQH-DEB

# I.

## <u>STATEMENT OF FACTS</u>

1.      Plaintiff, Tanya Suarez (herein "Tanya"), is an inspiring young woman.  She genuinely cares about other people.  She cares about the environment.  So much so that she planned to dedicate her entire life to helping both. 

2.      Tanya was born and raised in San Diego.  She lives with her parents, twin sister, and younger siblings in National City.

3.      In early 2019, Tanya studied at San Diego State University.  She was seven credits shy of graduating with a bachelor's degree in psychology.  Tanya had no criminal record to speak of.

4.      Just before the chain of events at issue, Tanya started associating with a new group of people.  Shortly thereafter, she began lightly experimenting with methamphetamines.  That experiment went terribly wrong and now serves a lesson on how experimenting with drugs can have a life altering impact.

5.      On May 6, 2019, Tanya used methamphetamines with her new group of friends.  Not being an experienced methamphetamine user, Tanya began experiencing psychotic delusions.  Tanya was acting bizarrely in the parking lot of a gas station and caught the attention of San Diego Police Officers.

6.      Tanya was arrested for being under the influence of a controlled substance. Tanya was taken into custody for the safety of herself and others.  Upon her arrest, Tanya was screaming and wailing on the ground.  During the struggle, Tanya asked the officers to shoot her.  It was evident to the arresting officers that Tanya was experiencing delusions.  Ultimately, Tanya was transported to Las Colinas Jail.

/ / /

2

THIRD AMENDED COMPLAINT                                    20-CV-00456-WQH-BGS

7.      According to the intake records, Tanya was honest and informed the intake nurse that she had used meth that night and that she had a 5150 hospitalization the year prior. Tanya also admitted to the nurse that at the same time of her 5150 hospitalization she had thoughts of committing suicide.  During her intake interview, Tanya acted bizarrely and responded to internal stimuli.

8.      While being fingerprinted, Tanya again experienced psychotic delusions.  She believed she was going to be tortured by the correctional deputies. At the same time, Tanya overheard another woman screaming about her eyes.

9.      At 4:38 a.m., in a deranged effort to prevent the deputies from torturing her, Tanya began to claw out her right eye.

10.      Defendant Deputies Jessica Castner, Natalie Crist, Cynthia Randolph, Paola Rendon-Aguilera, and Andrea Villa (Herein "Deputy Defendants") immediately intervened and tackled Tanya to the ground.  Deputy Defendants then handcuffed Tanya and secured her in waist chains and a spit sock.

11.      Deputy Defendants placed Tanya on a gurney. Defendant Nurse Beneliza Balangcod responded to the scene. Discovery indicates Defendant Balangcod was the Gatekeeper on duty; meaning, she was the medical professional responsible for evaluating Tanya's risk of self-harm and treating/housing Tanya appropriately. Defendant Balangcod was the highest ranking medical personnel on duty.

12.      Deputy Defendants informed Defendant Balangcod of Tanya's self-harming behavior.  According to the medical records, Defendant Balangcod was advised that Tanya was bipolar and not currently on medication; and, that she had been using meth and was experiencing paranoid delusions.[1]

13.      At this point, Defendant Balangcod knew that Tanya was 1) actively engaging in self-harming behavior by attempting to remove her eyeball, 2) actively

---

[1] It took approximately nine minutes for Defendant Deputies to secure Tanya to the gurney and have her evaluated by Defendant Balangcod. During the entire encounter, Defendant Wilson and Jackson were supervising the scene and were aware that Tanya had attempted to gouge out her eye.

3

THIRD AMENDED COMPLAINT                              20-CV-00456-WQH-BGS

suffering from meth-induced-psychosis, 3) actively experiencing commanding delusions, 4) actively suffering from untreated mental health conditions, and 5) was now bearing jagged acrylic nails. Lastly, having had access to Tanya's intake chart, Defendant Balangcod also knew that Tanya was recently hospitalized on a 5150 for suicidal ideations.

14.    As the gatekeeper, Defendant Balangcod was duty-bound to acknowledge Tanya's act of attempting to gouge out her eyeball as an act of self-harm. Upon such a determination, Defendant Balangcod was duty-bound to identify Tanya as a severe risk for self-harm by placing a pink wristband on Tanya's right wrist. Pursuant to policy, if an inmate is actively engaging in self-harm, the gatekeeper is to place the inmate on the ISP ("Inmate Safety Plan") program. According to Detention Policy, MSD.S.10, if an inmate is actively engaging in self-harming behavior the inmate is to be assigned to a safety cell *with restraints*. The policy requires the inmate to be scheduled for a psychiatric evaluation immediately.

15.    Per jail medical records, Defendant Balangcod failed to assume the role of gatekeeper and failed to recognize Tanya as a severe and imminent risk of self-harm. Evident by her PSA note, Defendant Balangcod failed to perform an assessment of Tanya's self-harming risks. Rather, Defendant Balangcod heard Deputy Defendant's recitation of events and based on that alone, recommended Tanya be placed in a safety cell. There is no indication that Defendant Balangcod actually evaluated Tanya or even spoke to her. Defendant Balangcod's only recommendation was to house Tanya in a safety cell. Defendant Balangcod failed to order Tanya be restrained or handcuffed while being housed in order to abate the continued risk of self-harm. Defendant Balangcod also failed to order/recommend a psychiatric evaluation, increased monitoring, and anti-psychotic medication, as required by M.S.D. 10, the county's suicide prevention policy.

///

4

16.     During Defendant Balangcod's medical evaluation, Deputy Crist briefed Defendant Supervisors Wilson and Jackson. Specifically, Deputy Crist told the Supervisors, "**I explained Suarez had just finished her fingerprints when she attempted to gouge out her eyes using her fingernails. I explained Suarez bit Deputy Chavez while we were trying to restrain her.** *I suggested to the supervisors on scene the option of utilizing the Prostraint chair to prevent Suarez further harming herself or possibly having to use force to stop her again in the future.*"[2]

17.     Defendant Watch Commander Wilson and Defendant Sergeant Jackson denied the request. Defendant Supervisors "explained to [Deputy Crist] due to Suarez being calm and not actively trying to harm herself that the Prostraint chair would not be utilized at this time."

18.     After Defendant Balangcod evaluated Tanya, she determined Tanya needed to be housed in a safety cell. Deputy Defendants Jessica Castner, Natalie Crist, Cynthia Randolph, Paola Rendon-Aguilera, Andrea Villa, and Supervisors Wilson and Jackson, escorted Tanya to the safety cell area.

19.     Prior to entering the safety cell, "due to Suarez' unpredictable behavior and being under the influence of a controlled substance," Deputy Defendants removed Tanya's clothes leaving her completely naked.

20.     As Deputy Defendants were in the process of removing Tanya's clothes, Deputy Natalie Crist turned around and asked Defendant Watch Commander Wilson and Defendant Sergeant Jackson for permission to cut Tanya's fingernails fearing she might harm herself again. Defendant Wilson and Jackson agreed.



/ / /

/ / /

---

[2] Use of the Prostraint chair requires Supervisor approval.

THIRD AMENDED COMPLAINT                    20-CV-00456-WQH-BGS

21.     With the permission from Watch Commander Wilson and Defendant Sergeant Jackson, Defendant Deputy Crist cut Tanya's acrylic nails.  Because Tanya had on acrylic nails, the nails shattered in some places and became jagged on the edges.  Deputy Crist acknowledged that the nails were more jagged and dangerous than before but took no effort to file Tanya's nails or place protective gloves on her hands.

22.     Predictably, while in the safety cell, Tanya continued to act erratic and delusional. According to the video, on several occasions, Tanya can be seen making violent gestures with her fingers near her eyes indicating she could and would gouge out her eyes. Those gestures of self-harm went ignored by all Defendants.

23.     At 5:04 a.m., Defendant Deputy Rocio Espinoza, who has been advised of Tanya's self-harming attempt, approached the window of the safety cell and started recording Tanya using her personal cell phone. As Defendant Espinoza was filming Tanya—who was naked and acting erratic— she again gestured to gouge out her eyes by putting her fingers near her eyes and making taunting movements. Defendant Espinoza continued to film Tanya for over a minute. Defendant Espinoza never once directed Tanya to stop or intervened in a more substantial way such as banging on the door, handcuffing Tanya or having her evaluated by a psychiatrist. After a minute or so, Defendant Espinoza stopped recording and walked away.

/ / /
/ / /
/ / /
/ / /
/ / /
/ / /
/ / /
/ / /

6

24.    Six minutes later, at 5:10 a.m. Defendant Deputy Castner, was conducting a cell check and noticed Tanya was struggling. It took Defendant Castner only two or three seconds to determine that Tanya was again attempting to remove her eyeball. The video indicates, that Defendant Castner continued to watch for at least ten seconds without directing Tanya to stop or intervening by kicking the door or going inside.  Similarly, according to Defendant Castner's report, Deputy Castner admitted that she watched Tanya try to remove her right eyeball for at least 10 seconds. She then witnessed the right eyeball fall to the floor and <u>still failed to intervene by banging on the door or going inside the cell.</u>

25.    The surveillance video shows Defendant Watch Commander Wilson standing approximately 2 feet away from Tanya's safety cell. Defendant Castner turned to Defendant Wilson and informed her that Tanya's right eyeball just fell out. Defendant Wilson instructed <u>Defendant Castner to **"get the prostraint chair."**</u>

26.    Despite being the top official in charge, and despite knowing Tanya had just ripped out one eyeball and was going for the other one, as she could still be heard screaming and thrashing about, Defendant Wilson did nothing to help Tanya. Surveillance footage shows Deputy Wilson never so much as approached the safety cell door despite knowing Tanya was going for her second eyeball. Footage shows Defendant Wilson failed to order other deputies to intervene and failed to intervene herself. Instead, footage depicts Defendant Wilson walking to the back of the hallway as Tanya was removing her second eyeball. Notably, this is the same supervisor that denied use of the Prostraint chair prior to Tanya's safety cell placement.

27.    **During the next two minutes, Tanya managed to remove her second eyeball. Not a single deputy tried to intervene nor did any defendant even approach the safety cell door within that period.**

/ / /

/ / /

7

28.   Importantly, had Defendant Castner or Wilson intervened when she initially saw the right eyeball fall to the floor, Tanya would have been prevented from removing the left eyeball!

29.   The video indicates that the extraction of the left eyeball took over a minute.

30.   After it was determined that both eyeballs had been removed, it took another five to ten minutes for deputies to enter the cell.  Jail staff contacted 911 and Tanya was rushed to the hospital.

31.   **Importantly, the liability of Supervisor Jackson and Wilson is reflected in an IA investigation that followed Tanya's injuries. Discovery revealed that Supervisor Jackson and Wilson removed from Deputy Crist's incident report the reference to utilizing the Prostraint chair to prevent Tanya from further injuring herself prior to placement in the safety cell. Charges were sustained against Supervisor Jackson. Superior Wilson admitted to an investigator that she directed Supervisor Jackson to remove the reference to utilization of the Prostraint chair because she did not want to get in further trouble because she was on probation at the time.**

32.   As a result of Defendants' callous and indifferent behavior, Tanya is now permanently blind and has two prosthetic eyes.  Before her arrest, even as a 23-year-old, Tanya was known to sleep with the lights on because she was afraid of the dark.  Now, she lives in complete darkness.  She can no longer do simple day-to-day tasks.  She cannot drive.  She cannot put on makeup.  She cannot make a cup of coffee.  She cannot cook.  She cannot go shopping.  She cannot walk around outside, at least not yet. Tanya constantly walks into things as she roams around her *own* house.  She trips every time she needs to walk up or down the stairs.  She spills food every time she tries to eat.  She fights off the feeling of depression every week.  She feels anxious about the burden she has created for her family, who must do nearly everything for her.  Most of all, she is fearful of being alone and

8

incapable of living without support. Most recently, Tanya fears the thought of having children and never being able to see them.

33.   The list goes on. But, so does Tanya. Despite this horrific incident, Tanya is optimistic that her life will not end in tragedy. Tanya wants to use this experience – and her psychology degree – to help others who suffer from mental illness and drug abuse.

34.   Incredibly, while this incident has changed her life forever, Tanya maintains her sense of optimism and drive. She fights off her physical limitations and depression by trying to maintain her previous goals. Tanya is currently taking classes at San Diego Center for the Blind and Blind Community Center. She intends to enroll in the Braille Institute within the year. Once she obtains the necessary skill level, Tanya will complete the seven remaining credits needed to graduate with a degree in psychology.

  

## II.

## JURISDICTION AND VENUE

35.   This action arises under the Constitution and laws, including Article III, Section 1 of the United States Constitution and is brought pursuant to 42 U.S.C. section 1983. The Jurisdiction of this court is invoked pursuant to 28 U.S.C. section 1331. State law claims are alleged as well, over which Plaintiff invokes the Court's supplemental jurisdiction.

36.   This case is instituted in the United States District Court for the Southern District of California pursuant to 28 U.S.C. section 1391, as the judicial

THIRD AMENDED COMPLAINT                    20-CV-00456-WQH-BGS

district in which all relevant events and omissions occurred and in which Defendants maintain offices, work, and/or reside.

37.    Pursuant to the California Government Code, Plaintiff filed her claim with the County of San Diego based on the foregoing incident on July 23, 2019. The claim was rejected on September 10, 2019. Thus, the present complaint is timely, pursuant to California Government Code section 945.6.

## III.

## THE PARTIES

38.    Plaintiff Tanya Suarez was a resident of San Diego County in the State of California and a citizen of the United States at all times relevant to this complaint. She was injured at Las Colinas Jail which is in the County of San Diego.

39.    Defendant Deputy Jessica Castner was working at Las Colinas Jail on the morning of May 6, 2019. Based on information and belief, Deputy Castner lives in the County of San Diego at all times mentioned herein, and committed the culpable acts against Plaintiff in the same county.

40.    Defendant Deputy Natalie Crist was working at Las Colinas Jail on the morning of May 6, 2019. Based on information and belief, Deputy Crist lives in the County of San Diego at all times mentioned herein, and committed the culpable acts against Plaintiff in the same county.

41.    Defendant Deputy Cynthia Randolph was working at Las Colinas Jail on the morning of May 6, 2019. Based on information and belief, Deputy Randolph lives in the County of San Diego at all times mentioned herein, and committed the culpable acts against Plaintiff in the same county.

42.    Defendant Deputy Paola Rendon-Aguilera was working at Las Colinas Jail on the morning of May 6, 2019. Based on information and belief, Deputy Rendon-Aguilera lives in the County of San Diego at all times mentioned herein, and committed the culpable acts against Plaintiff in the same county.

10

THIRD AMENDED COMPLAINT                    20-CV-00456-WQH-BGS

1        43.    Defendant Deputy Andrea Villa was working at Las Colinas Jail on the

2   morning of May 6, 2019.  Based on information and belief, Deputy Villa lives in

3   the County of San Diego at all times mentioned herein, and committed the culpable

4   acts against Plaintiff in the same county.

5        44.    Defendant Deputy Rocio Espinoza was working at Las Colinas Jail on

6   the morning of May 6, 2019.  Based on information and belief, Deputy Espinoza

7   lives in the County of San Diego at all times mentioned herein, and committed the

8   culpable acts against Plaintiff in the same county.

9        45.    Watch Commander Wilson was working at Las Colinas Jail on the

10  morning of May 6, 2019.  Based on information and belief, WC Wilson lives in the

11  County of San Diego at all times mentioned herein, and committed the culpable

12  acts against Plaintiff in the same county.

13       46.    Sergeant Jackson was working at Las Colinas Jail on the morning of

14  May 6, 2019.  Based on information and belief, Sergeant Jackson lives in the

15  County of San Diego at all times mentioned herein, and committed the culpable

16  acts against Plaintiff in the same county.

17       47.    Defendant Registered Nurse Beneliza Balangcod was working at Las

18  Colinas Jail on the morning of May 6, 2019.  Based on information and belief,

19  Registered Nurse Balangcod lives in the County of San Diego at all times

20  mentioned herein, and committed the culpable acts against Plaintiff in the same

21  county. Discovery is pending but based on information and belief, Nurse Balangcod

22  is employed by the county.

23       48.    Defendant County of San Diego ("county") is, and at all times

24  mentioned herein was, a public entity authorized by law to establish certain

25  departments responsible for enforcing the laws and protecting the welfare of San

26  Diego County citizens.  At all times mentioned herein, Defendant county was

27  responsible for overseeing the operation, management, and supervision of the San

28  Diego County jails such as Las Colinas, as well as its Corrections Deputies,

THIRD AMENDED COMPLAINT             20-CV-00456-WQH-BGS

1   Medical Staff, and inmates.  The county is also responsible for developing,

2   implementing, and amending jail policies, procedures, and training.

3       49.    The names of the other individual Sheriff's Deputies who are

4   responsible for Plaintiffs' injuries are currently unknown to Plaintiff.  As such,

5   these individuals are sued herein as DOES 1-10, and referred to herein as "DOE

6   Deputy Defendants and Female DOE Deputy Defendant."

7       50.    The true names and capacities whether individual, corporate, associate

8   or otherwise, of defendants named herein as DOES 1-10 are unknown to Plaintiff,

9   who therefore sue said defendants by said fictitious names.  Plaintiff will amend

10  this complaint to show said defendants true names and capacities when the same

11  have been ascertained.  Plaintiff is informed and believes and thereon alleges that

12  all defendants sued herein as DOES are in some manner responsible for the acts and

13  injuries alleged herein.

14      51.    At all times mentioned herein Defendants named herein as DOES 1-10

15  were employees and/or independent contractors of Defendant San Diego County

16  and in doing the acts hereinafter described acted within the course and scope of

17  their employment.  The acts of all defendants and each of them were also done

18  under the color and pretense of the statutes, ordinances, and regulations of the

19  County of San Diego and the State of California.  In committing the acts and/or

20  omissions alleged herein, all defendants acted under color of authority and/or under

21  color of law.  Plaintiff sues all public employees named as Defendants in their

22  individual capacities.

23  / / /

24  / / /

25  / / /

26  / / /

27  / / /

28  / / /

12

THIRD AMENDED COMPLAINT          20-CV-00456-WQH-BGS

## IV.

## FIRST CAUSE OF ACTION

### 42 U.S.C. Section 1983 – 14th Amendment – Objective Indifference

### [By Tanya Suarez Against Defendants Jessica Castner, Natalie Crist, Cynthia Randolph, Paola Rendon-Aguilera, Andrea Villa, Rocio Espinoza, Watch Commander Wilson, Sergeant Terry Jackson, RN Beneliza Balangcod, and DOE Deputy Defendants 1-10]

52.   Plaintiff realleges and incorporates by reference all paragraphs stated above, as though fully set forth herein.

53.   When Tanya initially tried to remove the right eyeball while being fingerprinted, Deputy Defendants intervened by jumping on top of her and restraining her hands. (Plaintiff does not take issue with this use of force.) As this happened, Tanya was screaming and making delusional statements. She even bit a deputy that was trying to restrain her. Deputy Defendants put Tanya on a gurney in order to cut her nails. They then placed her in a restraint chair and took her to get medically evaluated.

54.   Deputy Defendants informed Defendant Balangcod of Tanya's self-harming behavior. According to the medical records, Defendant Balangcod was advised that Tanya was bipolar and not currently on medication; and that she had been using meth and was experiencing paranoid delusions. According to the medical records, Tanya continued to act delusional as she was being medically evaluated.

55.   At this point, Defendant Balangcod knew that Tanya was 1) actively engaging in self-harming behavior by attempting to remove her eyeball, 2) actively suffering from meth-induced-psychosis, 3) actively experiencing commanding delusions, 4) and was suffering from untreated mental health conditions. And, having access to Tanya's intake chart, Defendant Balangcod also knew that Tanya was recently hospitalized on a 5150 for suicidal ideations. Defendant Balangcod

13

1  also acknowledged that Tanya's acrylic nails had been cut by the deputies and were

2  sharp and jagged.

3       56.    San Diego Sheriff's Detention Policy (herein "Detention Policy") M4[3]

4  defines a "suicide" as an "incident of self-harm." Detention Policy J.5. describes

5  self-harm as "the act of deliberately causing destruction and/or damage to one's

6  body." Therefore, Tanya's attempt to remove her eyeball is considered self-

7  harming/suicidal behavior.

8       57.    Detention Policy M9 requires the "RN nurse," which was Defendant

9  Balangcod on the early morning hours of May 6, 2019, to identify and mark

10  "inmates potentially at risk for self-harm wi[th] a pink wristband reading 'ISP.'"

11       58.    According to Detention Policy MSD.S.10 ("Suicide Prevention

12  Policy"), "The Gatekeeper is a Qualified Mental Health Provider (QMHP) or an

13  assigned designee in their absence." "The assigned designee will be an assigned

14  registered nurse for that shift at each facility." Based on this policy, and discovery

15  responses, Defendant Balangcod was the Gatekeeper at Las Colinas on May 6,

16  2019.

17       59.    As the gatekeeper, Defendant Balangcod was responsible for

18  conducting a suicide risk assessment. According to MSD.S.10, when the gatekeeper

19  identifies that an inmate is actively engaging in self-harming behavior the policy

20  "requires further assessment by the gatekeeper for consideration of placement into

21  ISP (Inmate Suicide Program) housing."

22       60.    Pursuant to MSD.S.10, other relevant risk factors to consider during a

23  suicide evaluation include history of psychiatric illness, first time offender,

24  intoxication/withdrawal, severe aggressiveness, and physical signs of depression.

25  Tanya displayed each one of those risk factors.

26  / / /

27

28  [3] According to Plaintiff's research every Detention Policy relied on herein was
operative on May 6, 2019.

14

THIRD AMENDED COMPLAINT                    20-CV-00456-WQH-BGS

61.     According to MSD.S.10, "All inmates requiring an assessment and consideration for placement into ISP housing due to suicidal risk shall be evaluated by the facility gatekeeper.  If the facility gatekeeper determines the inmate requires placement into the ISP, they shall determine the appropriate ISP housing (e.g. safety cell vs. EOH).  Actively self-harming or actively assaultive inmates shall be temporarily placed in a safety cell (refer to DSB P&P J.1). The watch commander shall be notified of placements into ISP."

62.     According to MSD.S.10, the only housing options suitable for an inmate that is actively engaging self-harming behavior is a safety cell.  Moreover, based on information and belief, and based on national prevention protocols for correctional institutions, MSD.S.10 requires an inmate be restrained if they are actively engaging in self-harming behavior.  The correctional version of the suicide prevention policy, J.5, requires correctional deputies to monitor ISP inmates every fifteen minutes.

63.     Notably, Plaintiff's correctional nursing expert will opine that Tanya—suffering from excited delirium—was experiencing a medical emergency and should have been rushed to the hospital and administered anti-psychotic medication.  Plaintiff's correctional nursing expert will opine that Defendant Balangcod should have ordered that Tanya receive 1:1 observation. The nursing expert will opine that the standard of care required Defendant Balangcod to order that Tanya be restrained while she was being housed and awaiting psychiatric intervention.

64.     Here, none of that was done.  Despite knowing that Tanya was actively engaging in self-harming behavior, experiencing psychotic and commanding delusions, with untreated psychiatric disorders, it was Defendant Balangcod's responsibility to conduct a suicide risk assessment and to flag Tanya as a suicide/self-harm risk via a pink wristband.  As the gatekeeper, it was Defendant Balangcod's duty to recognize and acknowledge that Tanya's attempt to remove

15

her eyeball was a form of self-harm and that Tanya—currently experiencing commanding delusions—would continue to injure herself if unrestrained, unmonitored, and untreated. Upon recognition of Tanya's obvious intent to harm herself, it was Defendant Balangcod's responsibility to recommend ISP housing.

65.     According to MSD.S.10, as the gatekeeper, Defendant Balangcod should have known that policy required Tanya—an inmate "actively engaging in self-harm"—to be housed in a safety cell *with restraints*. Meaning, Defendant Balangcod made an intentional decision not to recommend safety housing with restraints.

66.     According to a correctional expert, Defendant Balangcod should have acknowledged that Tanya was a high risk for self-harm because she was actively engaging in self-harming behavior, was experiencing psychotic delusions, and suffering from untreated mental health disorders.  According to a correctional expert, Defendant Keene should have known that placing Tanya in an isolated cell—unrestrained—with her nails cut to be even shaper—would assuredly result in Tanya attempting to gouge out her eyes—again.  The expert stated, "staff was given no reason to think Tanya wouldn't attempt to injure herself again."  According to a correctional expert, Defendant Balangcod was obligated to intervene by way of assessment, housing, and immediate psychiatric evaluation.

67.     According to San Diego Sheriff's Department Nursing Protocol 6.32 requires the "RN," in "every circumstance" of a self-harming incident, to complete an application for a "72 hour Detention for Evaluation and Treatment," aka a 5150 hold. This was not done.

68.     Notably, the medical records do not indicate that an ISP evaluation was conducted or that a referral for an ISP evaluation was scheduled.  The medical records do not refer to Tanya's behavior as self-harming or suicidal behavior.  The medical records do not indicate a psychiatric evaluation was scheduled.

/ / /

THIRD AMENDED COMPLAINT                              20-CV-00456-WQH-BGS

69.     According to Nursing Protocol 6.32, Tanya should have also been evaluated for PSU placement via a 5150 hold.  Notably, the PSU is an inpatient psychiatric unit located inside Las Colinas.  Again, Defendant Balangcod's recognition that Tanya was engaging in self-harming behavior should have resulted in a 5150 evaluation.  PSU placement would have given Tanya the opportunity to be constantly monitored and treated by psychiatric staff. The PSU has safety cells for 5150 inmates that are actively engaging in self-harm.

70.     Based on Defendant Balangcod's medical note, she did not flag Tanya as a continued risk self-harm and did not communicate to Deputy Defendants that Tanya was in need of suicide precautions, i.e., pursuant to MSD.S.10.

71.     According to a correctional nursing expert, Defendant Balangcod should have:

     a. Ordered Tanya to be transported to an emergency room to be evaluated by a psychiatrist and administered anti-psychotic medication, such a Haldol;

     b. Called a supervisor;

     c. If she was the supervisor, acknowledged Tanya's conduct as self-harming; and

     d. Ordered Tanya to be placed in safety cell with restraints.

72.     Deputy Defendants Jessica Castner, Natalie Crist, Cynthia Randolph, Paola Rendon-Aguilera, and Andrea Villa were present when Tanya was being booked and finger-printed. Deputy Defendants knew that Tanya was acting psychotic and responding to internal stimuli.  Deputy Defendants witnessed Tanya attempt to gouge out her right eye.  Deputy Defendants tackled her and eventually placed Tanya on a gurney with her hands restrained behind her back.  Tanya continued to scream and kick while on the gurney.

/ / /

/ / /

17

THIRD AMENDED COMPLAINT                    20-CV-00456-WQH-BGS

73.    Defendant Balangcod arrived on scene and evaluated Tanya for PSA assessment.  Deputy Defendants were present when Tanya was "assessed" by Defendant Balangcod.

74.    Watch Commander Wilson and Sergeant Jackson were present during the incident.

75.    During Defendant Balangcod's medical evaluation, Deputy Crist briefed Defendant Supervisors Wilson and Jackson. Specifically, Deputy Crist told the Supervisors, "**I explained Suarez had just finished her fingerprints when she attempted to gouge out her eyes using her fingernails. I explained Suarez bit Deputy Chavez while we were trying to restrain her.** *I suggested to the supervisors on scene the option of utilizing the Prostraint chair to prevent Suarez further harming herself or possibly having to use force to stop her again in the future.*"[4]

76.    Defendant Watch Commander Wilson and Defendant Sergeant Jackson denied the request. Defendant Supervisors "explained to [Deputy Crist] due to Suarez being calm and not actively trying to harm herself that the Prostraint chair would not be utilized at this time."

77.    After Defendant Balangcod evaluated Tanya, she determined Tanya needed to be housed in a safety cell. Deputy Defendants Jessica Castner, Natalie Crist, Cynthia Randolph, Paola Rendon-Aguilera, Andrea Villa, and Supervisors Wilson and Jackson, escorted Tanya to the safety cell area.

78.    Prior to entering the safety cell, "due to Suarez' unpredictable behavior and being under the influence of a controlled substance," Deputy Defendants removed Tanya's clothes leaving her completely naked.

79.    As Deputy Defendants were in the process of removing Tanya's clothes, Deputy Natalie Crist turned around and asked Defendant Watch Commander Wilson and Defendant Sergeant Jackson for permission to cut Tanya's

---

[4] Use of the Prostraint chair requires Supervisor approval.

18

1  fingernails fearing she might harm herself again. Defendant Wilson and Jackson
2  agreed.

3       80.    Deputy Defendants then performed a medical procedure by cutting
4  Tanya's acrylic fingernails and leaving them sharper than before. Deputy
5  Defendants knew that policy required Defendant Balangcod to place Tanya on the
6  ISP plan.  However, being given no ISP guidance by Defendant Balangcod
7  regarding restraints or additional precautions, in violation of policy, Deputy
8  Defendants removed the handcuffs and removed Tanya's clothes.

9       81.    To make matters worse, Deputy Defendants placed Tanya in the safety
10  cell without restraints knowing her nails were now sharp and jagged. According to
11  a correctional expert, deputies should not perform medical procedures such as
12  cutting fingernails.  The expert also stated that Deputy Defendants had no reason to
13  think Tanya would not re-injure herself if left unrestrained.

14       82.    Immediately after, Deputy Defendants notified their supervisor, Watch
15  Commander Wilson, of all events alleged above. Specifically, Commander Wilson
16  knew Tanya had attempted to gouge out her eye. Commander Wilson also knew
17  that Tanya was being housed in the safety cell naked, unrestrained and without a
18  pending psychiatric evaluation or 5150 placement. Commander Wilson knew her
19  subordinates (Deputy Defendants) removed Tanya's handcuffs, without a medical
20  directive, and left her nails jagged and sharp. Commander Wilson knew the actions
21  taken by Deputy Defendants were an unreasonable departure from the county's own
22  policy and the nationally accepted standards set forth in Title 15. Knowing that
23  Tanya needed to be restrained given her psychotic state and active attempts to self-
24  harm, Commander Wilson disregarded the obvious consequence of his
25  subordinates' actions, and by rejecting the suggestions to use the Prostraint chair,
26  and went even further to ratify her subordinates' unconstitutional conduct by
27  permitting their actions and by failing to intervene prior to Tanya's total blindness.
28  ///

THIRD AMENDED COMPLAINT              20-CV-00456-WQH-BGS

83.     Approximately 14 minutes after Tanya was left in the cell naked and unrestrained, at 5:04 a.m., Defendant Deputy Rocio Espinoza approached the window of the safety cell and started recording Tanya using a camera. As Defendant Espinoza was filming Tanya—who was <u>naked</u> and acting erratic— Tanya again gestured to gouge out her eyes by putting her fingers near her eyes and making taunting movements. Defendant Espinoza continued to film Tanya for over a minute. Defendant Espinoza never once directed Tanya to stop or intervened in a more substantial way such as kicking the door, advising Tanya to stop, handcuffing Tanya or having her evaluated by a psychiatrist. After a minute or so, Defendant Espinoza stopped recording and walked away. Deputy Espinoza was callous and sadistic. She privately recorded Tanya, who was <u>naked</u> and threatening/gesturing to inflict more self-harm, for over a minute and never once attempted to prevent Tanya from injuring herself.

84.     Six minutes later, at 5:10 a.m. Defendant Deputy Castner, was conducting a cell check and noticed Tanya was struggling. It took Defendant Castner only two or three seconds to determine that Tanya was again attempting to remove her eyeball. The video indicates, that Defendant Castner continued to watch for at least ten seconds without directing Tanya to stop or intervening by kicking the door or going inside.  Similarly, according to Defendant Castner's report, Deputy Castner admitted that she watched Tanya try to remove her right eyeball for at least 10 seconds. She then witnessed the right eyeball fall to the floor and <u>still failed to intervene by banging on the door or going inside the cell.</u>

85.     The surveillance video shows Defendant Watch Commander Wilson standing approximately 2 feet away from Tanya's safety cell. Defendant Castner turned to Defendant Wilson and informed her that Tanya's right eyeball just fell out. Defendant Wilson instructed Defendant Castner to "**get the prostrait chair.**"

86.     Despite being the top official in charge, and despite knowing Tanya had just ripped out one eyeball and was going for the other one, as she could still be

20

heard screaming and thrashing about, Defendant Wilson did nothing to help Tanya. Surveillance footage shows Deputy Wilson never so much as approached the safety cell door despite knowing Tanya was going for her second eyeball. Footage shows Defendant Wilson failed to order other deputies to intervene and failed to intervene herself. Instead, footage depicts Defendant Wilson walking to the back of the hallway as Tanya was removing her second eyeball. Notably, this is the same supervisor that denied use of the Prostraint chair prior to Tanya's safety cell placement.

87.     **During the next two minutes, Tanya managed to remove her second eyeball. Not a single deputy tried to intervene nor did any defendant even approach the safety cell door during that period.**

88.     Importantly, had Defendant Castner or Wilson intervened when she initially saw the right eyeball fall to the floor, Tanya would have been prevented from removing the left eyeball!

89.     The video indicates that the extraction of the left eyeball took over a minute.

90.     After it was determined that both eyeballs had been removed, it took another five to ten minutes for deputies to enter the cell as they waited for hazardous suits to arrive.  Jail staff contacted 911 and Tanya was rushed to the hospital.

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

THIRD AMENDED COMPLAINT                    20-CV-00456-WQH-BGS

91.   **Importantly, the liability of Supervisor Jackson and Wilson is reflected in an IA investigation that followed Tanya's injuries. Discovery revealed that Supervisor Jackson and Wilson removed from Deputy Crist's incident report the reference to utilizing the Prostraint chair to prevent Tanya from further injuring herself prior to placement in the safety cell. Charges were sustained against Supervisor Jackson. Superior Wilson admitted to an investigator that she directed Supervisor Jackson to remove the reference to utilization of the Prostraint chair because she did not want to get in further trouble because she was on probation at the time.**

92.   A reasonable nurse, deputy, and supervisor, in Defendants' position would have appreciated the risk of harm that Tanya was presenting.  At a minimum, a reasonable deputy or nurse would have kept Tanya restrained until she was evaluated by a psychiatrist, or involuntarily medicated.  A reasonable deputy or nurse would not have left Tanya in a cell <u>unrestrained</u> without constant monitoring.  A reasonable deputy or nurse would have followed policy. Notably, the county has a policy that requires each safety cell to have a video surveillance system.  A deputy is tasked with observing the surveillance of inmates housed in the safety cells in order to prevent inmates from injuring themselves.  Knowing that Tanya had just attempted to remove her right eye, a reasonable deputy working in the surveillance bubble would not have ignored Tanya's self-harming behavior for over five minutes.

93.   As a result of Defendants' callous and indifferent behavior, Tanya is now permanently blind.  But <u>the very last vision</u> she constantly relives in her mind is of Defendant Espinoza recording this horrific scene. Defendant Espinoza took joy in recording the worst moment of Tanya's life.

94.   Before her arrest, even as a 23-year-old, Tanya was known to sleep with the lights on because she was afraid of the dark.  Now, she lives in complete darkness.  She can no longer do simple day-to-day tasks. She cannot drive.  She

22

cannot put on makeup.  She cannot make a cup of coffee.  She cannot cook.  She cannot go shopping.  She cannot walk around outside, at least not yet.  Tanya constantly walks into things as she roams around her *own* house.  She trips every time she needs to walk up or down the stairs.  She spills food every time she tries to eat.  She fights off the feeling of depression every week.  She feels anxious about the burden she has created for her family, who must do nearly everything for her. Most of all, she is fearful of being alone and incapable of living without support.

95.     The list goes on.  But, so does Tanya.  Despite this horrific incident, Tanya is optimistic that her life will not end in tragedy.  Tanya wants to use this experience – and her psychology degree – to help others who suffer from mental illness and drug abuse.

96.     Due to her permanent blindness and emotional trauma, Tanya is entitled to money damages pursuant to 42 U.S.C. section 1983 to compensate her for her injuries and for the violation of her constitutional and civil rights.

97.     In addition to compensatory, economic, consequential, and special damages, Plaintiff is entitled to punitive damages against each Defendant under 42 U.S.C. section 1983, in that the actions of each were done intentionally and with the intent to violate Plaintiff's right, or was done with a reckless disregard or wanton disregard for Tanya's constitutional rights.

## V.

## SECOND CAUSE OF ACTION

### 42 U.S.C. Section 1983 – 14th Amendment

### Inadequate Suicide Prevention / Self-Harm Policy and Training Program

### [By Tanya Suarez Against the County of San Diego]

98.     Plaintiff realleges and incorporates by reference all paragraphs stated above, as though fully set forth herein.

99.     Tanya's preventable blindness is one of many tragic stories.  In fact, the county's suicide and self-harming rates are the highest in the state of California.

23

1    According to the UT Tribune, "San Diego County's overall mortality rate over the

2    past decade is the highest among California's six largest jail systems, according to

3    data those departments are required to report to the state Department of Justice."

4    The county's suicide and self-harming rate has been a hot topic recently.  In 2017,

5    the Grand Jury found the county's prevention and training program was

6    inadequate.[5]  In 2019, the Disability Rights Center published a report that found the

7    county was failing to provide constitutionally adequate programs and training as it

8    pertains to mental illness and preventable injuries/deaths.[6]

9        100.   Within the last ten years the county has been hit with nearly 20 million

10   dollars in verdicts and settlements for cases alleging preventable deaths and

11   injuries.  As of date, San Diego County is defending itself in at least a dozen other

12   state and federal lawsuits brought by inmates and family members of those who

13   suffered from obvious and preventable injuries or death.

14       101.   The inadequate provisions identified by the Grand Jury include

15   shortcomings pertaining to the intake screening, the interplay of self-harming

16   conduct with mental health issues, and overall training in regards to deputies

17   preventing known inmates from inflicting self-harm in the future. These are the

18   same contentions Tanya alleges were the moving force in her sustaining her

19   resulting injuries.

20       102.   According to the UT Tribune, in a publication entitled *Rate of jail*

21   *inmate deaths in San Diego County far exceeds other large California counties*,[7]

22   dated September 20, 2019, "Despite years of controversy over departmental lapses

23

---

24   [5] Attached hereto as Exhibit 1 is a true and correct copy of the Grand Jury's findings
     as it pertains to suicide and self-harming injuries.  Plaintiff incorporates this report
25   by reference.

26   [6] Attached hereto as Exhibit 2 is a true and correct copy of the Disability Rights
     California report as it pertains to mental illness and suicide and self-harming
27   injuries. Plaintiff incorporates this report by reference.
     [7] Attached hereto as Exhibit 3 is a true and correct copy of the publication entitled
28   "Rate of jail inmate deaths in San Diego County far exceeds other large California
     counties." Plaintiff incorporates this article by reference.

THIRD AMENDED COMPLAINT                           20-CV-00456-WQH-BGS

and repeated promises of reform, deaths this year include: a young man who repeatedly threatened to commit suicide and had access to a plastic bag to suffocate himself after being found earlier in the day with a noose in his cell; a 34-year-old with a serious heart condition who was given cough syrup instead of his prescription medication when he told staff he was having trouble breathing; a young veteran who struggled with opiate and methamphetamine addiction after his hand was blown off in Afghanistan. He died with withdrawal symptoms less than an hour after being returned to his cell from the infirmary."

103.   There is more.

104.   The UT reported, "Ivan Ortiz managed to suffocate himself on March 18 while housed in the jail's psychiatric observation unit, its highest level of care for mentally ill inmates." ... "According to his autopsy report, Ortiz tried unsuccessfully to hang himself that morning and told jail staff he 'felt like ending his life.'" That afternoon, according to surveillance video, he climbed under a sheet and put a plastic bag over his head and died. Nearly an hour passed before deputies checked on him."

105.   In July 2018, Manuel Gomez Cruz, 36, choked himself to death in the jail's enhanced observation housing unit, which was created in 2015 to protect suicidal inmates.

106.   Though the county was on notice that it needed to address its suicide / self-harm program and training, according to the UT Tribune, "To date the Sheriff's Department has not remedied the problems," the Grand Jury's report notes. "The explanation provided to this Grand Jury was that [recommendations were] placed on hold due to the cost and a delay in renovation of Rock Mountain, which is expected to replace (South Bay Detention Facility)."

107.   The injuries and deaths that predated Tanya's and led to the findings by the Grand Jury and the DRC were just as preventable and egregious as Tanya's preventable blindness.

THIRD AMENDED COMPLAINT                                    20-CV-00456-WQH-BGS

108.   One of those instances involved 27 year-old, Jose Sierra.  Mr. Sierra was a mentally ill Mexican citizen who had been arrested for being under the influence of a controlled substance.  According to *CityBeat*, a summary of the incident in the CLERB's June agenda stated, during a security check Deputies 1 and 2 discovered Sierra hanging from a bed-sheet in his single occupancy locked cell ... During the previous security check, Deputies 1 and 2 observed and unauthorized laundry line affixed to the top bunk in Sierra's cell, and failed to take corrective action per Sheriff's Polices & Procedures.  Deputies 1 and 2 failed to remove the unauthorized laundry line or confront Sierra to direct its removal, actions which may have prevented Sierra from carrying out the suicide at that time. (Attached hereto as Exhibit 4.)

109.   Another instance involved a mentally ill inmate, Anna Wade.  In this particular case, the CLERB found that the deputy violated policy and procedure by logging a security check that did not actually happen.  According to *CityBeat*, a summary of the incident in the CLERB's October agenda stated, "Checks are supposed to happen hourly, but two hours passed between when Wade was last seen alive and when she was found hanging in her cell on April 28, 2013."[8]

110.   According to an October 2013 publication, "*10 More Dead Inmates,*" in *CityBeat*, another inmate, Robert Lubsen, displayed suicidal ideations – known and ignored by county staff – prior to committing suicide on February 7, 2013.  In that case, Mr. Lubsen was arrested by San Marcos campus police for a drug related crime.  While he was being detained in the campus holding cell, Mr. Lubsen attempted to commit suicide by trying to hang himself with his shoelaces.  The attempt was witnessed and stopped by campus police.  Mr. Lubsen was transferred the next day to VDF.  During intake it was noted that Mr. Lubsen had ligature marks around his neck.  In addition to the ligature mark, VDF "received a tip that

---

[8] Attached hereto as Exhibit 5 is a true and correct copy of the publication entitled "10 More Dead Inmates."  Plaintiff incorporates this article by reference.

THIRD AMENDED COMPLAINT                    20-CV-00456-WQH-BGS

1  Robert Lubsen was a risk to himself.  Despite the prior attempted suicide and
2  Robert Lubsen's history with substance abuse.  The San Diego County Sheriffs
3  determined the tip was not credible."  (Attached hereto as Exhibit 5.)

4       111.  Further, according to a December 2014 publication, *"San Diego*
5  *County Sets a Dubious Record for Jail Deaths,"* in CityBeat, "Hector Lleras, 36,
6  the fifth suicide of the year, twice told jail staff – first a nurse, then a deputy – that
7  he was going to kill himself.  On July 1, he was put in a safety cell and then
8  released 24 hours later.  Almost exactly 24 hours after that, he was found hanging
9  in his Central Jail cell."[9]

10      112.  According to that same article, in 2014, another inmate, Cristopher
11  Carroll, was a mentally ill homeless man who was placed in administrative
12  segregation because he was unable to get along with other inmates.  Mr. Carroll had
13  scrawled a suicide note on his cell walls using his blood.  Prior to hanging himself
14  he had urinated on the floor and stuck food and feces to the ceiling of his cell.
15  Carroll was never transferred out of his Ad-seg call.

16      113.  Jonathan Thomas was a paranoid schizophrenic whom was transferred
17  from Atascadero State Hospital to Central Jail.  Central Jail had knowledge that Mr.
18  Thomas had attempted suicide multiple times at Atascadero.  Central also knew Mr.
19  Thomas had previously jumped twice from the second tier while in custody in
20  County Jail.  In 2014, upon a routine commitment hearing, despite knowing about
21  Mr. Thomas' previous suicide attempts, mental conditions, and transfer status,
22  Central housed Mr. Thomas on a second tier cell.  Days later Mr. Thomas jumped
23  from the second tier sustaining severe injuries.

24      114.  In February 2014, Kristopher NeSmith hung himself in his general
25  population cell.  NeSmith displayed classic triggers of active suicidal ideations;
26  such as, previous suicide attempts while in custody, severe mental and personality

27  ――――――――――
[9] Attached hereto as Exhibit 6 is a true and correct copy of the publication entitled
28  "San Diego Sets a Dubious Record for Jail Deaths."  Plaintiff incorporates this
article by reference.

THIRD AMENDED COMPLAINT                    20-CV-00456-WQH-BGS

disorders, repeated family warnings of suicidal ideations, recorded admissions of a desire to kill himself, and a change in his medication prescriptions. Hours before he hung himself, a deputy saw a noose hanging from NeSmith's light fixture. Instead of taking any proactive measures, the deputy said, "NeSmith, what are you trying to do? Kill yourself? Take that thing down!" Nesmith was found dead hours later.

115.   Jason Nishimoto had never had a run-in with the law. However, Jason was a known paranoid schizophrenic. Jason attempted to overdose on prescription pain pills but his brother intervened. As he had done in the past, his brother called the authorities to have them take Jason in for evaluation. Jason, and his family, informed the sheriffs Jason was trying to kill him. Instead, Jason was arrested and taken to VDF. Jason's mother spoke to a psychiatric nurse the following day and informed her Jason was schizophrenic and suicidal. The nurse said, "don't worry mom, we'll take care of him." Jason was then housed in ad-seg. After three days of seclusion, being un-medicated, and having gone unevaluated by a psychiatrist, Jason hung himself.

116.   In May of 2016, Heron Moriarty admitted to Central jail staff that he was feeling suicidal. Central rejected Moriarty because it did not have an available safety cell. Moriarty was transferred to VDF for the specifically to be housed in a safety cell. However, when Moriarty arrived he was treated and processed like a typical inmate. Over the days, Moriarty was acting manic and psychotic. A psychiatric provider recommended Moriarty be placed in a safety cell. The sergeant on duty rejected the recommendation and said, "No, it's my Friday."

117.   Lastly, Pursuant to Federal Rule of Evidence 201 *Judicial Notice of Adjudicative Facts* and Rule 32.1 *Citing Judicial Dispositions*, Plaintiff requests this Court take judicial notice of a recent September 12, 2016, Order written by Judge Sammartino in *NeSmith v. County of San Diego,* in which the court found ample evidence to establish a pre-existing pattern of similar violations. In pertinent

28

part, the Order states, Plaintiffs' Second Amended Complaint describes a number of previous suicides and events leading up to them in San Diego County jails so as to establish a pre-existing pattern that put the county on notice it's policies and training were inadequate and in need of modification.[10]

118.    Given the well-established, and long-lasting, pattern of apathy towards suicidal and self-harming inmates, and the countless publicized preventable injuries and deaths, the county continues to be deliberately indifferent by permitting non-mental health providers (such as registered nurses) to perform the "gatekeeper" function.  RNs are not qualified or equipped to perform a mental health and suicide risk assessments.  This is especially so at Las Colinas, where the PSU is on site. Based on information and belief, the county does not provide RNs with specialized training regarding suicide assessments.

119.    As detailed in the above paragraphs, the county is liable for Tanya's blindness and trauma because it was on notice via a pre-existing – and highly publicized – pattern of similar constitutional violations due to the county's inadequate suicide and self-harm prevention policies and training programs. Notwithstanding the litany of media publications, the millions paid in litigation, the Grand Jury's findings and the report from Disability Rights California, the sheer number of obvious and preventable injuries occurring in county jails across San Diego, alone, imputes knowledge on the county that its inadequate policies and training were the moving force behind these preventable deaths and injuries; and, therefore required modification.

120.    As a result of the county's objective indifference, Tanya had to endure the pain and suffering of removing both of her eyeballs, she continues to endure living a life in total blindness, as well as the emotional and psychological trauma of this horrific incident and the consequences it had medically and psychologically.

---

[10] Attached hereto as Exhibit 7 is a true and correct copy the Court's Order. Plaintiff incorporates this article by reference.

THIRD AMENDED COMPLAINT                              20-CV-00456-WQH-BGS

121.   Because the county was on notice that its self-harming policies and training were constitutionally inadequate, yet failed to improve it, Plaintiff is entitled to money damages pursuant to 42 U.S.C. section 1983 to compensate her for her injuries and for the violation of her constitutional and civil rights.

122.   In addition to compensatory, economic, consequential, and special damages, Plaintiff is entitled to punitive damages against each Defendant under 42 U.S.C. section 1983, in that the actions of each were done intentionally and with the intent to violate Plaintiff's right, or was done with a reckless disregard or wanton disregard for Tanya's constitutional rights.

123.   Notably, "Municipal defendants may be liable under Section 1983 even in situations in which no individual officer is held liable for violating a plaintiff's constitutional rights." *Fairley v. Luman*, 281 F.3d 913, 917 (9th Cir. 2002). The Ninth Circuit has previously acknowledged, constitutional deprivations may occur "not . . . as a result of actions of the individual officers, but as a result of the collective inaction" of the municipal defendant. *Fairley v. Luman*, 281 F.3d 913, 917 (9th Cir. 2002). "If a plaintiff establishes he suffered a constitutional injury by the City, the fact that individual officers are exonerated is immaterial to liability under § 1983, 'regardless of whether their exoneration is on the basis of qualified immunity, because they were merely negligent, or for other failure of proof.'" *Id.* at 917; see *Horton v. City of Santa Maria*, 915 F.3d 592, 604 (9th Cir. 2019).

124.   According to *Gibson v. County of Washoe*, 290 F.3d 1175, 1186 n.7 (9th Cir. 2002), "A municipality may be liable if an individual officer is exonerated on the basis of the defense of qualified immunity, because even if an officer is entitled to immunity a constitutional violation might still have occurred."

125.   Similarly, *Horton v. City of Santa Maria, 915 F.3d 592, 604 (9th Cir. 2019)*) held "The district court's grants of summary judgment as to the individual officers [] were not appealable, and therefore cannot be assumed to be correct. As a

30

1    result, the district court could conclude that municipal constitutional violations

2    occurred involving the actions of officers" dismissed earlier in the case.

## VI.

## **THIRD CAUSE OF ACTION**

### Negligence

**[By Tanya Suarez Against All Defendants and DOE Deputy Defendants 1-10]**

126.    Plaintiff realleges and incorporates by reference all paragraphs stated above, as though fully set forth herein.

127.    Defendants were charged with the duty to act in accordance with the laws of state and the Constitution.  Each have a particularized duty to summon adequate medical care when they are on notice that an inmate is in need of such care.  They are charged to as a reasonable deputy or nurse in the same or similar circumstances.

128.    Deputy Defendants, Sergeant Jackson, and Commander Wilson were negligent because they were directly on notice that Tanya was under the influence and experiencing paranoid-meth-induced-psychosis. They also knew those delusions were influencing her to gouge her eyes out. Deputies, with the approval of Supervisors Wilson and Jackson, jaggedly cut Tanya's nails. Deputy Defendants placed Tanya is a safety cell, naked, unmonitored, and <u>unrestrained.</u>

129.    Deputy Defendants, Sergeant Jackson, and Commander Wilson removed Tanya's handcuffs knowing that there was no medical directive to do so. They also failed to restrain Tanya, using other alternatives, despite knowing she was intent on gouging out her eyes.

130.    Deputy Espinoza then <u>watched and recorded</u> Tanya as she continued to act erratic and gestured/threatened to remove her right eyeball. Instead of intervening, Defendant Espinoza privately recorded her.

131.    Minutes later, Defendant Castner actually acknowledged Tanya was removing her right eyeball yet did <u>nothing!</u> Then, once she saw the right eye fall to

31

the ground, instead of rushing inside the cell or banging on the door to get Tanya's attention to prevent her from removing the left eyeball, Defendant Castner casually walked away and did not return until the second eyeball was removed—two minutes later.

132. Despite directing Deputy Castner to retrieve the Prostraint chair, Supervisor Wilson failed to prevent Tanya from removing the second eyeball despite, or directing other deputies to intervene.

133. Defendants' conduct was done for the sole purpose of causing severe harm, distress, injury, fear, and pain, or at the very least, was done in reckless disregard of that probability.

134. As for Defendant Balangcod, based on the detailed allegations alleged above, she was the gatekeeper and duty bound to perform a PSA evaluation and duty bound to house Tanya in a safety cell with restraints.

135. As a result of these acts or inactions, Plaintiff suffered the injuries and damages described above, entitling her to damages in an amount to be proven at trial.

136. Pursuant to California Government Code Section 845.6, public employees, and the public entity itself, are liable for Tanya's injuries because Defendants knew Tanya was in need of immediate medical care yet not only denied Tanya that care, but stood by and recorded Tanya's erratic and life-altering behavior.

137. In committing the acts alleged above, the individual Defendants acted maliciously and/or were guilty of a wanton and reckless disregard for Tanya's rights and feelings and by reason thereof she is entitled to exemplary and punitive damages in an amount to be proven at trial.

/ / /

/ / /

/ / /

32

## VII.

## FOURTH CAUSE OF ACTION

### Intentional Infliction of Emotional Distress

### [By Tanya Suarez Against Defendant Espinoza, Defendant Castner, Defendant Jackson, and Defendant Wilson]

138.   Plaintiff realleges and incorporates by reference all paragraphs stated above, as though fully set forth herein.

139.   Defendants were charged with the duty to act in accordance with the laws of state and the Constitution.  Each have a particularized duty to summon adequate medical care when they are on notice that an inmate is in need of such care.  They are charged to as a reasonable deputy or nurse in the same or similar circumstances.

140.   As alleged above, Defendant Deputy Espinoza approached the window of the safety cell and started recording Tanya using her personal cell phone. As Defendant Espinoza was filming Tanya—who was <u>naked</u> and acting erratic— Tanya again gestured to gouge out her eyes by putting her fingers near her eyes and making taunting movements. Defendant Espinoza continued to film Tanya for over a minute. Defendant Espinoza never once directed Tanya to stop or intervened in a more substantial way such as kicking the door, advising Tanya to stop, handcuffing Tanya or having her evaluated by a psychiatrist. After a minute or so, Defendant Espinoza stopped recording and walked away. Deputy Espinoza was callous and sadistic. She privately recorded Tanya, who was <u>naked</u> and threatening/gesturing to inflict more self-harm, for over a minute and never once attempted to prevent Tanya from injuring herself.

141.   Six minutes later, at 5:10 a.m. Defendant Deputy Castner, was conducting a cell check and noticed Tanya was struggling. It took Defendant Castner only two or three seconds to determine that Tanya was again attempting to remove her eyeball. The video indicates, that Defendant Castner continued to watch

33

for at least ten seconds without directing Tanya to stop or intervening by kicking the door or going inside.  According to Defendant Castner's report, after observing Tanya, she witnessed Tanya's right eyeball fall to the floor.

142.  **Defendant Castner did not attempt to bang on the door or stop Tanya!**

143.  At this exact time, the surveillance video shows Defendant Watch Commander Wilson standing approximately 2 feet away from Tanya's safety cell. Defendant Castner turned to Defendant Wilson and informed her that Tanya's right eyeball just fell out. Defendant Wilson instructed Defendant Castner to "**get the Prostraint chair.**"

144.  Despite being the top official in charge, and despite knowing Tanya had just ripped out one eyeball and was going for the other one, as she could still be heard screaming and thrashing about, Defendant Wilson did nothing to help Tanya. Surveillance footage shows Deputy Wilson never so much as approached the safety cell door despite knowing Tanya was going for her second eyeball. Footage shows Defendant Wilson failed to order other deputies to intervene and failed to intervene herself. Instead, footage depicts Defendant Wilson walking to the back of the hallway as Tanya was removing her second eyeball. Notably, this is the same supervisor that denied use of the Prostraint chair prior to Tanya's safety cell placement.

145.  **During the next two minutes, Tanya managed to remove her second eyeball. Not a single deputy tried to intervene nor did any defendant even approach the safety cell door during that period.**

146.  Importantly, had Defendant Castner or Wilson intervened when she initially saw the right eyeball fall to the floor, Tanya would have been prevented from removing the left eyeball!

147.  **Importantly, the liability of Supervisor Jackson and Wilson is reflected in an IA investigation that followed Tanya's injuries. Discovery**

34

**revealed that Supervisor Jackson and Wilson removed from Deputy Crist's incident report the reference to utilizing the Prostraint chair to prevent Tanya from further injuring herself prior to placement in the safety cell. Charges were sustained against Supervisor Jackson. Superior Wilson admitted to an investigator that she directed Supervisor Jackson to remove the reference to utilization of the Prostraint chair because she did not want to get in further trouble because she was on probation at the time.**

148. As a result of these shocking and offensive actions, Plaintiff suffered the injuries and damages described above, entitling her to damages in an amount to be proven at trial.

149. Pursuant to California Government Code Section 845.6, public employees, and the public entity itself, are liable for Tanya's injuries because Defendants knew Tanya was in need of immediate medical care yet not only denied Tanya that care, but sadistically stood by and recorded Tanya as she made self-harming gestures. Then, when Tanya was in the act of removing her right eye, Deputy Castner and Watch Commander Wilson knew but failed to act reasonably.

150. In committing the acts alleged above, the individual Defendants acted maliciously and/or were guilty of a wanton and reckless disregard for Tanya's rights and feelings and by reason thereof she is entitled to exemplary and punitive damages in an amount to be proven at trial.

## VIII.

## FIFTH CAUSE OF ACTION

### 42 U.S.C. Section 1983 – 14th Amendment – Supervisory Defendant

### [By Tanya Suarez Against Watch Commander Wilson and Sergeant Terry Jackson]

151. Plaintiff realleges and incorporates by reference all paragraphs stated above, as though fully set forth herein.

/ / /

35

152.   As detailed above, Defendant Jackson and Defendant Wilson both knew that Tanya attempted to remove her eye ball at the finger printing station. Both Supervisors were present when Deputy Defendants subdued Tanya. They were also present when Tanya was being evaluated by the Gatekeeper, Defendant Balangcod. Both Supervisors also knew that Tanya was to be housed in a safety cell because she presented a danger to herself.

153.   Furthermore, both supervisors were asked by Deputy Crist to place Tanya in the Prostraint chair to prevent her from inflicting additional self-harm. Unreasonably, both Supervisors denied that request "because Suarez was calm." Notably, at the exact moment Deputy Crist requested use of the Prostraint chair, Tanya was strapped to a gurney yelling and moving around. There was no reasonable expectation that Tanya would not injure herself again if given the opportunity.

154.   All of Deputy Defendants' unconstitutional conduct described above (cutting the nails, removing the handcuffs, failing to elevate the matter with a psychiatrist/hospital, failing to restrain Tanya while in the safety cell, and failing to intervene when Castner saw the first eyeball fall to the floor) was ratified by Supervisor Jackson and Wilson because each Supervisor was aware of the circumstances and failed to act reasonably. Additionally, each Supervisor failed to direct their subordinates to act reasonably.

155.   All of the conduct described herein was performed under the color of state law.

156.   The actions of Supervisor Jackson and Wilson's subordinates (Deputy Defendants) deprived Tanya of her particular rights under the Constitution.

157.   Furthermore, Supervisor Jackson and Wilson directed and ratified Deputy Defendants' conduct, and set in motion a series of acts by their subordinates that she should have reasonably should have known would cause the subordinates to deprive Tanya of her rights under the Constitution. Lastly, despite being fully

36

informed of Tanya's intent to commit self-harm, Supervisors Jackson and Wilson knew Deputy Defendants were engaging in unconstitutional conduct yet failed to prevent Deputy Defendants' conduct.

158.   Despite knowledge of Deputy Defendants' conduct, and Tanya's intent to harm herself, both Supervisors disregarded the known or obvious consequence of failing to prevent Tanya from inflicting more self-harm. In failing to remedy their subordinates conduct, Supervisor Jackson and Wilson engaged in conduct that showed a reckless or callous indifference to the depravation of Tanya's Constitutional rights.

159.   **Importantly, the liability of Supervisor Jackson and Wilson is reflected in an IA investigation that followed Tanya's injuries. Discovery revealed that Supervisor Jackson and Wilson removed from Deputy Crist's incident report the reference to utilizing the Prostraint chair to prevent Tanya from further injuring herself prior to placement in the safety cell. Charges were sustained against Supervisor Jackson. Superior Wilson admitted to an investigator that she directed Supervisor Jackson to remove the reference to utilization of the Prostraint chair because she did not want to get in further trouble because she was on probation at the time.**

160.   Finally, the Supervisors conduct was so closely related to the depravation of Tanya's rights as t be the moving force that caused the ultimate injury.

161.   As a result of the Supervisors' callous and indifferent behavior, Tanya is now permanently blind.

162.   Before her arrest, even as a 23-year-old, Tanya was known to sleep with the lights on because she was afraid of the dark. Now, she lives in complete darkness. She can no longer do simple day-to-day tasks. She cannot drive. She cannot put on makeup. She cannot make a cup of coffee. She cannot cook. She cannot go shopping. She cannot walk around outside, at least not yet. Tanya

THIRD AMENDED COMPLAINT                    20-CV-00456-WQH-BGS

1   constantly walks into things as she roams around her *own* house.  She trips every

2   time she needs to walk up or down the stairs.  She spills food every time she tries to

3   eat.  She fights off the feeling of depression every week.  She feels anxious about

4   the burden she has created for her family, who must do nearly everything for her.

5   Most of all, she is fearful of being alone and incapable of living without support.

6       163.   The list goes on.  But, so does Tanya.  Despite this horrific incident,

7   Tanya is optimistic that her life will not end in tragedy.  Tanya wants to use this

8   experience – and her psychology degree – to help others who suffer from mental

9   illness and drug abuse.

10      164.   Due to her permanent blindness and emotional trauma, Tanya is

11  entitled to money damages pursuant to 42 U.S.C. section 1983 to compensate her

12  for her injuries and for the violation of her constitutional and civil rights.

13      165.   In addition to compensatory, economic, consequential, and special

14  damages, Plaintiff is entitled to punitive damages against each Defendant under 42

15  U.S.C. section 1983, in that the actions of each were done intentionally and with the

16  intent to violate Plaintiff's right, or was done with a reckless disregard or wanton

17  disregard for Tanya's constitutional rights.

18                                    **IX.**

19                          **PRAYER FOR RELIEF**

20      WHEREFORE, Plaintiff prays for judgement against Defendants, for each

21  and every cause of action, as follows:

22      1.     For compensatory, general, and special damages against each

23  defendant, jointly and severally, in an amount according to proof;

24      2.     For punitive and exemplary damages against each individually named

25  defendant in their individual capacity in an amount appropriate to punish

26  defendants and deter others from engaging in similar misconduct;

27      3.     For costs and reasonable attorney's fees pursuant to 42 U.S.C. section

28  1988 and as otherwise authorized by statute or law;

THIRD AMENDED COMPLAINT                    20-CV-00456-WQH-BGS

4.      For any further relief that the Court may deem appropriate.

## X.

## __DEMAND FOR JURY TRIAL__

Demand is hereby made by for a jury trial.

Respectfully submitted,

**PHG Law Group**

Dated:  July 8, 2022            by: ___*s/ Danielle R. Pena*___
Danielle R. Pena, Esq.
dpena@morrislawfirmapc.com
Attorneys for Plaintiff

THIRD AMENDED COMPLAINT                    20-CV-00456-WQH-BGS

# INDEX OF EXHIBITS TO COMPLAINT

| Exhibit | Description | Pages |
|---|---|---|
| 1 | San Diego County Grand Jury Report Examining the Issues of Suicides in San Diego County Jails | 33-44 |
| 2 | Pertinent Portions of the Disability Rights California Report on Suicides in San Diego County Jail | 44-53 |
| 3 | San Diego Union Tribune Article – Rate of Jail Inmate Deaths in San Diego County Far Exceeds Other Large California Counties | 54-78 |
| 4 | San Diego CityBeat Article – Law Enforcement Review Board Finds Deputy Error in Inmate Suicide | 79-83 |
| 5 | San Diego CityBeat Article – 10 More Dead Inmates | 84-93 |
| 6 | San Diego CityBeat Article – San Diego County Sets a Dubious Record for Jail Deaths | 94-104 |
| 7 | September 12, 2016, Order written by Judge Sammartino in *NeSmith v. County of San Diego* | 105-119 |

THIRD AMENDED COMPLAINT                    20-CV-00456-WQH-BGS

# EXHIBIT 3

1  ~~Christ~~Cristopher S. Morris, Esq., SBN
   ~~163188~~
2  ~~cmorris@morrislawfirmapc.com~~
3  dpena@PHGLawGroup~~morrislawfirmape.co~~
   ~~m~~
4  PHG Law Group~~MORRIS LAW FIRM,~~
   ~~APC~~
5  501 West Broadway, Suite 1480
   San Diego, CA 92101
6  Telephone:  (619) 826-8060
   Facsimile:  (619) 826-8065
7
8  Attorneys for Tanya Suarez
9
             UNITED STATES DISTRICT COURT
10           SOUTHERN DISTRICT OF CALIFORNIA
11

12  TANYA SUAREZ, Individually,        Case No. 20-cv-00456-WQH-DEB
13                 Plaintiff,          ~~SECOND~~ THIRD AMENDED
                                       COMPLAINT FOR:
14         v.
                                       1. 14th AMENDMENT – OBJECTIVE
15  COUNTY OF SAN DIEGO,                  INDIFFERENCE
    REGISTERED NURSE SHANNON
16  KEENE, Individually, AND DOES 1-   2. 14th AMENDMENT – INADEQUATE
    10, inclusive,                        SUICIDE PREVENTION / SELF-
17                                        HARM POLICY AND TRAINING
                   Defendants.
18                                     3. NEGLIGENCE
19                                     4. INTENTIONAL INFLICTION OF
                                          EMOTIONAL DISTRESS
20
                                       5. 14th AMENDMENT –
21                                        SUPERVISORY LIABILITY
22
23
24
25
26
27
28

    THIRD~~SECOND~~ AMENDED COMPLAINT        20-CV-00456-WQH-
    DEB                                      DEB



Field Code Changed

Formatted: Superscript

**I.**

**STATEMENT OF FACTS**

1.     Plaintiff, Tanya Suarez (herein
"Tanya"), is an inspiring young woman.  She
genuinely cares about other people.  She cares about
the environment.  So much so that she planned to
dedicate her entire life to helping both. 

2.     Tanya was born and raised in San
Diego.  She lives with her parents, twin sister, and
younger siblings in National City.

3.     In early 2019, Tanya studied at San
Diego State University.  She was seven credits shy of graduating with a bachelor's
degree in psychology.  Tanya had no criminal record to speak of.

4.     Just before the chain of events at issue, Tanya started associating with
a new group of people.  Shortly thereafter, she began lightly experimenting with
methamphetamines.  That experiment went terribly wrong and now serves a lesson
on how experimenting with drugs can have a life altering impact.

5.     On May 6, 2019, Tanya used methamphetamines with her new group
of friends.  Not being an experienced methamphetamine user, Tanya began
experiencing psychotic delusions.  Tanya was acting bizarrely in the parking lot of
a gas station and caught the attention of San Diego Police Officers.

6.     Tanya was arrested for being under the influence of a controlled
substance. Tanya was taken into custody for the safety of herself and others.  Upon
her arrest, Tanya was screaming and wailing on the ground.  During the struggle,
Tanya asked the officers to shoot her.  It was evident to the arresting officers that
Tanya was experiencing delusions.  Ultimately, Tanya was transported to Las
Colinas Jail.

/ / /

2

~~THIRDSECOND~~ AMENDED COMPLAINT                    20-CV-00456-
WQH-BGS

7.      According to the intake records, Tanya was honest and informed the intake nurse that she had used meth that night and that she had a 5150 hospitalization the year prior. Tanya also admitted to the nurse that at the same time of her 5150 hospitalization she had thoughts of committing suicide.  During her intake interview, Tanya acted bizarrely and responded to internal stimuli.

8.      While being fingerprinted, Tanya again experienced psychotic delusions.  She believed she was going to be tortured by the correctional deputies. At the same time, Tanya overheard another woman screaming about her eyes.

9.      At 4:38 a.m., in a deranged effort to prevent the deputies from torturing her, Tanya began to claw out her right eye.

10.   Defendant Deputies Jessica Castner, Natalie ~~Christ~~Crist, Cynthia Randolph, Paola Rendon-Aguilera, and Andrea Villa (Herein "Deputy Defendants") immediately intervened and tackled Tanya to the ground.  ~~Deputy Defendants secured Tanya to a gurney face down.~~ Deputy Defendants then handcuffed Tanya ~~with her hands behind her back.~~and secured her in waist chains and a spit sock.

~~10.~~

~~11.   Deputy Defendants placed Tanya on a gurney. While lying face-down on the gurney, Deputy Natalie Christ cut Tanya's acrylic nails.  Because Tanya had on acrylic nails, the nails shattered in some places and became jagged on the edges. Deputy Christ acknowledged that the nails were more jagged and dangerous than before but took no effort to file Tanya's nails or place protective gloves on her hands.~~

~~12.   In violation of the County's Detention Policies, Deputy Defendants, without first notifying a superior, placed Tanya in a restraint chair and escorted her to the Registered Nurse (herein "RN") on duty, Registered Nurse Shannon Keene for evaluation and assessment. It was Nurse Keene's responsibility to perform a medical evaluation of Tanya's eye. After Nurse Keene determined that Tanya~~

THIRD~~SECOND~~ AMENDED COMPLAINT                    20-CV-00456-
WQH-BGS

1  suffered from a hematoma on her right pupil, but denied visual impairment and was

2  able to track visually, Nurse Keene medically cleared Tanya and turned her over to

3  Deputy Defendants.

4      11.   Deputy Defendants then escorted Tanya to Defendant Nurse Beneliza

5  Balangcod responded to the scene. Discovery indicates Defendant Balangcod was

6  the Gatekeeper on duty; meaning, she was the medical professional responsible for

7  evaluating Tanya's risk of self-harm and treating/housing Tanya appropriately.

8  Defendant Balangcod was the highest ranking medical personnel on duty.

9      13.

10      14.12. Deputy Defendants informed Defendant Balangcod of Tanya's self-

11  harming behavior.  According to the medical records, Defendant Balangcod was

12  advised that Tanya was bipolar and not currently on medication; and, that she had

13  been using meth and was experiencing paranoid delusions.[1]

14      15.13. At this point, Defendant Balangcod knew that Tanya was 1) actively

15  engaging in self-harming behavior by attempting to remove her eyeball, 2) actively

16  suffering from meth-induced-psychosis, 3) actively experiencing commanding

17  delusions, 4) actively suffering from untreated mental health conditions, and 5) was

18  now bearing jagged acrylic nails.  Lastly, having had access to Tanya's intake chart,

19  Defendant Balangcod also knew that Tanya was recently hospitalized on a 5150 for

20  suicidal ideations.

21      16.14. As the gatekeeper, Defendant Balangcod was duty-bound to

22  acknowledge Tanya's act of attempting to gouge out her eyeball as an act of self-

23  harm.  Upon such a determination, Defendant Balangcod was duty-bound to

24  identify Tanya as a severe risk for self-harm by placing a pink wristband on

25  Tanya's right wrist.  Pursuant to policy, if an inmate is actively engaging in self-

26  harm, the gatekeeper is to place the inmate on the ISP ("Inmate Safety Plan")

27  It took approximately nine minutes for Defendant Deputies to secure Tanya to the gurney and have her evaluated by

28  Defendant Balangcod. During the entire encounter, Defendant Wilson and Jackson were supervising the scene and
    were aware that Tanya had attempted to gouge out her eye.

THIRDSECOND AMENDED COMPLAINT                    20-CV-00456-
WQH-BGS

program. According to Detention Policy, MSD.S.10, if an inmate is actively engaging in self-harming behavior the inmate is to be assigned to a safety cell *restraints*. The policy requires the inmate *with* to be scheduled for a psychiatric evaluation immediately.



15.   Per jail medical records, Defendant Balangcod failed to assume the role of gatekeeper and failed to recognize Tanya as a severe and imminent risk of self-harm.  Evident by her PSA note, Defendant Balangcod failed to perform an assessment of Tanya's self-harming risks. Rather, Defendant Balangcod heard Deputy Defendant's recitation of events and based on that alone, recommended Tanya be placed in a safety cell. There is no indication that Defendant Balangcod actually evaluated Tanya or even spoke to her. Defendant Balangcod's only recommendation was to house Tanya in a safety cell. Defendant Balangcod failed to order Tanya be restrained or handcuffed while being housed in order to abate the continued risk of self-harm. Defendant Balangcod also failed to order/recommend a psychiatric evaluation, increased monitoring, and anti-psychotic medication, as required by M.S.D. 10, the county's suicide prevention policy.

17.   ///

16.   During Defendant Balangcod's medical evaluation, Deputy Crist briefed Defendant Supervisors Wilson and Jackson. Specifically, Deputy Crist told the Supervisors, "**I explained Suarez had just finished her fingerprints when she attempted to gouge out her eyes using her fingernails. I explained Suarez bit Deputy Chavez while we were trying to restrain her.** *I suggested to the supervisors on scene the option of utilizing the Prostraint chair to prevent Suarez further harming herself or possibly having to use force to stop her again in the*

5

THIRD~~SECOND~~ AMENDED COMPLAINT
WQH-BGS

20-CV-00456-

Formatted: No bullets or numbering

Formatted: Font: Bold

Formatted: Font: Bold

1  *future."*[2]

2      17.    Defendant Watch Commander Wilson and Defendant Sergeant

3  Jackson denied the request. Defendant Supervisors "explained to [Deputy Crist] due

4  to Suarez being calm and not actively trying to harm herself that the Prostraint chair

5  would not be utilized at this time."

6      18.    After Defendant Balangcod evaluated Tanya, she determined Tanya

7  needed to be housed in a safety cell. Deputy Defendants Jessica Castner, Natalie

8  ~~Christ~~Crist, Cynthia Randolph, Paola Rendon-Aguilera, ~~and~~ Andrea Villa, and

9  Supervisors Wilson and Jackson, ~~then~~ escorted Tanya to th~~e~~a safety cell area.

10     19.    Prior to entering the safety cell, "due to Suarez' unpredictable behavior

11  and being under the influence of a controlled substance," Deputy Defendants

12  removed Tanya's clothes leaving her completely naked.

13     20.    As Deputy Defendants were in the process of removing Tanya's

14  clothes, Deputy Natalie Crist turned around and asked Defendant Watch

15  Commander Wilson and Defendant Sergeant Jackson for permission to cut Tanya's

16  fingernails fearing she might harm herself again. Defendant Wilson and Jackson

17  agreed.

18  / / /

19  / / /

20     21.    With the permission from Watch Commander Wilson and Defendant

21  Sergeant Jackson, Defendant Deputy Crist cut Tanya's acrylic nails.  Because

22  Tanya had on acrylic nails, the nails shattered

23  in some places and became jagged on the

24  edges.  Deputy Crist acknowledged that the

25  nails were more jagged and dangerous than

26  before but took no effort to file Tanya's nails or

27  place protective gloves on her hands.



28  ²Use of the Prostraint chair requires Supervisor approval.

THIRD~~SECOND~~ AMENDED COMPLAINT                    20-CV-00456-
WQH-BGS

Formatted: No bullets or numbering

Formatted: Font: 14 pt

1    ~~18.    But first, Deputy Defendants, amongst themselves, without medical~~
2    ~~directive, decided to remove Tanya's handcuffs! Deputy Defendants then removed~~
3    ~~Tanya's clothes and placed her in the safety cell—naked and unrestrained.~~
4    ~~19.    Pursuant to policy, an inmate is stripped of their clothes when placed~~
5    ~~into safety cell. The policy requires the inmate be administered a suicide smock. In~~
6    ~~this instance, Tanya was not given a suicide smock because it was acknowledged~~
7    ~~among the Deputy Defendants that Tanya continued to pose as a high-risk for self-~~
8    ~~harm.~~

9    ~~20.~~22.  Predictably, while in the safety cell, Tanya continued to act erratic and

10   delusional. According to the video, on several occasions, Tanya can be seen making

11   violent gestures with her fingers near her eyes indicating she could and would

12   gouge out her eyes. Those gestures of self-harm went ignored by all Defendants.

13   23.    At 5:04 a.m., Defendant Deputy Rocio Espinoza, who has been

14   advised of Tanya's self-harming attempt, approached the window of the safety cell

15   and started recording Tanya using her personal cell phone. As Defendant Espinoza

16   was filming Tanya—who was <u>naked</u> and acting erratic— she again gestured to

17   gouge out her eyes by putting her fingers near her eyes and making taunting

18   movements. Defendant Espinoza continued to film Tanya for over a minute.

19   Defendant Espinoza never once directed Tanya to stop or intervened in a more

20   substantial way such as banging on the door, handcuffing Tanya or having her

21   evaluated by a psychiatrist. After a minute or so, Defendant Espinoza stopped

22   recording and walked away.

23   ///
24   ///
25   ///
26   ///
27   ///
28   ///

7

THIRD~~SECOND~~ AMENDED COMPLAINT                    20-CV-00456-
WQH-BGS

/// 

21.   ///

Formatted: No bullets or numbering

24.   Six minutes later, at 5:10 a.m. Defendant Deputy Castner, was conducting a cell check and noticed Tanya was struggling. It took Defendant Castner only two or three seconds to determine that Tanya was again attempting to remove her eyeball. The video indicates, that Defendant Castner continued to watch for at least ten seconds without directing Tanya to stop or intervening by kicking the door or going inside.  Similarly, according to Defendant Castner's report, Deputy Castner admitted that she watched Tanya try to remove her right eyeball for at least 10 seconds. She then witnessed the right eyeball fall to the floor and still failed to intervene by banging on the door or going inside the cell.

Formatted: Font color: Black

25.   The surveillance video shows Defendant Watch Commander Wilson standing approximately 2 feet away from Tanya's safety cell. Defendant Castner turned to Defendant Wilson and informed her that Tanya's right eyeball just fell out. Defendant Wilson instructed Defendant Castner to "get the prostraint chair."

Formatted: No underline, Font color: Black

26.   Despite being the top official in charge, and despite knowing Tanya had just ripped out one eyeball and was going for the other one, as she could still be heard screaming and thrashing about, Defendant Wilson did nothing to help Tanya. Surveillance footage shows Deputy Wilson never so much as approached the safety cell door despite knowing Tanya was going for her second eyeball. Footage shows Defendant Wilson failed to order other deputies to intervene and failed to intervene herself. Instead, footage depicts Defendant Wilson walking to the back of the hallway as Tanya was removing her second eyeball. Notably, this is the same supervisor that denied use of the Prostraint chair prior to Tanya's safety cell placement.

Formatted: No underline, Font color: Black

27.   then causally walked down the hallway and returned with other deputies two minutes later. During the nextose two minutes, Tanya managed to remove her second eyeball. Not a single deputy tried to intervene nor did any

THIRDSECOND AMENDED COMPLAINT                    20-CV-00456-WQH-BGS

**defendant even approach the safety cell door within that period.**

*/ / /*

~~22.~~   */ / /*

~~23.~~28. Importantly, had Defendant Castner or Wilson intervened when she initially saw the right eyeball fall to the floor, Tanya would have been prevented from removing the left eyeball!

~~24.~~29. The video indicates that the extraction of the left eyeball took over a minute.

*/ / /*

~~25.~~30. After it was determined that both eyeballs had been removed, it took another five to ten minutes for deputies to enter the cell.  Jail staff contacted 911 and Tanya was rushed to the hospital.

31.   **Importantly, the liability of Supervisor Jackson and Wilson is reflected in an IA investigation that followed Tanya's injuries. Discovery revealed that Supervisor Jackson and Wilson removed from Deputy Crist's incident report the reference to utilizing the Prostraint chair to prevent Tanya from further injuring herself prior to placement in the safety cell. Charges were sustained against Supervisor Jackson. Superior Wilson admitted to an investigator that she directed Supervisor Jackson to remove the reference to utilization of the Prostraint chair because she did not want to get in further trouble because she was on probation at the time.**

~~26.~~32. As a result of Defendants' callous and indifferent behavior, Tanya is now permanently blind and has two prosthetic eyes.  Before her arrest, even as a 23-year-old, Tanya was known to sleep with the lights on because she was afraid of the dark.  Now, she lives in complete darkness.  She can no longer do simple day-to-day tasks.  She cannot drive.  She cannot put on makeup.  She cannot make a cup of coffee.  She cannot cook.  She cannot go shopping.  She cannot walk around outside, at least not yet.  Tanya constantly walks into things as she roams around her

THIRD~~SECOND~~ AMENDED COMPLAINT                    20-CV-00456-WQH-BGS

Formatted: Font: Not Bold, Font color: Black

Formatted:  No bullets or numbering

*own* house.  She trips every time she needs to walk up or down the stairs.  She spills food every time she tries to eat.  She fights off the feeling of depression every week.  She feels anxious about the burden she has created for her family, who must do nearly everything for her.  Most of all, she is fearful of being alone and incapable of living without support. Most recently, Tanya fears the thought of having children and never being able to see them.

~~27.~~33. The list goes on.  But, so does Tanya.  Despite this horrific incident, Tanya is optimistic that her life will not end in tragedy.  Tanya wants to use this experience – and her psychology degree – to help others who suffer from mental illness and drug abuse.

~~28.~~34. Incredibly, while this incident has changed her life forever, Tanya maintains her sense of optimism and drive.  She fights off her physical limitations and depression by trying to maintain her previous goals.  Tanya is currently taking classes at San Diego Center for the Blind and Blind Community Center.  She intends to enroll in the Braille Institute within the year.  Once she obtains the necessary skill level, Tanya will complete the seven remaining credits needed to graduate with a degree in psychology.

  

**II.**

**JURISDICTION AND VENUE**

~~29.~~35. This action arises under the Constitution and laws, including Article III, Section 1 of the United States Constitution and is brought pursuant to 42 U.S.C.

~~THIRD~~SECOND AMENDED COMPLAINT    20-CV-00456-WQH-BGS

10

section 1983.  The Jurisdiction of this court is invoked pursuant to 28 U.S.C.

section 1331.  State law claims are alleged as well, over which Plaintiff invokes the

Court's supplemental jurisdiction.

30.36. This case is instituted in the United States District Court for the

Southern District of California pursuant to 28 U.S.C. section 1391, as the judicial

district in which all relevant events and omissions occurred and in which

Defendants maintain offices, work, and/or reside.

31.37. Pursuant to the California Government Code, Plaintiff filed her claim

with the County of San Diego based on the foregoing incident on July 23, 2019.

The claim was rejected on September 10, 2019.  Thus, the present complaint is

timely, pursuant to California Government Code section 945.6.

### III.

### THE PARTIES

32.  Plaintiff Tanya Suarez was a resident of San Diego County in the State

of California and a citizen of the United States at all times relevant to this

complaint.  She was injured at Las Colinas Jail which is in the County of San

Diego.

38.   ///

33.39. Defendant Deputy Jessica Castner was working at Las Colinas Jail on

the morning of May 6, 2019.  Based on information and belief, Deputy Castner

lives in the County of San Diego at all times mentioned herein, and committed the

culpable acts against Plaintiff in the same county.

34.40. Defendant Deputy Natalie ChristCrist was working at Las Colinas Jail

on the morning of May 6, 2019.  Based on information and belief, Deputy

ChristCrist lives in the County of San Diego at all times mentioned herein, and

committed the culpable acts against Plaintiff in the same county.

35.41. Defendant Deputy Cynthia Randolph was working at Las Colinas Jail

on the morning of May 6, 2019.  Based on information and belief, Deputy

THIRDSECOND AMENDED COMPLAINT                    20-CV-00456-
WQH-BGS

1    Randolph lives in the County of San Diego at all times mentioned herein, and

2    committed the culpable acts against Plaintiff in the same county.

3        ~~36.~~42. Defendant Deputy Paola Rendon-Aguilera was working at Las Colinas

4    Jail on the morning of May 6, 2019.  Based on information and belief, Deputy

5    Rendon-Aguilera lives in the County of San Diego at all times mentioned herein,

6    and committed the culpable acts against Plaintiff in the same county.

7        ~~37.~~43. Defendant Deputy Andrea Villa was working at Las Colinas Jail on the

8    morning of May 6, 2019.  Based on information and belief, Deputy Villa lives in

9    the County of San Diego at all times mentioned herein, and committed the culpable

10   acts against Plaintiff in the same county.

11       ~~38.~~44. Defendant Deputy Rocio Espinoza was working at Las Colinas Jail on

12   the morning of May 6, 2019.  Based on information and belief, Deputy Espinoza

13   lives in the County of San Diego at all times mentioned herein, and committed the

14   culpable acts against Plaintiff in the same county.

15       45.    Watch Commander —Wilson was working at Las Colinas Jail on the

16   morning of May 6, 2019.  Based on information and belief, ~~Deputy~~ WC Wilson

17   lives in the County of San Diego at all times mentioned herein, and committed the

18   culpable acts against Plaintiff in the same county.

19       ~~39.~~46. Sergeant Jackson was working at Las Colinas Jail on the morning of

20   May 6, 2019.  Based on information and belief, Sergeant Jackson lives in the

21   County of San Diego at all times mentioned herein, and committed the culpable

22   acts against Plaintiff in the same county.

23       ~~40.~~47. Defendant Registered Nurse Beneliza Balangcod was working at Las

24   Colinas Jail on the morning of May 6, 2019.  Based on information and belief,

25   Registered Nurse Balangcod lives in the County of San Diego at all times

26   mentioned herein, and committed the culpable acts against Plaintiff in the same

27   county. Discovery is pending but based on information and belief, Nurse Balangcod

28   is employed by the county.                    12

     ~~THIRD~~SECOND AMENDED COMPLAINT              20-CV-00456-
     WQH-BGS

Formatted: Font color: Black

1    41.48.Defendant County of San Diego ("county") is, and at all times

2    mentioned herein was, a public entity authorized by law to establish certain

3    departments responsible for enforcing the laws and protecting the welfare of San

4    Diego County citizens.  At all times mentioned herein, Defendant county was

5    responsible for overseeing the operation, management, and supervision of the San

6    Diego County jails such as Las Colinas, as well as its Corrections Deputies,

7    Medical Staff, and inmates.  The county is also responsible for developing,

8    implementing, and amending jail policies, procedures, and training.

9    42.49.The names of the other individual Sheriff's Deputies who are

10   responsible for Plaintiffs' injuries are currently unknown to Plaintiff.  As such,

11   these individuals are sued herein as DOES 1-10, and referred to herein as "DOE

12   Deputy Defendants and Female DOE Deputy Defendant."

13   43.50.The true names and capacities whether individual, corporate, associate

14   or otherwise, of defendants named herein as DOES 1-10 are unknown to Plaintiff,

15   who therefore sue said defendants by said fictitious names.  Plaintiff will amend

16   this complaint to show said defendants true names and capacities when the same

17   have been ascertained.  Plaintiff is informed and believes and thereon alleges that

18   all defendants sued herein as DOES are in some manner responsible for the acts and

19   injuries alleged herein.

20   51.    At all times mentioned herein Defendants named herein as DOES 1-10

21   were employees and/or independent contractors of Defendant San Diego County

22   and in doing the acts hereinafter described acted within the course and scope of

23   their employment.  The acts of all defendants and each of them were also done

24   under the color and pretense of the statutes, ordinances, and regulations of the

25   County of San Diego and the State of California.  In committing the acts and/or

26   omissions alleged herein, all defendants acted under color of authority and/or under

27   color of law.  Plaintiff sues all public employees named as Defendants in their

28   individual capacities.                    13

     THIRDSECOND AMENDED COMPLAINT              20-CV-00456-
     WQH-BGS

1   ///
2   ///
3   ///
4   ///
5   ///
6   44.   ///

7

8

9

10

11

12

13

**IV.**

**FIRST CAUSE OF ACTION**

**42 U.S.C. Section 1983 – 14th Amendment – Objective Indifference**

**[By Tanya Suarez Against Defendants Jessica Castner, Natalie ~~Christ~~Crist,**

**Cynthia Randolph, Paola Rendon-Aguilera, Andrea Villa, Rocio Espinoza,**

**Watch Commander Wilson, Sergeant Terry Jackson, RN Beneliza Balangcod,**

**and DOE Deputy Defendants 1-10]**

14    ~~45.~~52. Plaintiff realleges and incorporates by reference all paragraphs stated
15   above, as though fully set forth herein.

16    ~~46.~~53. When Tanya initially tried to remove the right eyeball while being
17   fingerprinted, Deputy Defendants intervened by jumping on top of her and
18   restraining her hands. (Plaintiff does not take issue with this use of force.)  As this
19   happened, Tanya was screaming and making delusional statements.  She even bit a
20   deputy that was trying to restrain her.  Deputy Defendants put Tanya on a gurney in
21   order to cut her nails.  They then placed her in a restraint chair and took her to get
22   medically evaluated.

23    ~~47.~~54. Deputy Defendants informed Defendant Balangcod of Tanya's self-
24   harming behavior.  According to the medical records, Defendant Balangcod was
25   advised that Tanya was bipolar and not currently on medication; and that she had
26   been using meth and was experiencing paranoid delusions.  According to the
27   medical records, Tanya continued to act delusional as she was being medically
28   evaluated.

14

~~THIRD~~SECOND AMENDED COMPLAINT                     20-CV-00456-
WQH-BGS

Formatted: No bullets or numbering

48.55. At this point, Defendant Balangcod knew that Tanya was 1) actively engaging in self-harming behavior by attempting to remove her eyeball, 2) actively suffering from meth-induced-psychosis, 3) actively experiencing commanding delusions, 4) and was suffering from untreated mental health conditions. And, having access to Tanya's intake chart, Defendant Balangcod also knew that Tanya was recently hospitalized on a 5150 for suicidal ideations. Defendant Balangcod also acknowledged that Tanya's acrylic nails had been cut by the deputies and were sharp and jagged.

49.56. San Diego Sheriff's Detention Policy (herein "Detention Policy") M4[3] defines a "suicide" as an "incident of self-harm." Detention Policy J.5. describes self-harm as "the act of deliberately causing destruction and/or damage to one's body." Therefore, Tanya's attempt to remove her eyeball is considered self-harming/suicidal behavior.

50.57. Detention Policy M9 requires the "RN nurse," which was Defendant Balangcod on the early morning hours of May 6, 2019, to identify and mark "inmates potentially at risk for self-harm wi[th] a pink wristband reading 'ISP.'"

51.58. According to Detention Policy MSD.S.10 ("Suicide Prevention Policy"), "The Gatekeeper is a Qualified Mental Health Provider (QMHP) or an assigned designee in their absence." "The assigned designee will be an assigned registered nurse for that shift at each facility." Based on this policy, and discovery responses, Defendant Balangcod was the Gatekeeper at Las Colinas on May 6, 2019.

///
///
///
///

---

[3] According to Plaintiff's research every Detention Policy relied on herein was operative on May 6, 2019.

15

THIRDSECOND AMENDED COMPLAINT          20-CV-00456-
WQH-BGS

52.59. As the gatekeeper, Defendant Balangcod was responsible for conducting a suicide risk assessment. According to MSD.S.10, when the gatekeeper identifies that an inmate is actively engaging in self-harming behavior the policy "requires further assessment by the gatekeeper for consideration of placement into ISP (Inmate Suicide Program) housing."

60.    Pursuant to MSD.S.10, other relevant risk factors to consider during a suicide evaluation include history of psychiatric illness, first time offender, intoxication/withdrawal, severe aggressiveness, and physical signs of depression. Tanya displayed each one of those risk factors.

53.    / / /

54.61. According to MSD.S.10, "All inmates requiring an assessment and consideration for placement into ISP housing due to suicidal risk shall be evaluated by the facility gatekeeper.  If the facility gatekeeper determines the inmate requires placement into the ISP, they shall determine the appropriate ISP housing (e.g. safety cell vs. EOH).  Actively self-harming or actively assaultive inmates shall be temporarily placed in a safety cell (refer to DSB P&P J.1). The watch commander shall be notified of placements into ISP."

55.62. According to MSD.S.10, the only housing options suitable for an inmate that is actively engaging self-harming behavior is a safety cell.  Moreover, based on information and belief, and based on national prevention protocols for correctional institutions, MSD.S.10 requires an inmate be restrained if they are actively engaging in self-harming behavior.  The correctional version of the suicide prevention policy, J.5, requires correctional deputies to monitor ISP inmates every fifteen minutes.

56.63. Notably, Plaintiff's correctional nursing expert will opine that Tanya— suffering from excited delirium—was experiencing a medical emergency and should have been rushed to the hospital and administered anti-psychotic medication.  Plaintiff's correctional nursing expert will opine that Defendant

THIRDSECOND AMENDED COMPLAINT                          20-CV-00456-
WQH-BGS

Balangcod should have ordered that Tanya receive 1:1 observation. The nursing expert will opine that the standard of care required Defendant Balangcod to order that Tanya be restrained while she was being housed and awaiting psychiatric intervention.

~~57.~~64. Here, none of that was done.  Despite knowing that Tanya was actively engaging in self-harming behavior, experiencing psychotic and commanding delusions, with untreated psychiatric disorders, it was Defendant Balangcod's responsibility to conduct a suicide risk assessment and to flag Tanya as a suicide/self-harm risk via a pink wristband.  As the gatekeeper, it was Defendant Balangcod 's duty to recognize and acknowledge that Tanya's attempt to remove her eyeball was a form of self-harm and that Tanya—currently experiencing commanding delusions—would continue to injure herself if unrestrained, unmonitored, and untreated. Upon recognition of Tanya's obvious intent to harm herself, it was Defendant Balangcod's responsibility to recommend ISP housing.

~~58.~~65.  According to MSD.S.10, as the gatekeeper, Defendant Balangcod should have known that policy required Tanya—an inmate "actively engaging in self-harm"—to be housed in a safety cell *with restraints*. Meaning, Defendant Balangcod made an intentional decision not to recommend safety housing with restraints.

~~59.~~66. According to a correctional expert, Defendant Balangcod should have acknowledged that Tanya was a high risk for self-harm because she was actively engaging in self-harming behavior, was experiencing psychotic delusions, and suffering from untreated mental health disorders.  According to a correctional expert, Defendant Keene should have known that placing Tanya in an isolated cell—unrestrained—with her nails cut to be even shaper—would assuredly result in Tanya attempting to gouge out her eyes—again.  The expert stated, "staff was given no reason to think Tanya wouldn't attempt to injure herself again."  According to a correctional expert, Defendant Balangcod was obligated to intervene by way of

1    assessment, housing, and immediate psychiatric evaluation.

2        60.67. According to San Diego Sheriff's Department Nursing Protocol 6.32

3    requires the "RN," in "every circumstance" of a self-harming incident, to complete

4    an application for a "72 hour Detention for Evaluation and Treatment," aka a 5150

5    hold. This was not done.

6        68.    Notably, the medical records do not indicate that an ISP evaluation

7    was conducted or that a referral for an ISP evaluation was scheduled.  The medical

8    records do not refer to Tanya's behavior as self-harming or suicidal behavior.  The

9    medical records do not indicate a psychiatric evaluation was scheduled.

10   61.    / / /                                              Formatted: No bullets or numbering

11       62.69. According to Nursing Protocol 6.32, Tanya should have also been

12   evaluated for PSU placement via a 5150 hold.  Notably, the PSU is an inpatient

13   psychiatric unit located inside Las Colinas.  Again, Defendant Balangcod's

14   recognition that Tanya was engaging in self-harming behavior should have resulted

15   in a 5150 evaluation.  PSU placement would have given Tanya the opportunity to

16   be constantly monitored and treated by psychiatric staff. The PSU has safety cells

17   for 5150 inmates that are actively engaging in self-harm.

18       63.70. Based on Defendant Balangcod's medical note, she did not flag Tanya

19   as a continued risk self-harm and did not communicate to Deputy Defendants that

20   Tanya was in need of suicide precautions, i.e., pursuant to MSD.S.10.

21       64.71. According to a correctional nursing expert, Defendant Balangcod

22   should have:

23           a. Ordered Tanya to be transported to an emergency room to be

24              evaluated by a psychiatrist and administered anti-psychotic

25              medication, such a Haldol;

26           b. Called a supervisor;

27           c. If she was the supervisor, acknowledged Tanya's conduct as self-

28              harming; and

                                        18

THIRDSECOND AMENDED COMPLAINT              20-CV-00456-
WQH-BGS

1            d.  Ordered Tanya to be placed in safety cell with restraints.

2   ///

3      72.    Deputy Defendants Jessica Castner, Natalie ~~Christ~~Crist, Cynthia

4 Randolph, Paola Rendon-Aguilera, and Andrea Villa were present when Tanya was

5 being booked and finger-printed.  Deputy Defendants knew that Tanya was acting

6 psychotic and responding to internal stimuli.  Deputy Defendants witnessed Tanya

7 attempt to gouge out her right eye.  Deputy Defendants tackled her and eventually

8 placed Tanya on a gurney with her hands restrained behind her back.  Tanya

9 continued to scream and kick while on the gurney.

10   ///

11     ///

12     ~~65.~~73.~~Deputy Defendants then performed a medical procedure by cutting~~

13 ~~Tanya's acrylic fingernails and leaving them sharper than before.  Against policy,~~

14 ~~Deputy Defendants then put Tanya in a restraint chair and escorted Tanya to the RN~~

15 ~~on duty,~~ Defendant Balangcod arrived on scene and evaluated Tanya, for PSA

16 assessment.  Deputy Defendants were present when Tanya was "assessed" by

17 Defendant Balangcod.

18     74.    Watch Commander Wilson and Sergeant Jackson were present during

19 the incident,

20     75.    During Defendant Balangcod's medical evaluation, Deputy Crist

21 briefed Defendant Supervisors Wilson and Jackson. Specifically, Deputy Crist told

22 the Supervisors, "**I explained Suarez had just finished her fingerprints when she**

23 **attempted to gouge out her eyes using her fingernails. I explained Suarez bit**

24 **Deputy Chavez while we were trying to restrain her.  *I suggested to the***

25 ***supervisors on scene the option of utilizing the Prostraint chair to prevent Suarez***

26 ***further harming herself or possibly having to use force to stop her again in the***

27 ***future.***"[4]

28   [4] Use of the Prostraint chair requires Supervisor approval.

Formatted: No bullets or numbering

Formatted: Font color: Black

Formatted: Not Highlight

Formatted: Not Highlight

Formatted: Not Highlight

Formatted: Font: 14 pt

76.    Defendant Watch Commander Wilson and Defendant Sergeant Jackson denied the request. Defendant Supervisors "explained to [Deputy Crist] due to Suarez being calm and not actively trying to harm herself that the Prostraint chair would not be utilized at this time."

77.    After Defendant Balangcod evaluated Tanya, she determined Tanya needed to be housed in a safety cell. Deputy Defendants Jessica Castner, Natalie Crist, Cynthia Randolph, Paola Rendon-Aguilera, Andrea Villa, and Supervisors Wilson and Jackson, escorted Tanya to the safety cell area.

78.    Prior to entering the safety cell, "due to Suarez' unpredictable behavior and being under the influence of a controlled substance," Deputy Defendants removed Tanya's clothes leaving her completely naked.

79.    As Deputy Defendants were in the process of removing Tanya's clothes, Deputy Natalie Crist turned around and asked Defendant Watch Commander Wilson and Defendant Sergeant Jackson for permission to cut Tanya's fingernails fearing she might harm herself again. Defendant Wilson and Jackson agreed.

66.80.Deputy Defendants then performed a medical procedure by cutting Tanya's acrylic fingernails and leaving them sharper than before. Deputy Defendants knew that policy required Defendant Balangcod to place Tanya on the ISP plan.  However, being given no ISP guidance by Defendant Balangcod regarding restraints or additional precautions, in violation of policy, DOE Deputy Defendants removed the handcuffs and removed Tanya's clothes.

67.81.To make matters worse, Deputy Defendants placed Tanya in the safety cell without restraints knowing her nails were now sharp and jagged. According to a correctional expert, deputies should not perform medical procedures such as cutting fingernails.  The expert also stated that Deputy Defendants had no reason to think Tanya would not re-injure herself if left unrestrained.

82.    Immediately after, Deputy Defendants notified their supervisor, Watch

THIRDSECOND AMENDED COMPLAINT                    20-CV-00456-WQH-BGS

20

Commander Wilson, of all events alleged above. Specifically, Commander Wilson knew Tanya had attempted to gouge out her eye. Commander Wilson also knew that Tanya was being housed in the safety cell naked, unrestrained and without a pending psychiatric evaluation or 5150 placement. Commander Wilson knew heris subordinates (Deputy Defendants) removed Tanya's handcuffs, without a medical directive, and left her nails jagged and sharp. Commander Wilson knew the actions taken by Deputy Defendants were an unreasonable departure from the county's own policy and the nationally accepted standards set forth in Title 15. Knowing that Tanya needed to be restrained given her psychotic state and active attempts to self-harm, Commander Wilson disregarded the obvious consequence of his subordinates' actions, and by rejecting the suggestions to use the Prostraint chair, and went even further to ratify heris subordinates' unconstitutional conduct by permitting their actions and by failing to intervene prior to Tanya's total blindness.

68.   ///

69.83. Approximately 14 minutes after Tanya was left in the cell naked and unrestrained, at 5:04 a.m., Defendant Deputy Rocio Espinoza approached the window of the safety cell and started recording Tanya using her personal cell phonea camera. As Defendant Espinoza was filming Tanya—who was naked and acting erratic— Tanya again gestured to gouge out her eyes by putting her fingers near her eyes and making taunting movements. Defendant Espinoza continued to film Tanya for over a minute. Defendant Espinoza never once directed Tanya to stop or intervened in a more substantial way such as kicking the door, advising Tanya to stop, handcuffing Tanya or having her evaluated by a psychiatrist. After a minute or so, Defendant Espinoza stopped recording and walked away. Deputy Espinoza was callous and sadistic. She privately recorded Tanya, who was naked and threatening/gesturing to inflict more self-harm, for over a minute and never once attempted to prevent Tanya from injuring herself.

84.   Six minutes later, at 5:10 a.m., Defendant Deputy Castner, was

THIRDSECOND AMENDED COMPLAINT          20-CV-00456-
WQH-BGS

**Formatted:** No bullets or numbering

1   conducting a cell check and noticed Tanya was struggling. It took Defendant
2   Castner only two or three seconds to determine that Tanya was again attempting to
3   remove her eyeball. The video indicates, that Defendant Castner continued to watch
4   for at least ten seconds without directing Tanya to stop or intervening by kicking
5   the door or going inside.  Similarly, according to Defendant Castner's report,
6   Deputy Castner admitted that she watched Tanya try to remove her right eyeball for
7   at least 10 seconds. She then witnessed the right eyeball fall to the floor and still
8   failed to intervene by banging on the door or going inside the cell.

9       85.    The surveillance video shows Defendant Watch Commander Wilson
10   standing approximately 2 feet away from Tanya's safety cell. Defendant Castner
11   turned to Defendant Wilson and informed her that Tanya's right eyeball just fell
12   out. Defendant Wilson instructed Defendant Castner to "**get the prostraint chair.**"

13       86.    Despite being the top official in charge, and despite knowing Tanya
14   had just ripped out one eyeball and was going for the other one, as she could still be
15   heard screaming and thrashing about, Defendant Wilson did nothing to help Tanya.
16   Surveillance footage shows Deputy Wilson never so much as approached the safety
17   cell door despite knowing Tanya was going for her second eyeball. Footage shows
18   Defendant Wilson failed to order other deputies to intervene and failed to intervene
19   herself. Instead, footage depicts Defendant Wilson walking to the back of the
20   hallway as Tanya was removing her second eyeball. Notably, this is the same
21   supervisor that denied use of the Prostraint chair prior to Tanya's safety cell
22   placement.

23       87.    **During the next two minutes, Tanya managed to remove her**
24   **second eyeball. Not a single deputy tried to intervene nor did any defendant**
25   **even approach the safety cell door during that period.**

26       88.    Importantly, had Defendant Castner or Wilson intervened when she
27   initially saw the right eyeball fall to the floor, Tanya would have been prevented
28   from removing the left eyeball!

22

THIRD~~SECOND~~ AMENDED COMPLAINT                    20-CV-00456-
WQH-BGS

Formatted: No underline

1   89.   The video indicates that the extraction of the left eyeball took over a

2   minute.

3   ~~70.   Six minutes later, at 5:10 a.m. Defendant Deputy Castner, was~~

4   ~~conducting a cell check and noticed Tanya was struggling. It took Defendant~~

5   ~~Castner only two or three seconds to determine that Tanya was again attempting to~~

6   ~~remove her eyeball. The video indicates, that Defendant Castner continued to watch~~

7   ~~for at least ten seconds without directing Tanya to stop or intervening by kicking~~

8   ~~the door or going inside.  According to Defendant Castner's report, after observing~~

9   ~~Tanya, she witnessed Tanya's right eyeball fall to the floor.~~

10  ~~/ / /~~

11  ~~71.   **Defendant Castner did not attempt to bang on the door or stop**~~

12  ~~**Tanya!** Instead, Defendant Castner turned around and casually walked down the~~

13  ~~hall, off camera. Defendant Castner displayed zero sense of urgency.~~ ~~**Deputies did**~~

14  ~~**not return to the cell until nearly two minutes later at which point Tanya had**~~

15  ~~**removed her left eyeball!**~~

16  ~~72.   Importantly, had Defendant Castner intervened when she initially saw~~

17  ~~the right eyeball fall to the floor, Tanya would have been prevented from removing~~

18  ~~the left eyeball!~~

19  ~~73.   The video indicates that the extraction of the left eyeball took over a~~

20  ~~minute.~~

21  90.   After it was determined that both eyeballs had been removed, it took

22  another five to ten minutes for deputies to enter the cell as they waited for

23  hazardous suits to arrive.  Jail staff contacted 911 and Tanya was rushed to the

24  hospital.

25  / / /

26  / / /

27  / / /

28  / / /

                                    23

THIRD~~SECOND~~ AMENDED COMPLAINT                    20-CV-00456-
WQH-BGS

1  ///
2  ///
3  ///
4  ~~74.~~  ///

Formatted: No bullets or numbering

5      91.    Importantly, the liability of Supervisor Jackson and Wilson is
6  reflected in an IA investigation that followed Tanya's injuries. Discovery
7  revealed that Supervisor Jackson and Wilson removed from Deputy Crist's
8  incident report the reference to utilizing the Prostraint chair to prevent Tanya
9  from further injuring herself prior to placement in the safety cell. Charges
10  were sustained against Supervisor Jackson. Superior Wilson admitted to an
11  investigator that she directed Supervisor Jackson to remove the reference to
12  utilization of the Prostraint chair because she did not want to get in further
13  trouble because she was on probation at the time.

14      ~~75.~~92. A reasonable nurse, deputy, and supervisor, in Defendants' position
15  would have appreciated the risk of harm that Tanya was presenting.  At a minimum,
16  a reasonable deputy or nurse would have kept Tanya restrained until she was
17  evaluated by a psychiatrist, or involuntarily medicated.  A reasonable deputy or
18  nurse would not have left Tanya in a cell <u>unrestrained</u> without constant monitoring.
19  A reasonable deputy or nurse would have followed policy. Notably, the county has
20  a policy that requires each safety cell to have a video surveillance system.  A
21  deputy is tasked with observing the surveillance of inmates housed in the safety
22  cells in order to prevent inmates from injuring themselves.  Knowing that Tanya
23  had just attempted to remove her right eye, a reasonable deputy working in the
24  surveillance bubble would not have ignored Tanya's self-harming behavior for over
25  five minutes.

26      ~~76.~~93. As a result of Defendants' callous and indifferent behavior, Tanya is
27  now permanently blind.  But <u>the very last vision</u> she constantly relives in her mind
28  is of Defendant Espinoza recording this horrific scene. Defendant Espinoza took

<u>THIRD</u>~~SECOND~~ AMENDED COMPLAINT                    20-CV-00456-
WQH-BGS

1  joy in recording the worst moment of Tanya's life.

2      ~~77.~~94. Before her arrest, even as a 23-year-old, Tanya was known to sleep

3  with the lights on because she was afraid of the dark.  Now, she lives in complete

4  darkness.  She can no longer do simple day-to-day tasks. She cannot drive.  She

5  cannot put on makeup.  She cannot make a cup of coffee.  She cannot cook.  She

6  cannot go shopping.  She cannot walk around outside, at least not yet.  Tanya

7  constantly walks into things as she roams around her *own* house.  She trips every

8  time she needs to walk up or down the stairs.  She spills food every time she tries to

9  eat.  She fights off the feeling of depression every week.  She feels anxious about

10  the burden she has created for her family, who must do nearly everything for her.

11  Most of all, she is fearful of being alone and incapable of living without support.

12      ~~78.~~95. The list goes on.  But, so does Tanya.  Despite this horrific incident,

13  Tanya is optimistic that her life will not end in tragedy.  Tanya wants to use this

14  experience – and her psychology degree – to help others who suffer from mental

15  illness and drug abuse.

16      ~~79.~~96. Due to her permanent blindness and emotional trauma, Tanya is

17  entitled to money damages pursuant to 42 U.S.C. section 1983 to compensate her

18  for her injuries and for the violation of her constitutional and civil rights.

19      ~~80.~~97. In addition to compensatory, economic, consequential, and special

20  damages, Plaintiff is entitled to punitive damages against each Defendant under 42

21  U.S.C. section 1983, in that the actions of each were done intentionally and with the

22  intent to violate Plaintiff's right, or was done with a reckless disregard or wanton

23  disregard for Tanya's constitutional rights.

24  ///

25  ///

26  ///

27  ///

28

THIRD~~SECOND~~ AMENDED COMPLAINT                    20-CV-00456-
WQH-BGS

**SECOND CAUSE OF ACTION**

**42 U.S.C. Section 1983 – 14th Amendment**

**Inadequate Suicide Prevention / Self-Harm Policy and Training Program**

**[By Tanya Suarez Against the County of San Diego]**

81.98. Plaintiff realleges and incorporates by reference all paragraphs stated above, as though fully set forth herein.

82.99. Tanya's preventable blindness is one of many tragic stories.  In fact, the county's suicide and self-harming rates are the highest in the state of California. According to the UT Tribune, "San Diego County's overall mortality rate over the past decade is the highest among California's six largest jail systems, according to data those departments are required to report to the state Department of Justice." The county's suicide and self-harming rate has been a hot topic recently.  In 2017, the Grand Jury found the county's prevention and training program was inadequate.[5]  In 2019, the Disability Rights Center published a report that found the county was failing to provide constitutionally adequate programs and training as it pertains to mental illness and preventable injuries/deaths.[6]

83.100.      Within the last ten years the county has been hit with nearly 20 million dollars in verdicts and settlements for cases alleging preventable deaths and injuries.  As of date, San Diego County is defending itself in at least a dozen other state and federal lawsuits brought by inmates and family members of those who suffered from obvious and preventable injuries or death.

84.101.      The inadequate provisions identified by the Grand Jury include shortcomings pertaining to the intake screening, the interplay of self-harming conduct with mental health issues, and overall training in regards to deputies

_____

[5] Attached hereto as Exhibit 1 is a true and correct copy of the Grand Jury's findings as it pertains to suicide and self-harming injuries.  Plaintiff incorporates this report by reference.

[6] Attached hereto as Exhibit 2 is a true and correct copy of the Disability Rights California report as it pertains to mental illness and suicide and self-harming injuries. Plaintiff incorporates this report by reference.

THIRDSECOND AMENDED COMPLAINT                    20-CV-00456-WQH-BGS

preventing known inmates from inflicting self-harm in the future. These are the same contentions Tanya alleges were the moving force in her sustaining her resulting injuries.

85.102.    According to the UT Tribune, in a publication entitled *Rate of jail inmate deaths in San Diego County far exceeds other large California counties*,[7] dated September 20, 2019, "Despite years of controversy over departmental lapses and repeated promises of reform, deaths this year include: a young man who repeatedly threatened to commit suicide and had access to a plastic bag to suffocate himself after being found earlier in the day with a noose in his cell; a 34-year-old with a serious heart condition who was given cough syrup instead of his prescription medication when he told staff he was having trouble breathing; a young veteran who struggled with opiate and methamphetamine addiction after his hand was blown off in Afghanistan. He died with withdrawal symptoms less than an hour after being returned to his cell from the infirmary."

86.103.    There is more.

87.104.    The UT reported, "Ivan Ortiz managed to suffocate himself on March 18 while housed in the jail's psychiatric observation unit, its highest level of care for mentally ill inmates." … "According to his autopsy report, Ortiz tried unsuccessfully to hang himself that morning and told jail staff he 'felt like ending his life.'" That afternoon, according to surveillance video, he climbed under a sheet and put a plastic bag over his head and died. Nearly an hour passed before deputies checked on him."

88.105.    In July 2018, Manuel Gomez Cruz, 36, choked himself to death in the jail's enhanced observation housing unit, which was created in 2015 to protect suicidal inmates.

89.106.    Though the county was on notice that it needed to address its

[7] Attached hereto as Exhibit 3 is a true and correct copy of the publication entitled "Rate of jail inmate deaths in San Diego County far exceeds other large California counties." Plaintiff incorporates this article by reference.

THIRDSECOND AMENDED COMPLAINT          20-CV-00456-
WQH-BGS

1    suicide / self-harm program and training, according to the UT Tribune, "To date the

2    Sheriff's Department has not remedied the problems," the Grand Jury's report

3    notes.  "The explanation provided to this Grand Jury was that [recommendations

4    were] placed on hold due to the cost and a delay in renovation of Rock Mountain,

5    which is expected to replace (South Bay Detention Facility)."

6        ~~90.~~107.    The injuries and deaths that predated Tanya's and led to the

7    findings by the Grand Jury and the DRC were just as preventable and egregious as

8    Tanya's preventable blindness.

9        ~~91.~~108.    One of those instances involved 27 year-old, Jose Sierra.  Mr.

10    Sierra was a mentally ill Mexican citizen who had been arrested for being under the

11    influence of a controlled substance.  According to *CityBeat*, a summary of the

12    incident in the CLERB's June agenda stated, during a security check Deputies 1

13    and 2 discovered Sierra hanging from a bed-sheet in his single occupancy locked

14    cell … During the previous security check, Deputies 1 and 2 observed and

15    unauthorized laundry line affixed to the top bunk in Sierra's cell, and failed to take

16    corrective action per Sheriff's Polices & Procedures.  Deputies 1 and 2 failed to

17    remove the unauthorized laundry line or confront Sierra to direct its removal,

18    actions which may have prevented Sierra from carrying out the suicide at that time.

19    (Attached hereto as Exhibit 4.)

20        ~~92.~~109.    Another instance involved a mentally ill inmate, Anna Wade.  In

21    this particular case, the CLERB found that the deputy violated policy and procedure

22    by logging a security check that did not actually happen.  According to *CityBeat*, a

23    summary of the incident in the CLERB's October agenda stated, "Checks are

24    supposed to happen hourly, but two hours passed between when Wade was last

25    seen alive and when she was found hanging in her cell on April 28, 2013."[8]

26        ~~93.~~110.    According to an October 2013 publication, "*10 More Dead*

27

28    [8] Attached hereto as Exhibit 5 is a true and correct copy of the publication entitled "10 More Dead Inmates."  Plaintiff incorporates this article by reference.

~~THIRD~~SECOND AMENDED COMPLAINT        20-CV-00456-WQH-BGS

1  *Inmates,"* in *CityBeat*, another inmate, Robert Lubsen, displayed suicidal ideations

2  – known and ignored by county staff – prior to committing suicide on February 7,

3  2013.  In that case, Mr. Lubsen was arrested by San Marcos campus police for a

4  drug related crime.  While he was being detained in the campus holding cell, Mr.

5  Lubsen attempted to commit suicide by trying to hang himself with his shoelaces.

6  The attempt was witnessed and stopped by campus police.  Mr. Lubsen was

7  transferred the next day to VDF.  During intake it was noted that Mr. Lubsen had

8  ligature marks around his neck.  In addition to the ligature mark, VDF "received a

9  tip that Robert Lubsen was a risk to himself.  Despite the prior attempted suicide

10  and Robert Lubsen's history with substance abuse.  The San Diego County Sheriffs

11  determined the tip was not credible." (Attached hereto as Exhibit 5.)

12      94.111.      Further, according to a December 2014 publication, *"San Diego*

13  *County Sets a Dubious Record for Jail Deaths,"* in CityBeat, "Hector Lleras, 36,

14  the fifth suicide of the year, twice told jail staff – first a nurse, then a deputy – that

15  he was going to kill himself.  On July 1, he was put in a safety cell and then

16  released 24 hours later.  Almost exactly 24 hours after that, he was found hanging

17  in his Central Jail cell."[9]

18      95.112.      According to that same article, in 2014, another inmate,

19  ~~Christ~~Cristopher Carroll, was a mentally ill homeless man who was placed in

20  administrative segregation because he was unable to get along with other inmates.

21  Mr. Carroll had scrawled a suicide note on his cell walls using his blood.  Prior to

22  hanging himself on the floor and stuck food and feces to the ceiling

23  of his cell. Carroll was never transferred out of his Ad-seg call.

24      96.113.      Jonathan Thomas was a paranoid schizophrenic whom was

25  transferred from Atascadero State Hospital to Central Jail.  Central Jail had

26  knowledge that Mr. Thomas had attempted suicide multiple times at Atascadero.

27  ───────────
[9] Attached hereto as Exhibit 6 is a true and correct copy of the publication entitled

28  "San Diego Sets a Dubious Record for Jail Deaths."  Plaintiff incorporates this
article by reference.                                    29

~~THIRD~~SECOND AMENDED COMPLAINT                    20-CV-00456-
WQH-BGS

1  Central also knew Mr. Thomas had previously jumped twice from the second tier

2  while in custody in County Jail.  In 2014, upon a routine commitment hearing,

3  despite knowing about Mr. Thomas' previous suicide attempts, mental conditions,

4  and transfer status, Central housed Mr. Thomas on a second tier cell.  Days later

5  Mr. Thomas jumped from the second tier sustaining severe injuries.

6      97.114.    In February 2014, Kristopher NeSmith hung himself in his

7  general population cell.  NeSmith displayed classic triggers of active suicidal

8  ideations; such as, previous suicide attempts while in custody, severe mental and

9  personality disorders, repeated family warnings of suicidal ideations, recorded

10  admissions of a desire to kill himself, and a change in his medication prescriptions.

11  Hours before he hung himself, a deputy saw a noose hanging from NeSmith's light

12  fixture.  Instead of taking any proactive measures, the deputy said, "NeSmith, what

13  are you trying to do?  Kill yourself?  Take that thing down!"  Nesmith was found

14  dead hours later.

15      98.115.    Jason Nishimoto had never had a run-in with the law.  However,

16  Jason was a known paranoid schizophrenic.  Jason attempted to overdose on

17  prescription pain pills but his brother intervened.  As he had done in the past, his

18  brother called the authorities to have them take Jason in for evaluation.  Jason, and

19  his family, informed the sheriffs Jason was trying to kill him.  Instead, Jason was

20  arrested and taken to VDF.  Jason's mother spoke to a psychiatric nurse the

21  following day and informed her Jason was schizophrenic and suicidal.  The nurse

22  said, "don't worry mom, we'll take care of him."  Jason was then housed in ad-seg.

23  After three days of seclusion, being un-medicated, and having gone unevaluated by

24  a psychiatrist, Jason hung himself.

25      99.116.    In May of 2016, Heron Moriarty admitted to Central jail staff

26  that he was feeling suicidal.  Central rejected Moriarty because it did not have an

27  available safety cell.  Moriarty was transferred to VDF for the specifically to be

28  housed in a safety cell.  However, when Moriarty arrived he was treated and

THIRDSECOND AMENDED COMPLAINT              20-CV-00456-
WQH-BGS

1  processed like a typical inmate.  Over the days, Moriarty was acting manic and

2  psychotic.  A psychiatric provider recommended Moriarty be placed in a safety cell.

3  The sergeant on duty rejected the recommendation and said, "No, it's my Friday."

4      ~~100.~~117.    Lastly, Pursuant to Federal Rule of Evidence 201 *Judicial*

5  *Notice of Adjudicative Facts* and Rule 32.1 *Citing Judicial Dispositions*, Plaintiff

6  requests this Court take judicial notice of a recent September 12, 2016, Order

7  written by Judge Sammartino in *NeSmith v. County of San Diego,* in which the

8  court found ample evidence to establish a pre-existing pattern of similar violations.

9  In pertinent part, the Order states, Plaintiffs' Second Amended Complaint describes

10  a number of previous suicides and events leading up to them in San Diego County

11  jails so as to establish a pre-existing pattern that put the county on notice it's

12  policies and training were inadequate and in need of modification.[10]

13      ~~101.~~118.    Given the well-established, and long-lasting, pattern of apathy

14  towards suicidal and self-harming inmates, and the countless publicized preventable

15  injuries and deaths, the county continues to be deliberately indifferent by permitting

16  non-mental health providers (such as registered nurses) to perform the "gatekeeper"

17  function.  RNs are not qualified or equipped to perform a mental health and suicide

18  risk assessments.  This is especially so at Las Colinas, where the PSU is on site.

19  Based on information and belief, the county does not provide RNs with specialized

20  training regarding suicide assessments.

21      ~~102.~~119.    As detailed in the above paragraphs, the county is liable for

22  Tanya's blindness and trauma because it was on notice via a pre-existing – and

23  highly publicized – pattern of similar constitutional violations due to the county's

24  inadequate suicide and self-harm prevention policies and training programs.

25  Notwithstanding the litany of media publications, the millions paid in litigation, the

26  Grand Jury's findings and the report from Disability Rights California, the sheer

27  _____

28  [10] Attached hereto as Exhibit 7 is a true and correct copy the Court's Order.
   Plaintiff incorporates this article by reference.

~~THIRD~~ ~~SECOND~~ AMENDED COMPLAINT                    20-CV-00456-
WQH-BGS

1   number of obvious and preventable injuries occurring in county jails across San
2   Diego, alone, imputes knowledge on the county that its inadequate policies and
3   training were the moving force behind these preventable deaths and injuries; and,
4   therefore required modification.

5   ~~103.~~120.   As a result of the county's objective indifference, Tanya had to
6   endure the pain and suffering of removing both of her eyeballs, she continues to
7   endure living a life in total blindness, as well as the emotional and psychological
8   trauma of this horrific incident and the consequences it had medically and
9   psychologically.

10   ~~104.~~121.   Because the county was on notice that its self-harming policies
11   and training were constitutionally inadequate, yet failed to improve it, Plaintiff is
12   entitled to money damages pursuant to 42 U.S.C. section 1983 to compensate her
13   for her injuries and for the violation of her constitutional and civil rights.

14   ~~105.~~122.   In addition to compensatory, economic, consequential, and
15   special damages, Plaintiff is entitled to punitive damages against each Defendant
16   under 42 U.S.C. section 1983, in that the actions of each were done intentionally
17   and with the intent to violate Plaintiff's right, or was done with a reckless disregard
18   or wanton disregard for Tanya's constitutional rights.

19   ~~106.~~123.   Notably, "Municipal defendants may be liable under Section
20   1983 even in situations in which no individual officer is held liable for violating a
21   plaintiff's constitutional rights." *Fairley v. Luman*, 281 F.3d 913, 917 (9th Cir.
22   2002). The Ninth Circuit has previously acknowledged, constitutional deprivations
23   may occur "not . . . as a result of actions of the individual officers, but as a result of
24   the collective inaction" of the municipal defendant. *Fairley v. Luman*, 281 F.3d
25   913, 917 (9th Cir. 2002). "If a plaintiff establishes he suffered a constitutional
26   injury by the City, the fact that individual officers are exonerated is immaterial to
27   liability under § 1983, 'regardless of whether their exoneration is on the basis of
28   qualified immunity, because they were merely negligent, or for other failure of

THIRD~~SECOND~~ AMENDED COMPLAINT                    20-CV-00456-
WQH-BGS

1   proof.'"  *Id.* at 917; see *Horton v. City of Santa Maria*, 915 F.3d 592, 604 (9th Cir.

2   2019).

3   ~~107.~~124.   According to *Gibson v. County of Washoe*, 290 F.3d 1175, 1186

4   n.7 (9th Cir. 2002), "A municipality may be liable if an individual officer is

5   exonerated on the basis of the defense of qualified immunity, because even if an

6   officer is entitled to immunity a constitutional violation might still have occurred."

7   ~~108.~~125.   Similarly, *Horton v. City of Santa Maria, 915 F.3d 592, 604 (9th*

8   *Cir. 2019)*) held "The district court's grants of summary judgment as to the

9   individual officers [] were not appealable, and therefore cannot be assumed to be

10  correct. As a result, the district court could conclude that municipal constitutional

11  violations occurred involving the actions of officers" dismissed earlier in the case.

12                          **VI.**

13                  **THIRD CAUSE OF ACTION**

14                      **Negligence**

15  **[By Tanya Suarez Against All Defendants and DOE Deputy Defendants 1-10]**

16  ~~109.~~126.   Plaintiff realleges and incorporates by reference all paragraphs

17  stated above, as though fully set forth herein.

18  ~~110.~~127.   Defendants were charged with the duty to act in accordance with

19  the laws of state and the Constitution.  Each have a particularized duty to summon

20  adequate medical care when they are on notice that an inmate is in need of such

21  care.  They are charged to as a reasonable deputy or nurse in the same or similar

22  circumstances.

23  ~~111.~~128.   Deputy Defendants, Sergeant Jackson, and ~~and~~ Commander

24  Wilson were negligent because they were directly on notice that Tanya was under

25  the influence and experiencing paranoid-meth-induced-psychosis. They also knew

26  those delusions were influencing her to gouge her eyes out. Deputies, with the

27  approval of Supervisors Wilson and Jackson, jaggedly cut Tanya's nails. Deputy

28  Defendants placed Tanya is a safety cell, naked, unmonitored, and unrestrained.

THIRD~~SECOND~~ AMENDED COMPLAINT                    20-CV-00456-
WQH-BGS

1  ///

2  ~~112.~~129.     Deputy Defendants, Sergeant Jackson, and Commander Wilson

3  ~~Deputy Defendants and Commander Wilson~~ removed Tanya's handcuffs knowing

4  that there was no medical directive to do so. They also failed to restrain Tanya,

5  using other alternatives, despite knowing she was intent on gouging out her eyes.

6  ~~113.~~130.     Deputy Espinoza then watched and recorded Tanya as she

7  continued to act erratic and gestured/threatened to remove her right eyeball. Instead

8  of intervening, Defendant Espinoza privately recorded her.

9  ~~114.~~131.     Minutes later, Defendant Castner actually acknowledged Tanya

10  was removing her right eyeball yet did nothing! Then, once she saw the right eye

11  fall to the ground, instead of rushing inside the cell or banging on the door to get

12  Tanya's attention to prevent her from removing the left eyeball, Defendant Castner

13  casually walked away and did not return until the second eyeball was removed—

14  two minutes later.

15  132.   Despite directing Deputy Castner to retrieve the Prostraint chair,

16  Supervisor Wilson failed to prevent Tanya from removing the second eyeball

17  despite, or directing other deputies to intervene.

18  ~~115.~~133.     Defendants' conduct was done for the sole purpose of causing

19  severe harm, distress, injury, fear, and pain, or at the very least, was done in

20  reckless disregard of that probability.

21  ~~116.~~134.     As for Defendant Balangcod, based on the detailed allegations

22  alleged above, she was the gatekeeper and duty bound to perform a PSA evaluation

23  and duty bound to house Tanya in a safety cell with restraints.

24  ~~117.~~135.     As a result of these acts or inactions, Plaintiff suffered the

25  injuries and damages described above, entitling her to damages in an amount to be

26  proven at trial.

27  ~~118.~~136.     Pursuant to California Government Code Section 845.6, public

28  employees, and the public entity itself, are liable for Tanya's injuries because

THIRD~~SECOND~~ AMENDED COMPLAINT                    20-CV-00456-
WQH-BGS

1  Defendants knew Tanya was in need of immediate medical care yet not only denied

2  Tanya that care, but stood by and recorded Tanya's erratic and life-altering

3  behavior.

4  ///

5  ///

6  ///

7  137. In committing the acts alleged above, the individual Defendants acted

8  maliciously and/or were guilty of a wanton and reckless disregard for Tanya's

9  rights and feelings and by reason thereof she is entitled to exemplary and punitive

10 damages in an amount to be proven at trial.

11 ///

12 ///

13 119. ///

14                                VII.

15                    **FOURTH CAUSE OF ACTION**

16              **Intentional Infliction of Emotional Distress**

17  **[By Tanya Suarez Against Defendant Espinoza, and Defendant Castner,**

18        **Defendant Jackson, and Defendant Wilson]**

19  Plaintiff realleges and incorporates by reference all paragraphs stated above,

20                    as though fully set forth herein.

21  138. Plaintiff realleges and incorporates by reference all paragraphs stated

22  above, as though fully set forth herein.

23  120.139. Defendants were charged with the duty to act in accordance with

24  the laws of state and the Constitution. Each have a particularized duty to summon

25  adequate medical care when they are on notice that an inmate is in need of such

26  care. They are charged to as a reasonable deputy or nurse in the same or similar

27  circumstances.

28  121.140. As alleged above, Defendant Deputy Espinoza approached the

THIRDSECOND AMENDED COMPLAINT                20-CV-00456-
WQH-BGS

1    window of the safety cell and started recording Tanya using her personal cell

2    phone. As Defendant Espinoza was filming Tanya—who was underlined[naked] and acting

3    erratic— Tanya again gestured to gouge out her eyes by putting her fingers near her

4    eyes and making taunting movements. Defendant Espinoza continued to film Tanya

5    for over a minute. Defendant Espinoza never once directed Tanya to stop or

6    intervened in a more substantial way such as kicking the door, advising Tanya to

7    stop, handcuffing Tanya or having her evaluated by a psychiatrist. After a minute or

8    so, Defendant Espinoza stopped recording and walked away. Deputy Espinoza was

9    callous and sadistic. She privately recorded Tanya, who was underlined[naked] and

10   threatening/gesturing to inflict more self-harm, for over a minute and never once

11   attempted to prevent Tanya from injuring herself.

12   ~~/ / /~~

13        ~~122.~~141.    Six minutes later, at 5:10 a.m. Defendant Deputy Castner, was

14   conducting a cell check and noticed Tanya was struggling. It took Defendant

15   Castner only two or three seconds to determine that Tanya was again attempting to

16   remove her eyeball. The video indicates, that Defendant Castner continued to watch

17   for at least ten seconds without directing Tanya to stop or intervening by kicking

18   the door or going inside.  According to Defendant Castner's report, after observing

19   Tanya, she witnessed Tanya's right eyeball fall to the floor.

20        142.    **Defendant Castner did not attempt to bang on the door or stop**

21   **Tanya!**

22        143.    At this exact time, the surveillance video shows Defendant Watch

23   Commander Wilson standing approximately 2 feet away from Tanya's safety cell.

24   Defendant Castner turned to Defendant Wilson and informed her that Tanya's right

25   eyeball just fell out. Defendant Wilson instructed Defendant Castner to **"get the**

26   **Prostraint chair."**

27        144.    Despite being the top official in charge, and despite knowing Tanya

28   had just ripped out one eyeball and was going for the other one, as she could still be

THIRD~~SECOND~~ AMENDED COMPLAINT                    20-CV-00456-
WQH-BGS

1   heard screaming and thrashing about, Defendant Wilson did nothing to help Tanya.

2   Surveillance footage shows Deputy Wilson never so much as approached the safety

3   cell door despite knowing Tanya was going for her second eyeball. Footage shows

4   Defendant Wilson failed to order other deputies to intervene and failed to intervene

5   herself. Instead, footage depicts Defendant Wilson walking to the back of the

6   hallway as Tanya was removing her second eyeball. Notably, this is the same

7   supervisor that denied use of the Prostrain chair prior to Tanya's safety cell

8   placement.

9        145.   During the next two minutes, Tanya managed to remove her

10  second eyeball. Not a single deputy tried to intervene nor did any defendant

11  even approach the safety cell door during that period.

12       146.   Importantly, had Defendant Castner or Wilson intervened when she

13  initially saw the right eyeball fall to the floor, Tanya would have been prevented

14  from removing the left eyeball!

15       147.   Importantly, the liability of Supervisor Jackson and Wilson is

16  reflected in an IA investigation that followed Tanya's injuries. Discovery

17  revealed that Supervisor Jackson and Wilson removed from Deputy Crist's

18  incident report the reference to utilizing the Prostrain chair to prevent Tanya

19  from further injuring herself prior to placement in the safety cell. Charges

20  were sustained against Supervisor Jackson. Superior Wilson admitted to an

21  investigator that she directed Supervisor Jackson to remove the reference to

22  utilization of the Prostrain chair because she did not want to get in further

23  trouble because she was on probation at the time.

24       123.   Instead, Defendant Castner turned around and casually walked down

25  the hall off camera. Defendant Castner displayed zero sense of urgency. Deputies

26  did not return to the cell until nearly two minutes later at which point Tanya

27  had removed her left eyeball!

28       124.   Importantly, had Defendant Castner intervened when she initially saw

37

THIRDSECOND AMENDED COMPLAINT                    20-CV-00456-
WQH-BGS

1   the right eyeball fall to the floor, Tanya would have been prevented from removing

2   the left eyeball!

3       125.148.    As a result of these shocking and offensive actions, Plaintiff

4   suffered the injuries and damages described above, entitling her to damages in an

5   amount to be proven at trial.

6       126.149.    Pursuant to California Government Code Section 845.6, public

7   employees, and the public entity itself, are liable for Tanya's injuries because

8   Defendants knew Tanya was in need of immediate medical care yet not only denied

9   Tanya that care, but sadistically stood by and recorded Tanya as she made self-

10  harming gestures. Then, when Tanya was in the act of removing her right eye,

11  Deputy Castner and Watch Commander Wilson stood by and watchedknew but

12  failed to act reasonably. She then causally walked away instead of intervening to

13  prevent Tanya from attempting (and succeeding) at removing her left eye.

14      127.150.    In committing the acts alleged above, the individual Defendants

15  acted maliciously and/or were guilty of a wanton and reckless disregard for Tanya's

16  rights and feelings and by reason thereof she is entitled to exemplary and punitive

17  damages in an amount to be proven at trial.

18                              VIII.

19                   **FIFTH CAUSE OF ACTION**

20      **42 U.S.C. Section 1983 – 14th Amendment – Supervisory Defendant**

21      **[By Tanya Suarez Against Watch Commander Wilson and Sergeant Terry**

22                          **Jackson]**

23      151.   Plaintiff realleges and incorporates by reference all paragraphs stated

24  above, as though fully set forth herein.

25  / / /

26      152.   As detailed above, Defendant Jackson and Defendant Wilson both

27  knew that Tanya attempted to remove her eye ball at the finger printing station.

28  Both Supervisors were present when Deputy Defendants subdued Tanya. They

38

THIRDSECOND AMENDED COMPLAINT                    20-CV-00456-
WQH-BGS

---

Formatted: Font: Bold, Underline

Formatted: Left

Formatted: Left, Indent: Left: 0", First line: 0.5",
Numbered + Level: 1 + Numbering Style: 1, 2, 3, … + Start
at: 1 + Alignment: Left + Aligned at: 0.5" + Indent at:

were also present when Tanya was being evaluated by the Gatekeeper, Defendant Balangcod. Both Supervisors also knew that Tanya was to be housed in a safety cell because she presented a danger to herself.

153.   Furthermore, both supervisors were asked by Deputy Crist to place Tanya in the Prostraint chair to prevent her from inflicting additional self-harm. Unreasonably, both Supervisors denied that request "because Suarez was calm." Notably, at the exact moment Deputy Crist requested use of the Prostraint chair, Tanya was strapped to a gurney yelling and moving around. There was no reasonable expectation that Tanya would not injure herself again if given the opportunity.

154.   All of Deputy Defendants' unconstitutional conduct described above (cutting the nails, removing the handcuffs, failing to elevate the matter with a psychiatrist/hospital, failing to restrain Tanya while in the safety cell, and failing to intervene when Castner saw the first eyeball fall to the floor) was ratified by Supervisor Jackson and Wilson because each Supervisor was aware of the circumstances and failed to act reasonably. Additionally, each Supervisor failed to direct their subordinates to act reasonably.

155.   All of the conduct described herein was performed under the color of state law.

156.   The actions of Supervisor Jackson and Wilson's subordinates (Deputy Defendants) deprived Tanya of her particular rights under the Constitution.

157.   Furthermore, Supervisor Jackson and Wilson directed and ratified Deputy Defendants' conduct, and set in motion a series of acts by their subordinates that she should have reasonably should have known would cause the subordinates to deprive Tanya of her rights under the Constitution. Lastly, despite being fully informed of Tanya's intent to commit self-harm, Supervisors Jackson and Wilson knew Deputy Defendants were engaging in unconstitutional conduct yet failed to prevent Deputy Defendants' conduct.

39

THIRDSECOND AMENDED COMPLAINT                    20-CV-00456-
WQH-BGS

158.   Despite knowledge of Deputy Defendants' conduct, and Tanya's intent to harm herself, both Supervisors disregarded the known or obvious consequence of failing to prevent Tanya from inflicting more self-harm. In failing to remedy their subordinates conduct, Supervisor Jackson and Wilson engaged in conduct that showed a reckless or callous indifference to the depravation of Tanya's Constitutional rights.

159.   Importantly, the liability of Supervisor Jackson and Wilson is reflected in an IA investigation that followed Tanya's injuries. Discovery revealed that Supervisor Jackson and Wilson removed from Deputy Crist's incident report the reference to utilizing the Prostraint chair to prevent Tanya from further injuring herself prior to placement in the safety cell. Charges were sustained against Supervisor Jackson. Superior Wilson admitted to an investigator that she directed Supervisor Jackson to remove the reference to utilization of the Prostraint chair because she did not want to get in further trouble because she was on probation at the time.

160.   Finally, the Supervisors conduct was so closely related to the depravation of Tanya's rights as t be the moving force that caused the ultimate injury.

161.   As a result of the Supervisors' callous and indifferent behavior, Tanya is now permanently blind.

162.   Before her arrest, even as a 23-year-old, Tanya was known to sleep with the lights on because she was afraid of the dark.  Now, she lives in complete darkness.  She can no longer do simple day-to-day tasks. She cannot drive.  She cannot put on makeup.  She cannot make a cup of coffee.  She cannot cook.  She cannot go shopping.  She cannot walk around outside, at least not yet.  Tanya constantly walks into things as she roams around her *own* house.  She trips every time she needs to walk up or down the stairs.  She spills food every time she tries to eat.  She fights off the feeling of depression every week.  She feels anxious about

THIRD~~SECOND~~ AMENDED COMPLAINT                    20-CV-00456-
WQH-BGS

the burden she has created for her family, who must do nearly everything for her. Most of all, she is fearful of being alone and incapable of living without support.

163.   The list goes on.  But, so does Tanya.  Despite this horrific incident, Tanya is optimistic that her life will not end in tragedy.  Tanya wants to use this experience – and her psychology degree – to help others who suffer from mental illness and drug abuse.

164.   Due to her permanent blindness and emotional trauma, Tanya is entitled to money damages pursuant to 42 U.S.C. section 1983 to compensate her for her injuries and for the violation of her constitutional and civil rights.

165.   In addition to compensatory, economic, consequential, and special damages, Plaintiff is entitled to punitive damages against each Defendant under 42 U.S.C. section 1983, in that the actions of each were done intentionally and with the intent to violate Plaintiff's right, or was done with a reckless disregard or wanton disregard for Tanya's constitutional rights.

IX.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for judgement against Defendants, for each and every cause of action, as follows:

1.    For compensatory, general, and special damages against each defendant, jointly and severally, in an amount according to proof;

2.    For punitive and exemplary damages against each individually named defendant in their individual capacity in an amount appropriate to punish defendants and deter others from engaging in similar misconduct;

3.    For costs and reasonable attorney's fees pursuant to 42 U.S.C. section 1988 and as otherwise authorized by statute or law;

4.    For any further relief that the Court may deem appropriate.

IX.

**DEMAND FOR JURY TRIAL**

THIRD~~SECOND~~ AMENDED COMPLAINT                    20-CV-00456-WQH-BGS

1    Demand is hereby made by for a jury trial.

2                                    Respectfully submitted,

3                                    ~~MORRIS LAW FIRM, APC~~PHG Law
4    Group

5

6    Dated: July 8, 2022~~June 10, 2022~~        by:    *s/ Danielle R. Pena*
                                     Danielle R. Pena, Esq.
7                                    dpena@PHGLawGroup~~morrislawfirmape~~.co
                   m
8    ─────────────────────────────   ~~Christ~~Cristopher S. Morris
                                     ~~cmorris@morrislawfirmape.com~~
9                                    Attorneys for Plaintiff

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28
                                    42

## INDEX OF EXHIBITS TO COMPLAINT

| Exhibit | Description | Pages |
|---------|-------------|-------|
| 1 | San Diego County Grand Jury Report Examining the Issues of Suicides in San Diego County Jails | 33-44 |
| 2 | Pertinent Portions of the Disability Rights California Report on Suicides in San Diego County Jail | 44-53 |
| 3 | San Diego Union Tribune Article – Rate of Jail Inmate Deaths in San Diego County Far Exceeds Other Large California Counties | 54-78 |
| 4 | San Diego CityBeat Article – Law Enforcement Review Board Finds Deputy Error in Inmate Suicide | 79-83 |
| 5 | San Diego CityBeat Article – 10 More Dead Inmates | 84-93 |
| 6 | San Diego CityBeat Article – San Diego County Sets a Dubious Record for Jail Deaths | 94-104 |
| 7 | September 12, 2016, Order written by Judge Sammartino in *NeSmith v. County of San Diego* | 105-119 |

43

THIRD~~SECOND~~ AMENDED COMPLAINT                    20-CV-00456-
WQH-BGS

# EXHIBIT 4

# San Diego County Sheriff's Department
## Crime/Incident Report

| | |
|---|---|
| Case No. | **19122867** |
| CAD Event No.: **E5725685** | |
| | Case Disposition: **Active** |
| Primary Victim: **Chavez-Enriquez, Griselda** | Report No. **19122867.1** |

**1**
Page 1 of 7

## GENERAL CASE INFORMATION

**Primary Charge:** 69 - PC - OBSTRUCT/RESIST EXECUTIVE OFFICER WITH MINOR INJURY (F)

**Special Studies:** | **Related Cases:**

**Location, City, State, ZIP:**
451 Riverview Pkwy, Santee, CA 92071

**Occurred On:**
05/06/2019 04:39:00 (Monday)
(and Between):

**Jurisdiction:** DETENTION FACILITY - DETENTION FACILITIES | **Beat:** 024 | **Call Source:** DEPUTY

**Means:** | **Motives:**

## VICTIM/S

### Victim #1

**Person Code:** ☐ Secured Premise  ☐ Discovered Crime  ☐ Reporting Party  ☒ Law Enforcement Officer

**Name:** Chavez-Enriquez, Griselda | **Victim Type:** L - Law Enforcement Officer | **Interpreter Language:**

**ALIAS / AKA / NICKNAME / MONIKER:**

| Name Type: | First: | Middle: | Last: | Suffix: |
|---|---|---|---|---|

**Victim Of:** 69 - PC - OBSTRUCT/RESIST EXECUTIVE OFFICER WITH MINOR INJURY (F)
243 (B) - PC - BATTERY ON PEACE OFFICER/EMERGENCY PERSONNEL/ETC (M) | **County Residence:** R - Resident

**Home Address, City, State, ZIP:** 451 Riverview Parkway, Santee, CA 92071 | **Res. Country:** US | **Place of Birth:** United States of America (USA) | **Undocumented:**

| Race: H | Sex: F | Date of Birth / Age: 34 | Height: | Weight: | Hair Color: | Eye Color: | Facial Hair: | Complexion: |
|---|---|---|---|---|---|---|---|---|

**Employment Status:** E - Employed | **Occupation/Grade:** Deputy Sheriff | **Employer/School:** San Diego County Sheriff's Department | **Employer Address, City, State, ZIP:** 9621 Ridgehaven Court, San Diego, CA 92123

**CONTACT INFORMATION:**

**Type:** | **Number/Address:**

**IDENTIFICATION:**

| Type: | Number: | State: | Country: |
|---|---|---|---|

**Attire:** | **Injury:** M - Apparent Minor Injury | **Extent of Treatment:** 03 - Hospital | **Violent Crime Circumstances:**

**LAW ENFORCEMENT OFFICER KILLED OR ASSAULTED INFORMATION** | **Type:** N - No Death Involved | **Type Activity:** 06 - Handling, Transporting, Custody of Prisoners | **Type Assignment:** L - Other - Assisted

**VICTIM OFFENDER RELATIONSHIPS** | **Offender:** Suarez, Tanya | **Relationship:** RU - Relationship Unknown

## IBR/UCR OFFENSE/S

**Offense Description:** 69 - PC - OBSTRUCT/RESIST EXECUTIVE OFFICER WITH MINOR INJURY (F) | **Level:** F | **Against:** PE | **Completed?** Yes | **Counts** | **Using:**

**Location Type:** 13 - Highway/Road/Alley | **Hate/Bias:** 88 - None (no bias) (mutually exclusive) | **Domestic Violence:** No

**Criminal Activity:** | **Type Security:** | **Gang Related:** No | **Entry:** | **Point of Entry:**

**Weapons/Force:** 40 - Personal Weapons (Threats, Hands, Fists, Feet, etc.) | **Tools:** | **Targets:**

| Reporting Officer | Division / Organization | Reviewed By |
|---|---|---|
| SH3604 - CRIST, NATALIE | Las Colinas Detention and Re-Entry Facility | SH7077 - MENDEZ, MARILYN |
| Report Date 5/6/2019 6:14:56 AM | Detective Assigned | Reviewed Date 05/09/2019 02:45:04 |

NetRMS_CASDCR.rtf v11-15-06 | Printed By SH431 | Printed: May 10, 2019 - 2:37 PM

CSD-000062 (Suarez v. CSD 20cv00456)

# San Diego County Sheriff's Department
## Crime/Incident Report

| | | |
|---|---|---|
| | Case No. | **19122867** |
| CAD Event No.: **E5725685** | Case Disposition: | **Active** |
| Primary Victim: **Chavez-Enriquez, Griselda** | Report No. | **19122867.1** |

**2**
Page 2 of 7

| Offense Description: **243 (B) - PC - BATTERY ON PEACE OFFICER/EMERGENCY PERSONNEL/ETC (M)** | Level: **M** | Against: **PE** | Completed? **Yes** | Counts: | Using: |
|---|---|---|---|---|---|
| Location Type: **15 - Jail/Prison** | Hate/Bias: **88 - None (no bias) (mutually exclusive)** | | | Domestic Violence: **No** | |
| Criminal Activity: | Type Security: | Gang Related: **No** | Entry: | Point of Entry: | |
| Weapons/Force: **40 - Personal Weapons (Threats, Hands, Fists, Feet, etc.)** | Tools: | | Targets: | | |

### ARRESTEE/S

### SUSPECT/S (Not Yet Arrested)

**Suspect #1**



| Name: **Suarez, Tanya** | | County Residence: **R - Resident** | | Interpreter Language: |
|---|---|---|---|---|

### ALIAS / AKA / NICKNAME / MONIKER:

| Name Type: | First: | Middle: | Last: | Suffix: |
|---|---|---|---|---|
| Home Address, City, State, ZIP: **Transient** | | Res. Country: **US** | Place of Birth: **United States of America (USA)** | Undocumented: |

| Race: **H** | Sex: **F** | Date of Birth / Age: **12/21/1995 - 23** | Height: **5' 1"** | Weight: **127** | Hair Color: **BRO** | Eye Color: **BRO** | Facial Hair: **12 - None/Fuzz** | Complexion: **LBR - Light Brown** |
|---|---|---|---|---|---|---|---|---|
| Hair Style: **S - Straight** | Hair Length: **L - Shoulder** | | Build: **THI - Thin** | | Teeth: | | Suspected User: **Yes** | |
| Employment Status: **U - Unemployed** | Occupation/Grade: | | Employer/School: | | Employer Address, City, State, ZIP: | | | |

### CONTACT INFORMATION:

| Type: | | Number/Address: |
|---|---|---|

### IDENTIFICATION:

| Type: **JIM - JIMS Number** | Number: **400450650** | State: | Country: |
|---|---|---|---|
| Type: **CII - CII Number** | Number: **37195166** | State: | Country: |
| Type: **FBI - FBI No.** | Number: **A9014HPAD** | State: | Country: |
| Type: **DLN - Drivers License Number** | Number: **F7058880** | State: **CA** | Country: |

| Reporting Officer **SH3604 - CRIST, NATALIE** | Division / Organization **Las Colinas Detention and Re-Entry Facility** | Reviewed By **SH7077 - MENDEZ, MARILYN** |
|---|---|---|
| Report Date **5/6/2019 6:14:56 AM** | Detective Assigned | Reviewed Date **05/09/2019 02:45:04** |

| NetRMS_CASDCR.rtf v11-15-06 | Printed By SH431 | Printed: May 10, 2019 - 2:37 PM |
|---|---|---|

CSD-000063 (Suarez v. CSD 20cv00456)

## San Diego County Sheriff's Department
## Crime/Incident Report

| | | |
|---|---|---|
| | Case No. | **19122867** |
| CAD Event No.: **E5725685** | Case Disposition: | **Active** |
| Primary Victim: **Chavez-Enriquez, Griselda** | Report No. | **19122867.1** |

**3**
Page 3 of 7

| SCARS, MARKS, TATTOOS, ODDITIES: | |
|---|---|
| Attire: **Blue jeans, brown sweater** | Suspect Actions: **27 - Inflicted Injury,** |

**WITNESSES**

**OTHER ENTITIES**

**PROPERTY**

### Property Item #1.000 - Video Footage

| Derivative No.: **0** | Property Category: | 1311 - Recording - Interview or Case related - Video/Photo CD, DVD, Tape, Film, Digital storage, Negative | |
|---|---|---|---|
| Status: **ES - Evidence (Seized)** | | Count: **1** | Value: |
| Manufacturer: | | Model: | |
| Serial No.: | | Model Year: | OAN: |
| Color: | | Caliber: | |
| Body Style: | | Recovered/ Seized Date: **05/06/2019** | |
| Owner: | | Disposition: | |
| Evidence Tag: | | Alert(s): | |
| Drug Type: | | Drug Quantity: | |
| Search Warrant: | | | |
| Notes: | | | |

### Property Item #2.000 - Photographs

| Derivative No.: **0** | Property Category: | 1311 - Recording - Interview or Case related - Video/Photo CD, DVD, Tape, Film, Digital storage, Negative | |
|---|---|---|---|
| Status: **ES - Evidence (Seized)** | | Count: **1** | Value: |
| Manufacturer: | | Model: | |
| Serial No.: | | Model Year: | OAN: |
| Color: | | Caliber: | |
| Body Style: | | Recovered/ Seized Date: **05/06/2019** | |
| Owner: | | Disposition: | |
| Evidence Tag: | | Alert(s): | |
| Drug Type: | | Drug Quantity: | |
| Search Warrant: | | | |
| Notes: | | | |

**REPORT NARRATIVE**

**SYNOPSIS:**

On 05/06/2019, at approximately 0439 hours, Tanya Suarez BN 19728325 used both hands to scratch at her eyes in an attempt to harm herself. Deputy Castner #3815, Deputy Chavez #4078, and I attempted to stop Suarez by using our hands to grab Suarez' arms and pull them away from her face. Suarez resisted our attempt and was thrashing her body to stop us from pulling her hands away from her eyes. Suarez assaulted Deputy Chavez by biting her right forearm during the incident.  Deputy Chavez sustained a puncture wound and bruising to her right forearm. Deputy Chavez desires prosecution. Suarez was medically and psychologically evaluated and placed into a safety cell for the safety of herself and others.

Deputy Chavez was treated at Concentra Urgent Care for her injury sustained during the incident.

| Reporting Officer **SH3604 - CRIST, NATALIE** | Division / Organization **Las Colinas Detention and Re-Entry Facility** | Reviewed By **SH7077 - MENDEZ, MARILYN** |
|---|---|---|
| Report Date **5/6/2019 6:14:56 AM** | Detective Assigned | Reviewed Date **05/09/2019 02:45:04** |
| NetRMS_CASDCR.rtf v11-15-06 | Printed By SH4431 | Printed: May 10, 2019 - 2:37 PM |

CSD-000064 (Suarez v. CSD 20cv00456)



## San Diego County Sheriff's Department
## Crime/Incident Report

| | |
|---|---|
| | Case No. **19122867** |
| CAD Event No.: **E5725685** | Case Disposition: **Active** |
| Primary Victim: **Chavez-Enriquez, Griselda** | Report No. **19122867.1** |

**4**

Page 4 of 7

Suarez is in violation of 243(b) PC - BATTERY AGAINST POLICE OFFICER WITH MINOR INJURY (F), 69PC - OBSTRUCT/RESIST EXECUTIVE OFFICER WITH MINOR INJURY (F).

ORIGIN:

On 05/06/2019, I was assigned to the Search Deputy position at LCDRF. I was by the deputy station in Open Booking when I heard screaming coming from the fingerprint machine.

BACKGROUND INFORMATION:

Suarez was arrested by the San Diego Police Department on 05/06/2019 at approximately 0135 hours for 11550(A) HS - UNDER INFLUENCE CONTROLED SUBSTANCE.

INVESTIGATION:

I turned around to see inmate Tanya Suarez #19728325 sitting in the fingerprint chair, screaming, with her hands up to her face. I saw Deputies Castner and Chavez approaching Suarez and I realized Suarez was using her fingernails to scratch her eyes, in an attempt to harm herself. Deputy Castner grabbed Suarez' right arm with both hands (see Deputy's Report by Deputy Castner) and Deputy Chavez grabbed Suarez' left arm with both hands (See Deputy Chavez' Officers Report) and attempted to pull Suarez' arms away from her face. I grabbed Suarez' right arm with both hands and pulled it away from her face to stop her from harming herself. I also instructed her to, "Stop resisting!" Suarez refused. Suarez continued to use her fingernails to scratch at her eyes; she stood up and thrashed her body to stop me and my partners from restraining her. As Deputies Castner, Chavez and I were pulling Suarez' arms away from her face I saw Suarez turn and bite Deputy Chavez on the right forearm. Deputy Chapman called, "Cover Intake!" (deputies in need of assistance) via handheld radio. Deputy Randolph heard the screaming and came to assist us. Deputy Randolph grabbed Suarez and assisted in taking her to the floor (see Deputy's Report by Deputy Randolph). To prevent Suarez from continuing to assault Deputy Chavez, I used my right hand to grab Suarez' hair and pulled her head away from Deputy Chavez' arm. Suarez would not release her grip, so I pulled Suarez head and upper body towards the floor. Suarez landed on the floor in the fetal position near the fingerprint machine. Deputies Rendon and Villa arrived on scene to assist. Suarez was bucking her body off the floor and thrashing her arms. Lieutenant Wilson #0901, Sergeant Jackson #3378, Sergeant Traina #9159, Sergeant Faustino #5853 and Sergeant Moore #3876 arrived on scene. I instructed Suarez to roll over on her stomach and put her hands behind her back. Suarez refused. Deputy Castner, Deputy Rendon, Deputy Randolph and I pulled Suarez away from the fingerprint machine and rolled her onto her stomach to be able to safely secure Suarez in restraints. Once Suarez was in the prone position, Deputy Castner pulled Suarez' right arm from above her head and Deputy Rendon placed it in handcuffs. Deputy Randolph used both her hands to remove Suarez' left arm from under her body and place it behind her back. Deputy Rendon secured Suarez' left arm in handcuffs. Deputy Rendon placed a spit sock over Suarez' face to prevent her from spitting. Deputy Chavez secured Suarez in leg chains.

| Reporting Officer | Division / Organization | Reviewed By |
|---|---|---|
| **SH3604 - CRIST, NATALIE** | **Las Colinas Detention and Re-Entry Facility** | **SH7077 - MENDEZ, MARILYN** |
| Report Date | Detective Assigned | Reviewed Date |
| **5/6/2019 6:14:56 AM** | | **05/09/2019 02:45:04** |

| | | |
|---|---|---|
| NetRMS_CASDCR.rtf v11-15-06 | Printed By SH431 | Printed: May 10, 2019 - 2:37 PM |

CSD-000065 (Suarez v. CSD 20cv00456)



**San Diego County Sheriff's Department**
**Crime/Incident Report**

Case No. **19122867**

CAD Event No.:  **E5725685**                   Case Disposition: **Active**

Primary Victim: **Chavez-Enriquez, Griselda**     Report No.  **19122867.1**

**5**

Page 5 of 7

Once Suarez was completely secured in handcuffs and a waist chain, Deputy Randolph, Deputy Castner, Deputy Villa, Deputy Rendon and I lifted Suarez onto the medical gurney and secured the straps. Nurse Keene #6324 and Nurse Ghabra #6182 medically evaluated Suarez and took her vital signs. Nurse Keene informed us Suarez had bruising to her eyes but she was medically cleared to be housed accordingly. As I was standing by the medical evaluation, I briefed the supervisors on scene of the incident. I explained Suarez had just finished her fingerprints when she attempted to gouge her eyes out using her fingernails. I explained Suarez bit Deputy Chavez while we were trying to restrain her. I suggested to supervisors on scene the option of utilizing the Prostraint chair to prevent Suarez from further harming herself or possibly having to use force to stop her in the future. It was explained to me that due to Suarez being calm and not actively trying to harm herself that the Prostraint chair would not be utilized at that time.

The facility gate-keeper was called to evaluate Suarez due to her active self-harming behavior and intention to harm others. After Suarez was evaluated, Nurse Balangcod determined Suarez would benefit from the safer environment of the safety cell. Sergeant Jackson #3378 heard Suarez tell the nurse she would not attempt to harm herself and would follow staff instructions.

My partners and I wheeled Suarez into Intake Safety Cell #3. I was on Suarez' left upper body and I assisted my partners in lifting Suarez off of the gurney, onto the cell floor, in prone position. Suarez became anxious and repeatedly stated, "I deserve this… I deserve this…" I reassured Suarez she was going to be okay and Suarez would calm down when I spoke to her. Due to Suarez' unpredictable behavior and being under the influence of a controlled substance, it was determined for our safety, Suarez' clothes would need to be removed for her. Deputy Randolph and I removed Suarez sweater, shirt and bra utilizing safety scissors. Deputy Rendon removed Suarez' clothes from her lower body. Suarez fingers were twitching and her body would tense up and relax throughout the incident. To prevent Suarez from potentially harming herself again using her fingernails, I used safety clippers to remove her acrylic nails. Once all acrylic nails were removed, Deputy Rendon removed the leg chain from Suarez' ankles. Deputy Villa took over and maintained control of Suarez' legs. To safely remove the handcuffs, Deputy Rendon placed the Tactical Shield on Suarez' back to limit her range of motion and prevent her from getting up and possibly hurting myself or one of my partners again. I asked Suarez if she would comply with my instructions when I removed the handcuffs. Suarez agreed to comply. I removed the handcuffs from Suarez' right arm and Deputy Castner assisted Suarez in placing her right arm under her stomach. I removed the handcuffs from the left arm and Suarez placed her hand under her stomach. Deputy Stevens stepped into the safety cell with her TASER at the low ready. At no point was the TASER pointed at Suarez. Deputy Randolph removed the spit sock from Suarez' head and exited the cell along with Deputies Villa and Castner. Suarez was instructed not get up until the door was secured. Deputy Rendon removed the Tactical Shield from Suarez' back and exited the safety cell. Deputy Stevens instructed Suarez to remain on the floor and she exited the cell safely. The door was secured at approximately 0453 hours.

Deputy Espinoza #0003 took photographs of Suarez through the safety cell window. Deputy Espinoza also took photographs of Deputy Chavez' sustained injuries.

| Reporting Officer<br>**SH3604 - CRIST, NATALIE** | Division / Organization<br>**Las Colinas Detention and Re-Entry Facility** | Reviewed By<br>**SH7077 - MENDEZ, MARILYN** |
|---|---|---|
| Report Date<br>**5/6/2019 6:14:56 AM** | Detective Assigned | Reviewed Date<br>**05/09/2019 02:45:04** |

NetRMS_CASDCR.rtf v11-15-06          Printed By SH4431          Printed: May 10, 2019 - 2:37 PM

CSD-000066 (Suarez v. CSD 20cv00456)



## San Diego County Sheriff's Department
## Crime/Incident Report

| | | |
|---|---|---|
| | Case No. | **19122867** |
| CAD Event No.: **E5725685** | Case Disposition: | **Active** |
| Primary Victim: **Chavez-Enriquez, Griselda** | Report No. | **19122867.1** |

**6**

Page 6 of 7

STATEMENT:

Statement of Deputy Chavez (Victim):

See Deputy Chavez' Deputy's Report.

Deputy Chavez desires prosecution of this incident.

INVESTIGATION CONTINUED:

Deputy Chavez sustained a puncture wound and bruising to her right forearm as a result of the assault.

The surveillance footage of the assault and safety cell placement were copied onto a compact disk by Sergeant Moore #3876. Corporal Nanusevic #3081 secured the DVD and CD with photographs into evidence locker #25 in the LCDRF Evidence Room.

I was unable to obtain a statement from Suarez at this time.

EVIDENCE:

The following items were placed into evidence locker #25 in the LCDRF Evidence Room:

1.    Compact disc containing digital photographs
2.    Compact disc containing digital video

INJURIES:

Deputy Chavez sustained a puncture wound and bruising to her right forearm as a result of the assault. She was treated at Concentra Urgent Care.

PROPERTY DAMAGE:

None.

FOLLOW UP:

To be determined by the Detentions Investigation Unit.

| Reporting Officer | Division / Organization | Reviewed By |
|---|---|---|
| **SH3604 - CRIST, NATALIE** | **Las Colinas Detention and Re-Entry Facility** | **SH7077 - MENDEZ, MARILYN** |
| Report Date **5/6/2019 6:14:56 AM** | Detective Assigned | Reviewed Date **05/09/2019 02:45:04** |

NetRMS_CASDCR.rtf v11-15-08 | Printed By SH4431 | Printed: May 10, 2019 - 2:37 PM

CSD-000067 (Suarez v. CSD 20cv00456)



**San Diego County Sheriff's Department**
**Crime/Incident Report**

| | |
|---|---|
| | Case No.  **19122867** |
| CAD Event No.:  **E5725685** | Case Disposition:  **Active** |
| Primary Victim:  **Chavez-Enriquez, Griselda** | Report No.  **19122867.1** |

**7**
Page 7 of 7

RELATED REPORTS:

Deputy's Report by: Deputy Castner #3815
Deputy's Report by: Deputy Chavez #4078
Deputy's Report by: Deputy Rendon #5729
Deputy's Report by: Deputy Randolph #3918
Deputy's Report by: Deputy Villa #3336

| Reporting Officer **SH3604 - CRIST, NATALIE** | Division / Organization **Las Colinas Detention and Re-Entry Facility** | Reviewed By **SH7077 - MENDEZ, MARILYN** |
|---|---|---|
| Report Date **5/6/2019 6:14:56 AM** | Detective Assigned | Reviewed Date **05/09/2019 02:45:04** |

NetRMS_CASOCR.rif v11-16-08   Printed By SH4431   Printed: May 10, 2019 - 2:37 PM